# Notice of Removal

# EXHIBIT 1

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE SAN JUAN**

| | |
|---|---|
| ESTADO LIBRE ASOCIADO DE PUERTO RICO, por conducto de su Secretario de Justicia<br><br>**Demandante**<br><br>v.<br><br>EXXON MOBIL CORPORATION, BP P.L.C., CHEVRON CORPORATION, CHEVRON PHILLIPS CHEMICAL PUERTO RICO CORE, LLC, CONOCOPHILLIPS, SHELL PLC, STATIONS MANAGERS OF PUERTO RICO, INC., TOTALENERGIES, Y TOTALENERGIES MARKETING PR CORP.,<br><br>**Demandados** | CIVIL NÚM.:<br><br>SALA:<br><br>ASUNTO: DAÑOS Y PERJUICIOS Ley de Política Pública Ambiental y Estorbo Público (Ley Núm. 416-2004) y otras |

# DEMANDA

**ANTE EL HONORABLE TRIBUNAL:**

COMPARECE, el **ESTADO LIBRE ASOCIADO DE PUERTO RICO**, a través de los abogados que suscriben y, muy respetuosamente, presenta Demanda en contra los Demandados, Exxon Mobil Corporation, BP P.L.C., Chevron Corporation, Chevron Philips Chemical Puerto Rico Core, LLC, ConocoPhillips, Shell plc, Stations Managers of Puerto Rico, Inc., TotalEnergies, y TotalEnergies Marketing PR Corp., a tenor con lo siguiente:

## I. Las Partes

### Demandante

1. El Demandante es el **Estado Libre Asociado de Puerto Rico** (en adelante el ELA o Gobierno de Puerto Rico). El Gobierno tiene a su cargo, entre otras funciones, proteger la salud y el bienestar de sus ciudadanos, conservar los recursos naturales y ambientales de Puerto Rico y hacer cumplir y buscar la reparación por violaciones de las leyes de Puerto Rico.

2. El **Secretario de Justicia** está autorizado a interponer esta acción en su capacidad de *parens patriae*, ya que el Estado Libre Asociado de Puerto Rico tiene un interés cuasi soberano en la salud y el bienestar físico y económico de sus ciudadanos

que han sufrido y seguirán sufriendo debido a la conducta de los Demandados. El Estado Libre Asociado de Puerto Rico, como entidad legal, también ha sufrido daños y pérdidas como resultado directo e inmediato de la conducta de los Demandados. De conformidad con las leyes aplicables y la Constitución de Puerto Rico, el Departamento de Justicia presenta la reclamación de epígrafe, de conformidad con las alegaciones que se exponen más adelante.[1]

**Demandados**

3. El Demandado, **Exxon Mobil Corporation**, es una empresa que cotiza en bolsa constituida en Nueva Jersey y con sede en 22777 Springwoods Village Parkway, Spring, Texas, EE. UU. 77389. Exxon Mobil Corporation y sus predecesores, sucesores, matrices, subsidiarias, afiliadas y divisiones se denominan colectivamente en el presente documento como "Exxon". Exxon Mobil Corporation controla y ha controlado las decisiones de toda la empresa, incluidas las de sus subsidiarias, relacionadas con la cantidad y extensión de la producción y venta de combustibles fósiles, así como el *marketing*, el cambio climático y las emisiones de gases de efecto invernadero de sus productos de combustibles fósiles, y las estrategias de comunicación relativas al cambio climático y el vínculo entre el uso de combustibles fósiles y los impactos relacionados con el clima en el medio ambiente y los seres humanos. En todo momento relevante para este procedimiento, Exxon hizo y hace negocios en el Estado Libre Asociado de Puerto Rico. Una cantidad significativa de los productos de combustibles fósiles de Exxon son o han sido transportados, comercializados, distribuidos, promocionados, fabricados, vendidos y/o consumidos en Puerto Rico, de los que Exxon deriva y ha obtenido ingresos

[1] La Asamblea Legislativa ha otorgado al Estado Libre Asociado responsabilidad exclusiva o suprema en las siguientes áreas, entre otras, dentro de las fronteras de Puerto Rico: la prevención de inundaciones y conservación de playas (véase, 12 LPRA § 255A); la conservación de las aguas territoriales, terrenos sumergidos y zona marítima-terrestre (véase, Ley Orgánica del Departamento de Recursos Naturales y Ambientales, 3 LPRA § 155(h)); la protección y conservación de los arrecifes de coral (véase, 12 LPRA § 241); las aguas públicas y terrenos adyacentes a aguas públicas (véase, 12 LPRA §§ 521, 603, y 613); la protección de la vida silvestre y especies en peligro de extinción (véase, 12 LPRA § 107 y la Ley Orgánica del Departamento de Recursos Naturales y Ambientales, 3 LPRA § 155(i)); los parques nacionales, reservas y humedales de Puerto Rico (véase Leyes de Puerto Rico Tít. 12 cap. 40, 40A y Leyes de Puerto Rico Tít. 12 cap. 250-260); los puertos de Puerto Rico (véase Leyes de Puerto Rico Tít. 23, cap. 25); la infraestructura pública (véase Leyes de Puerto Rico Tít. 22 cap. 9, 11, 18, 21); las carreteras y autopistas (véase Leyes de Puerto Rico Tít. 9, cap. 1); la protección de zonas antiguas o históricas de Puerto Rico (véase Ley Núm. 374 de 14 de mayo de 1949 y 23 LPRA §§ 161-190uu); y las tierras en Puerto Rico que no pertenecen a ninguna persona (véase 1 LPRA § 3).

El Secretario de Justicia tiene autoridad exclusiva para solicitar compensación por daños y pérdidas con respecto a estas áreas. Las disposiciones legales que le conceden dicha autoridad exclusiva son, entre otros, los Artículos 9, 16, 19, y 42 de la Ley Núm. 416-2004. 12 LPRA § 8002c, 12 LPRA § 8002j, 12 LPRA § 8002m, y 12 LPRA 8004*l*.

sustanciales. Por ejemplo, en 2022, Exxon llegó a un acuerdo para convertir 177 gasolineras en Puerto Rico a la marca Mobil. A pesar del conocimiento de Exxon de que sus productos han causado y seguirán causando daños relacionados con la crisis climática en Puerto Rico, incluido el Demandante, Exxon no advirtió a los consumidores puertorriqueños sobre estos riesgos existentes. Exxon ha distribuido, comercializado, publicitado y promocionado maliciosamente sus productos en Puerto Rico, incluso en plataformas de redes sociales como Meta y a través de publicaciones de circulación nacional como *The New York Times, Time Magazine*, *The Washington Post* y *The Wall Street Journal.*

4. El Demandado, **BP P.L.C.**, es una empresa multinacional de energía y petroquímica, verticalmente integrada, registrada en Inglaterra y Gales, con su sede principal de negocios en 1 St. James' Square, Londres, Inglaterra, SW1Y 4PD. BP P.L.C. Es la empresa matriz de numerosas subsidiarias, denominadas colectivamente Grupo BP, que exploran y extraen petróleo y gas en todo el mundo; refinan el petróleo para convertirlo en productos de combustibles fósiles como la gasolina; y comercializan y venden petróleo, combustible, otros productos refinados del petróleo y gas natural en todo el mundo. BP P.LC. controla y ha controlado las decisiones de toda la empresa, incluidas las de sus filiales, relacionadas con el mercadeo, la publicidad, el cambio climático y las emisiones de gases de efecto invernadero de sus productos de combustibles fósiles, así como las estrategias de comunicación relativas al cambio climático y el vínculo entre el uso de combustibles fósiles y los impactos relacionados con el clima sobre el medio ambiente y los seres humanos. En todo momento relevante a este procedimiento, BP P.L.C. ha comercializado y vendido sus productos en el Estado Libre Asociado de Puerto Rico. En 2015, BP P.L.C. vendió su negocio de aviación en el Aeropuerto Internacional Luis Muñoz Marín, que atendía a más de 4 millones de pasajeros al año, a Puma Energy.[2] Además, en Puerto Rico se venden lubricantes industriales y automotrices de BP P.L.C.

5. El Demandado, **Chevron Corporation**, es una empresa multinacional de energía y productos químicos integrada verticalmente, constituida en Delaware, con su

[2] Cision PR Newswire, *Puma Energy Acquires BP's Aviation Business In Puerto Rico*, May 18, 2015, https://www.prnewswire.com/news-releases/puma-energy-acquires-bps-aviation-business-in-puerto-rico-300085122.html, (última visita, 7 de noviembre de 2023).

sede mundial y su sede principal de negocios en 6001 Bollinger Canyon Road, San Ramon, California, EE. UU. 94583. Durante los momentos relevantes a este procedimiento, Chevron Phillips Chemical Puerto Rico Core, LLC ha mantenido un registro comercial activo en Puerto Rico.[3] Chevron Corporation controla y ha controlado las decisiones de toda la empresa sobre la cantidad y extensión de la producción y venta de combustibles fósiles, incluidas las de sus subsidiarias. Una cantidad significativa del producto de combustible fósil de Chevron ha sido transportada, comercializada, distribuida, promovida, fabricada, vendida y/o consumida en el Estado Libre Asociado de Puerto Rico, de la que Chevron ha obtenido ingresos sustanciales. En 2012, Chevron vendió sus negocios de distribución y almacenamiento de combustible en Puerto Rico a Puma Energy, incluidas 192 estaciones de servicio Texaco, un suministro de combustible de aviación y tanques de almacenamiento con una capacidad combinada de 430.000 barriles.[4] Las estaciones Texaco ahora están regresando a todo Puerto Rico a través del cambio de marca de las estaciones Puma.[5] Chevron ha dirigido y continúa dirigiendo su conducta negligente hacia el Estado Libre Asociado de Puerto Rico al comercializar, publicitar, promover y suministrar sus productos en Puerto Rico, con conocimiento de que estos productos han causado y seguirán causando daños relacionados con la crisis climática en Puerto Rico.

6. El Demandado, **Chevron Phillips Chemical Puerto Rico Core, LLC** es una subsidiaria de propiedad total de Chevron Corporation con domicilio social en Bo. Las Mareas, Carretera 710, K.M. 1.3, Guayama, Puerto Rico 00785.

7. El Demandado, **ConocoPhillips**, es una empresa energética multinacional constituida en Delaware y con su sede principal de negocios en 925 N. Eldridge Parkway, Houston, Texas, EE.UU. 77079. ConocoPhillips está formada por numerosas divisiones, subsidiarias y afiliadas que ejecutan las decisiones fundamentales de ConocoPhillips relacionadas con todos los aspectos de la industria de los combustibles fósiles, incluida la exploración, extracción, producción, fabricación, transporte y comercialización.

---

[3] Securities and Exchange Commission, *Form S-4 Registration Statement Under the Securities Act of 1933*, Aug. 6, 2002, https://www.sec.gov/Archives/edgar/data/1127399/000091205702030136/a2084101zs-4.htm, (última vista, 7 de noviembre de 2023).

[4] Reuters, *Trafigura Unit Buys Caribbean Assets from Chevron*, Dec. 8, 2011, https://jp.reuters.com/article/trafigura-chevron/trafigura-unit-buys-caribbean-assets-from-chevron-idUSN1E7B70OZ20111208, (última visita, 7 de noviembre de 2023).

[5] News is My Business, *Texaco Brand Returning to P.R. Market Through Rebranding of Puma Gas Stations*, June 28, 2019,https://newsismybusiness.com/texaco-brand-returning-to-p-r-market-through-rebranding-of-puma-gas-stations/, (última visita, 7 de noviembre de 2023).

ConocoPhillips controla y ha controlado las decisiones de toda la empresa sobre la cantidad y el alcance de la producción y venta de combustibles fósiles, incluidas las de sus subsidiarias. La demandada ConocoPhillips Company está registrada activamente para hacer negocios en Puerto Rico.[6] ConocoPhillips comercializa y vende, y ha comercializado y vendido, una cantidad significativa de gasolina y otros productos de combustibles fósiles a los consumidores de Puerto Rico. Actualmente, hay siete (7) estaciones de servicio activas Phillips66 ubicadas en Puerto Rico que continúan generando ingresos para ConocoPhillips.[7] Además, una presentación ante la SEC de 2004 informó que Chevron Phillips Chemical Company LLC (CPChem) posee una planta de producción de paraxileno en Guayama, Puerto Rico.[8] ConocoPhillips continúa promoviendo la distribución, mercadeo, publicidad, promoción y suministro de sus productos de combustibles fósiles en Puerto Rico, con conocimiento de que estos productos han causado y seguirán causando daños relacionados con la crisis climática en Puerto Rico. Además, ConocoPhillips ofrece licencias de marca en el Estado Libre Asociado de Puerto Rico, lo que permitiría a las empresas de combustible existentes vender combustible bajo la marca ConocoPhillips.[9]

8. El Demandado, **Shell PLC** (anteriormente Royal Dutch Shell PLC), es una empresa multinacional de energía y petroquímica integrada verticalmente. Shell PLC está constituida en Inglaterra y Gales, con su sede y lugar principal de negocios en Shell Centre, Londres, Inglaterra, SE17NA. Shell PLC es la empresa matriz definitiva de numerosas divisiones, subsidiarias y afiliadas, denominadas colectivamente Grupo Shell. Shell PLC controla y ha controlado las decisiones de toda la empresa, incluidas las de sus subsidiarias, relacionadas con el *marketing*, la publicidad, el cambio climático y las emisiones de gases de efecto invernadero de sus productos de combustibles fósiles, y las estrategias de comunicación relativas al cambio climático y el vínculo entre el uso de combustibles fósiles y los impactos relacionados con el clima en el medio ambiente y las comunidades. Shell ha distribuido, comercializado, publicitado y promocionado

---

[6] Gobierno de Puerto Rico, Departamento de Estado, Búsqueda de Corporaciones, https://rceweb.estado.pr.gov/en/search, (última visita, 7 de noviembre de 2023).

[7] Phillips 66, Station Finder, https://www.phillips66gas.com/station-finder/, (última visita, 7 de noviembre de 2023).

[8] Securities and Exchange Commission, *Form 10-k, Chevron Phillips Chemical Company LLC*,31 de diciembre de 2023, https://www.sec.gov/Archives/edgar/data/1127399/000110465904006224/a04-2520_110k.htm, (última visita, 7 de noviembre de 2023).

[9] Phillips 66, *Become a Brand Licensee*, https://www.phillips66fuelsupplier.com/getting-started/brand-licensing/, (último acceso, 7 de noviembre de 2023).

ilícitamente sus productos en Puerto Rico, incluso en plataformas de redes sociales como *Meta*. Shell ha obtenido una cantidad sustancial de ingresos a través de la promoción, producción y venta de combustibles fósiles que tuvo lugar en Puerto Rico durante el tiempo pertinente a este procedimiento. La página web de Shell actualmente anuncia alrededor de cincuenta (50) gasolineras Shell activas en Puerto Rico.[10] Además, Shell PLC posee el cien por ciento (100 %) de Station Managers of Puerto Rico, Inc.[11] De 2001 a 2009, Shell fue propietaria de una instalación de refinado en Yabucoa, Puerto Rico, que producía gasolina, diésel, combustible para aviones y combustibles residuales para el mercado puertorriqueño.[12]

9.      El Demandado, **Station Managers of Puerto Rico, Inc.**, es una subsidiaria de propiedad absoluta de Shell PLC, con domicilio social en Ochoa Building, 500 Calle de la Tranca, Suite 514, San Juan, Puerto Rico 00901.

10.     El Demandado, **TotalEnergies**, es una empresa multinacional francesa integrada verticalmente de energía y petróleo fundada en 1924. TotalEnergies se dedica a la exploración y producción de petróleo y gas, al refinado, a la petroquímica y a la distribución de energía en diversas formas, con su sede global y su sede principal de negocios en 2 Place Jean Millier, 92078 Paris La Défense, Francia. TotalEnergies controla y ha controlado las decisiones de toda la empresa relacionadas con *marketing*, publicidad, cambio climático y emisiones de gases de efecto invernadero de sus productos de combustibles fósiles, y estrategias de comunicación relacionadas con el cambio climático y el vínculo entre el uso de combustibles fósiles y los impactos relacionados con el clima en el medio ambiente y las comunidades. TotalEnergies ha obtenido una cantidad sustancial de ingresos a través de la promoción, producción y venta de combustibles fósiles que tuvo lugar en Puerto Rico durante el tiempo pertinente a este procedimiento. TotalEnergies posee y opera aproximadamente doscientas (200) gasolineras en Puerto Rico, las cuales han estado en funcionamiento desde 2004.[13] En 2008, Esso Standard Oil PR, una subsidiaria de Exxon, vendió sus ciento cuarenta y

---

[10] Shell United States, *Gas Station Near Me*, https://www.shell.us/motorist/gas-station-near-me (última visita, 7 de noviembre de 2023).
[11] Puerto Rico, *Shell Tax Contribution Report 2020*, https://reports.shell.com/tax-contribution-report/2020/our-tax-data/americas/puerto-rico.html, (última visita, 7 de noviembre de 2023).
[12] Oil and Gas Journal, *Shell Chemical to Buy Sunoco's Puerto Rico Refinery*, (7 de septiembre de 2001), https://www.ogj.com/refining-processing/article/17261399/shell-chemical-to-buy-sunocos-puerto-rico-refinery, (última visita, 7 de noviembre de 2023).
[13] TotalEnergies, *TotalEnergies in Puerto Rico*, https://totalenergies.com/puerto-rico, (última visita, 7 de noviembre de 2024).

cinco (145) estaciones de servicio y acceso a terminales y aeropuertos en Puerto Rico y St. Thomas a Total Petroleum Puerto Rico Corp. (TPPRC), una subsidiaria de Total Group.[14] TotalEnergies ha dirigido su conducta negligente hacia Puerto Rico al comercializar, publicitar, promocionar y suministrar intencional e injustamente sus productos en Puerto Rico, con conocimiento de que esos productos han causado y seguirán causando daños relacionados con la crisis climática en Puerto Rico. La base de datos de *Meta Ad* de *Facebook* cataloga múltiples anuncios publicados por TotalEnergies, promocionando su producto en Puerto Rico sin advertir a los consumidores sobre los peligros relacionados con el calentamiento global, sinónimos de la producción y compra de productos de TotalEnergies. Además, un comunicado de prensa de TotalEnergies publicado en 2016 afirma que TotalEnergies ha estado presente en el Caribe durante más de cuarenta (40) años y se describe a sí mismo como "líder en los principales mercados del Caribe, como Puerto Rico".[15]

11.     El Demandado, **TotalEnergies Marketing PR Corp.**, es una subsidiaria de propiedad total de la corporación TotalEnergies con domicilio social en Millenium Park Plaza, #15 Second Street, Suite 525, Guaynabo, Puerto Rico 00968.

## II.     Jurisdicción y Competencia

12.     El Tribunal General de Justicia de Puerto Rico tiene jurisdicción sobre los Demandados conforme a 32 LPRA Apéndice III R. 3., en tanto este caso surge dentro de los límites territoriales de Puerto Rico, y los Demandados han realizado negocios dentro del Estado Libre Asociado de Puerto Rico en todo momento relevante a esta Demanda.

13.     El Tribunal General de Justicia de Puerto Rico tiene competencia sobre las partes en este asunto de conformidad con 10 LPRA § 269.

14.     El Tribunal General de Justicia de Puerto Rico tiene competencia en la materia para conocer de esta acción civil conforme a 4 LPRA § 25a.

## III.     Los hechos

15.     Durante décadas, los Demandados, miembros importantes de la industria

---

[14]   TotalEnergies, *TotalEnergies in Puerto Rico*, https://totalenergies.com.pr/en/total-puerto-rico/totalenergies-puerto-rico, (última visita, 7 de noviembre de 2023).

[15]   TotalEnergies, *Dominican Republic: Total Acquires the Country's Main Retail Network and Establishes its Leadership in the Caribbean*, 27 de enero de 2016, https://totalenergies.com/media/news/press-releases/dominican-republic-total-acquires-countrys-main-retail-network-and-establishes-its-leadership, (última vista, 7 de noviembre de 2023).

de los combustibles fósiles, han engañado a los consumidores y al público sobre el cambio climático. Al menos desde la década de 1960, sus propios científicos han llegado sistemáticamente a la conclusión de que los combustibles fósiles producen dióxido de carbono y otros contaminantes de gases de efecto invernadero que pueden tener consecuencias catastróficas para el planeta y sus habitantes.[16] Los Demandados tomaron en serio estos hallazgos científicos internos e hicieron grandes inversiones para proteger sus propios activos e infraestructura del aumento del nivel del mar, tormentas más fuertes y otros impactos del cambio climático. No obstante, en lugar de advertir a los consumidores y al público, los Demandados y sus empresas pantallas o alter egos idearon y realizaron campañas de desinformación para desacreditar el consenso científico sobre el cambio climático; crear dudas en las mentes de los consumidores, los medios de comunicación, los docentes, y el público en general sobre los impactos de la quema de combustibles fósiles en el cambio climático; y retrasar la transición de la economía energética hacia un futuro con bajas emisiones de carbono.[17] Estas exitosas campañas de engaño climático tuvieron el propósito y el efecto de inflar y sostener el mercado de combustibles fósiles y retrasar la transición a fuentes de energía con bajas emisiones de carbono.  Lo cual, a su vez, aumentó las emisiones de gases de efecto invernadero, aceleró el calentamiento global y provocó un cambio climático devastador en el Estado Libre Asociado de Puerto Rico.

16.    Como resultado de las mentiras y los engaños de los Demandados y la industria de los combustibles fósiles, el Estado Libre Asociado de Puerto Rico ha incurrido o incurrirá en miles de millones de dólares en costos para limpiar desastres inducidos por el cambio climático, como los huracanes Irma y María, y se anticipa que sufrirá en el futuro adicionales y sustanciales daños, aún más costosos.[18] Esto, a medida que aumente el nivel del mar, las tormentas sean cada vez más frecuentes y graves, y el Estado Libre Asociado de Puerto Rico tenga que incurrir en más costos para fortificar su costa y sus tierras y proteger a su población, sus empresas, su infraestructura y sus

---

[16] Véase Anejo A en ¶¶ 14–58.
[17] Véase Anejo A en ¶¶ 59–104, 118–174.
[18] Gobierno de Puerto Rico, *Transformation and Innovation in the Wake of Devastation: An Economic and Disaster Recovery Plan for Puerto Rico*, 8 de Agosto de 2018, pág. vii–xvi, https://recovery.pr.gov/documents/pr-transformation-innovation-plan-congressional-submission-080818.pdf

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 10 of 119

recursos naturales de una variedad de otros peligros del cambio climático.[19] A pesar del claro daño a Puerto Rico y otras comunidades en todo el país, ExxonMobil, BP, Chevron, ConocoPhillips, Shell y TotalEnergies (los Demandados) continúan difundiendo información errónea sobre el clima y escondiendo y confundiendo a los consumidores y al público de sus esfuerzos cada vez mayores para consolidar la dependencia de combustibles fósiles. Es hora de detener esta conducta engañosa y asignar la responsabilidad de remediar sus efectos a los Demandados, a quienes corresponde, en lugar de a los contribuyentes y al Pueblo de Puerto Rico.

17. El Demandante, Estado Libre Asociado de Puerto Rico, por y a través de su Secretario de Justicia, presenta esta demanda por daños y perjuicios y sanciones monetarias civiles para cubrir los costos de protección y restauración de infraestructura, tierras, activos, recursos naturales y otros daños al Estado Libre Asociado de Puerto Rico causados por los Demandados durante décadas por la omisión de advertencias sobre los defectos de sus productos de combustibles fósiles y por sus prácticas comerciales engañosas en el mercadeo y promoción del petróleo, el carbón y el gas natural (colectivamente, productos de combustibles fósiles).

18. Los Demandados son miembros corporativos importantes de la industria de los combustibles fósiles, incluidos distribuidores, promotores, comercializadores y/o vendedores de productos de combustibles fósiles. Cada Demandado financió, dotó de personal, organizó y de alguna manera apoyó los esfuerzos para engañar al público y a los consumidores, dentro y fuera de Puerto Rico, sobre el papel de los productos de combustibles fósiles en la causa de la crisis climática global.

19. El ritmo al que los Demandados han extraído y vendido productos de combustibles fósiles se ha disparado desde la Segunda Guerra Mundial, al igual que las emisiones de dióxido de carbono ($CO_2$) y otras emisiones procedentes de esos productos. Las emisiones de combustibles fósiles (especialmente $CO_2$) son, por mucho, el principal factor del calentamiento global. La gran mayoría de todas las emisiones antropogénicas (causadas por el hombre) de gases de efecto invernadero de la historia se han producido desde la década de 1950 hasta el presente, un período conocido como

[19] Véase Anejo A en ¶¶ 189–193.

la Gran Aceleración.[20] Aproximadamente tres cuartas partes de todas las emisiones industriales de $CO_2$ de la historia se han producido desde la década de 1960, y más de la mitad han ocurrido desde 1990. La tasa anual de emisiones de $CO_2$ procedentes de la extracción, producción y consumo de combustibles fósiles ha aumentado sustancialmente desde 1990.

20. El conocimiento de los Demandados sobre los impactos negativos del consumo de combustibles fósiles sigue casi exactamente el inicio de la Gran Aceleración, lo que significa que los Demandados conocen desde hace más de cincuenta (50) años que la contaminación de gases de efecto invernadero proveniente de productos de combustibles fósiles tendría impactos adversos significativos en el clima de la Tierra y el nivel del mar. Con ese conocimiento, los Demandados tomaron medidas para proteger sus propios activos de los daños y riesgos climáticos a través de una inmensa inversión interna en investigación, mejoras de infraestructura y planes para explotar nuevas oportunidades comerciales en un mundo en calentamiento.

21. Sin embargo, en lugar de advertir a los consumidores o al público o representar verazmente las consecuencias conocidas derivadas del uso previsto y previsible de sus productos, o de trabajar para minimizar el daño asociado al uso y la combustión de dichos productos, los Demandados ocultaron y tergiversaron los peligros de los combustibles fósiles. Asimismo, difundieron información falsa y engañosa sobre la existencia, las causas y los efectos del cambio climático; y promovieron de forma agresiva el uso cada vez mayor de sus productos en volúmenes cada vez mayores. Desde al menos finales de la década de 1980, los Demandados han gastado millones de dólares orquestando campañas masivas de desinformación para poner en duda la ciencia del cambio climático; para difundir teorías negacionistas del clima que sus propios científicos ya habían desacreditado; y para ocultar el papel de los combustibles fósiles en la aceleración de la crisis climática.[21] Recientemente, los Demandados han adoptado una nueva estrategia de engaño comercial: el ecoblanqueo. En la actualidad, los Demandados exageran engañosamente sus inversiones en energía eólica, solar y otros recursos energéticos con bajas emisiones de carbono, sin revelar que esas inversiones

[20] Véase el Anejo A en ¶¶ 1–13.
[21] Véase Anejo A en ¶¶ 59–104.

representan una parte insignificante de su negocio general y que, de hecho, continúan aumentando la producción de combustibles fósiles.[22] Los Demandados también mercadean falsamente ciertos productos de combustibles fósiles como ecológicos o no contaminantes, mientras ocultan el hecho de que esos mismos productos (y las operaciones que los producen) son las principales causas del cambio climático.[23] También, los Demandados, individual y colectivamente, desempeñaron papeles de liderazgo en todas estas campañas, que estaban destinadas y dirigidas a la población de Puerto Rico. Estas campañas continúan al día de hoy.

22. Las acciones de los Demandados al ocultar los peligros de sus productos de combustibles fósiles, promover información falsa y engañosa y participar en campañas masivas para promover un mayor uso de sus productos de combustibles fósiles han retrasado con éxito la transición a una economía con bajas emisiones de carbono, profundizado la dependencia de los consumidores de los productos de combustibles fósiles, y contribuyendo sustancialmente a la acumulación de $CO_2$ en la atmósfera que impulsa el calentamiento global y sus consecuencias físicas, ambientales y socioeconómicas, incluidas aquellas que afectan al Estado Libre Asociado de Puerto Rico.

23. Por lo tanto, la conducta engañosa e ilícita de los Demandados fue un factor sustancial para provocar impactos devastadores del cambio climático en Puerto Rico, que incluyen, entre otros: aumento del nivel del mar, alteración del ciclo hidrológico; huracanes, tormentas tropicales y precipitaciones extremas e inundaciones asociadas más frecuentes e intensas; olas de calor más frecuentes e intensas junto con una exacerbación de los efectos localizados de isla de calor; sequías más frecuentes e intensas; acidificación oceánica; destrucción de arrecifes de coral y bosques de manglares; degradación de la calidad del aire y del agua; y pérdida de hábitats y especies. Las consecuencias asociadas a estos cambios físicos y ambientales tienen efectos agravantes en las comunidades sobre pobladas de Puerto Rico, que a menudo viven en las áreas más vulnerables desde el punto de vista medioambiental. En

[22] Véase Anejo A en ¶¶ 118–160.
[23] Véase Anejo A en ¶¶ 161–174.

consecuencia, los Demandados son directamente responsables de una parte sustancial de los impactos relacionados con la crisis climática en Puerto Rico.

24. Como isla caribeña, Puerto Rico es extremadamente vulnerable a los efectos del aumento del nivel del mar y otros impactos del cambio climático. El nivel promedio del mar en Puerto Rico está aumentando rápidamente y continuará aumentando sustancialmente a lo largo de la costa y los ríos estuarinos de Puerto Rico, causando inundaciones, intrusión de agua salada, erosión, pérdidas de humedales por mareas y pérdida de playas.[24] Además, los fenómenos meteorológicos extremos (incluidos tormentas y huracanes tropicales, sequías y olas de calor, entre otros) serán más frecuentes, más duraderos y graves.[25] Las consecuencias sociales, económicas y de otro tipo de estos y otros cambios ambientales, todos debido al calentamiento global antropogénico, seguirán aumentando en Puerto Rico.

25. La devastación humana, natural y económica provocada por los huracanes Irma y María en 2017 es un anticipo de las graves consecuencias relacionadas con el clima que enfrenta Puerto Rico como resultado directo del engaño ilícito de los Demandados.

26. Como resultado directo de los cambios medioambientales causados por la crisis climática, el Estado Libre Asociado de Puerto Rico ha sufrido y seguirá sufriendo daños graves. Los graves daños incluyen, entre otros: inundaciones y pérdida de propiedades gubernamentales o pertenecientes al Estado; inundaciones y pérdida de propiedad y negocios privados con la consiguiente pérdida de ingresos fiscales. Además, de la lesión o destrucción de instalaciones de propiedad operadas por el Estado Libre Asociado de Puerto Rico que son críticas para las operaciones del Gobierno, los servicios públicos y la gestión de riesgos, así como otros activos esenciales para la salud, la seguridad y el bienestar de la comunidad. Igualmente, se ha sufrido y sufrirá daño o pérdida de los recursos naturales del Estado Libre Asociado de Puerto Rico, incluidos los arrecifes de coral y los bosques de manglares, y sus ecosistemas asociados y beneficios de resiliencia climática; daño o pérdida de los recursos agrícolas del Estado Libre Asociado de Puerto Rico; aumento de los costos de refuerzo y mantenimiento de la

---

[24] Veáse Anejo A en ¶¶ 189–193.
[25] *Ibid*.

resiliencia de la infraestructura pública, gran parte de la cual está ubicada en municipios costeros vulnerables; aumento de costos de prestación de servicios gubernamentales; aumento de los costos de atención médica y de salud pública; aumento de los costos de planificación y preparación para la adaptación y resiliencia de las comunidades a los efectos de la crisis climática; desplazamiento, perturbación y pérdida de comunidades costeras, incluida la pérdida de vidas, con los daños asociados al Estado Libre Asociado de Puerto Rico; y menores ingresos fiscales debido a los impactos en la economía basada en el turismo y los océanos de Puerto Rico.[26]

27. La conducta individual y colectiva de los Demandados, incluida, entre otras, la introducción de productos de combustibles fósiles en el flujo comercial a sabiendas, pero sin advertir sobre las amenazas que representan para el clima mundial; la promoción indebida de productos de combustibles fósiles, incluida la tergiversación y el ocultamiento de peligros conocidos asociados con el uso previsto de esos productos; y sus campañas de engaño público diseñadas para ocultar la conexión entre los productos de combustibles fósiles y el calentamiento global, fue un factor sustancial en provocar los daños al Estado Libre Asociado de Puerto Rico. En otras palabras, la ocultación y la tergiversación de los peligros conocidos de los productos de combustibles fósiles por parte de los Demandados, junto con la promoción simultánea del uso desenfrenado de esos productos, impulsó el consumo de combustibles fósiles y retrasó la transición hacia un futuro con bajas emisiones de carbono, lo que resultó en una mayor contaminación de gases de efecto invernadero e impactos más graves de la crisis climática en Puerto Rico.

28. En consecuencia, el Demandante inicia esta acción contra los Demandados por conducta negligente; responsabilidad estricta o absoluta por falta de advertencias de los defectos de sus productos; y actos o prácticas desleales y engañosas en el comercio o las actividades económicas.

29. Por la presente, el Demandante renuncia a los daños derivados de la propiedad federal y aquellos que surjan del suministro por parte de los Demandados de productos de combustibles fósiles especializados y no comerciales al gobierno federal

---

[26] *Ibid*.

para fines militares y de defensa nacional. El Demandante no busca ninguna recuperación o compensación atribuible a estos daños a propiedad federal.

30.    El Demandante busca garantizar que las partes que se han beneficiado del engaño a los consumidores y al público sobre el cambio climático asuman los costos de esa actividad comercial engañosa, en lugar del Estado Libre Asociado de Puerto Rico, sus contribuyentes o sus residentes o ciudadanos.

31.    En el Anejo A se incluye una descripción más detallada de los hechos en que se apoya la presente demanda, los cuales se incorporan plenamente en la misma como parte de sus alegaciones.

**Entidades relevantes que no son partes pero que constituyen asociaciones y grupos fachada de la industria de combustibles fósiles utilizados por los demandados**

32.    El **Instituto Americano del Petróleo** (en inglés, the *American Petroleum Institute* o API) es una corporación sin fines de lucro con sede en el Distrito de Columbia. Con más de seiscientos (600) miembros, el API es la asociación comercial más grande de la industria de los combustibles fósiles. Su propósito es promover los intereses comerciales colectivos de sus miembros individuales, lo que incluye aumentar el consumo de petróleo y gas por parte de los consumidores para obtener ganancias financieras de los Demandados y actuar efectivamente como un brazo comercial para sus empresas miembro. En nombre de los Demandados y bajo su supervisión y control, el API ha participado y liderado varias coaliciones, grupos fachada y organizaciones que han promovido la desinformación sobre los impactos climáticos de los productos de combustibles fósiles entre los consumidores, incluidos, entre otros, el *Global Climate Coalition*, el *Partnership for a Better Energy Future*, el *Coalition for American Jobs*, el *Alliance for Energy and Economic Growth* y el *Alliance for Climate Strategies*. Estos grupos fachada se formaron para generar desinformación y promoción climática desde una fuente supuestamente objetiva, cuando, en realidad, fueron financiados y controlados por los Demandados. Los Demandados se han beneficiado de la difusión de esta desinformación porque, entre otras cosas, ha garantizado un mercado próspero de consumo de petróleo y gas, lo que ha generado ganancias sustanciales para los Demandados. Los Demandados controlaron, supervisaron y participaron directamente en los mensajes engañosos del API sobre el cambio climático. Todos los Demandados

y/o sus predecesores en interés han sido miembros principales del API en momentos relevantes para este litigio. Todos los Demandados son actualmente miembros del API.

33.      Los ejecutivos de Exxon, Shell, BP, Chevron y ConocoPhillips han formado parte del Comité Ejecutivo del API y/o han sido presidentes del API, lo que equivale a desempeñarse como funcionario corporativo. Por ejemplo, el director ejecutivo de Exxon formó parte del Comité Ejecutivo del API durante 15 de los 25 años comprendidos entre 1991 y 2016 (1991, 1996–97, 2001, 2005–2016). El director ejecutivo de BP fue presidente del API en 1988, 1989 y 1998. El director ejecutivo de Chevron fue presidente del API en 1994, 1995, 2003 y 2012. Mientras que, el presidente de Shell formó parte del Comité Ejecutivo del API de 2005 a 2006. El presidente y director ejecutivo de ConocoPhillips, Ryan Lance, fue presidente de la Junta Directiva de 2016 a 2018, y el presidente y director ejecutivo de Exxon, Darren Woods, fue presidente de la Junta Directiva de 2018 a 2020. En 2020, el API eligió al presidente y director ejecutivo de Phillips 66 (ConocoPhillips), Greg Garland, para desempeñarse por un período de dos años como presidente de la Junta. Los ejecutivos de ConocoPhillips también sirvieron como miembros de la Junta Directiva del API en distintos momentos.

34.      El **Consejo de Información para el Medio Ambiente** (en inglés, *The Information Council for the Environment*, o ICE) fue creado por empresas de carbón y sus aliados, incluidas la Western Fuels Association y la National Coal Association, para implementar publicidad pública y campañas de divulgación diseñadas para desacreditar la ciencia climática y negar la conexión entre la quema de combustibles fósiles y el cambio climático a los ojos del público. Las empresas asociadas incluyeron Pittsburg y Midway Coal Mining (Chevron).

35.      La **Coalición Global por el Clima** (en inglés, *The Global Climate Coalition*, o GCC) fue un grupo industrial creado para preservar y expandir la demanda de combustibles fósiles por parte de los consumidores, incluso cuestionando públicamente la ciencia climática y oponiéndose a las iniciativas de reducción de emisiones de gases de efecto invernadero. La GCC se fundó en 1989, poco después de la primera reunión del Grupo Intergubernamental de Expertos sobre el Cambio Climático (en inglés, *The Intergovernmental Panel on Climate Change*, o IPCC), el organismo de las Naciones Unidas para evaluar la ciencia relacionada con el cambio climático. La GCC se disolvió

alrededor de 2001. Entre sus miembros fundadores figuraban el API y la Asociación Nacional del Carbón, predecesora de la Asociación Nacional de Minería. A lo largo de su existencia, los miembros corporativos de la GCC incluyeron a Amoco (BP), API, Chevron, Exxon, Shell Oil, Texaco (Chevron) y Phillips Petroleum (ConocoPhillips). A lo largo de su existencia, otros miembros y financiadores incluyeron a ARCO (BP) y Western Fuels Association.

## IV. Causas de Acción

### i.
### Primera Causa de Acción
### Daños
### Ley sobre Política Pública Ambiental
### y Estorbo Público

36. El Demandante reafirma e incorpora por referencia todas y cada una de las alegaciones contenidas en los párrafos anteriores.

37. La Ley Núm. 416-2004, según enmendada, faculta al Gobierno de Puerto Rico, a través del Departamento de Justicia, a presentar reclamaciones judiciales para asegurar la política pública ambiental. 12 LPRA sec. 8002c. Dicha facultad incluye acciones para recobrar el valor total de los daños ocasionados al ambiente y/o los recursos naturales. *Id*. Véase, además, Art. 16 de la Ley Núm. 416-2004, 12 LPRA Sec. 8002j).

38. El Art. 19 de la Ley Núm. 416-2004 establece la facultad del Secretario de Justicia para incoar acción en daños y perjuicios contra cualquier persona basados en daños por violaciones ambientales. 12 LPRA sec. 8002m.

39. De igual forma, el Art. 42 de la Ley Núm. 416-2004 permite al Gobierno de Puerto Rico recobrar cualquier gasto incurrido para afrontar una emergencia ambiental. 12 LPRA sec. 8004*l*.

40. Por su parte, el Art. 277 del Código de Enjuiciamiento Civil de Puerto Rico, 32 LPRA sec. 2761 establece que “[t]odo lo que fuere perjudicial a la salud…, o que interrumpa el libre uso de la propiedad, de modo que impida el cómodo goce de la vida o de los bienes, o que estorbare el bienestar de todo un vecindario, o un gran número de personas, …constituye un estorbo público que da lugar a una acción. Dicha acción podrá ser promovida por cualquier… agencia pública… y la sentencia podrá ordenar que cese aquella, así como decretar el resarcimiento de los perjuicios”.

41.    La conducta de los Demandados violenta la ley y la política pública ambiental en Puerto Rico, y constituye un estorbo público para el Gobierno y los ciudadanos de Puerto Rico, por lo que los Demandados le responden al Gobierno de Puerto Rico por los perjuicios y daños ambientales y económicos ocasionados por su conducta y por los gastos en que el Gobierno de Puerto Rico incurra para mitigarlos.

42.    Los Demandados, de forma individual y coordinada entre sí, han participado y continúan participando en conductas ilegales, negligentes, imprudentes, conscientes y/o intencionales. Tales conductas incluyen:

a. Promover incertidumbre en la mente de las personas sobre la existencia, causas y efectos del cambio climático;

b. Promover la venta y el uso de combustibles fósiles sin advertir a los consumidores que el uso de combustibles fósiles provocaría un cambio climático peligroso;

c. Promover la venta y el uso de combustibles fósiles que los Demandados sabían que eran peligrosos y que causarían o exacerbarían el cambio climático y sus consecuencias relacionadas, incluidos, entre otros, el aumento del nivel del mar, la sequía, las precipitaciones y el calor extremos;

d. Promover la venta y el uso de combustibles fósiles que los Demandados sabían que eran peligrosos y que causarían o exacerbarían el cambio climático y sus consecuencias relacionadas, incluidos, entre otros, el aumento del nivel del mar, la sequía, los eventos de precipitación extrema y los eventos de calor extremo;

e. Ocultar los peligros que los Demandados sabían que resultarían del uso normal de sus combustibles fósiles al tergiversar y plantear dudas sobre la integridad de la información científica relacionada con el cambio climático;

f. Promover combustibles fósiles para usos que los Demandados sabían que serían peligrosos para los consumidores, el público y el Estado Libre Asociado;

g. Difundir y financiar la difusión de información que induzca a error a los consumidores y al público sobre el riesgo conocido y previsible del cambio

climático y sus consecuencias, que se derivan del uso normal y previsto de los combustibles fósiles;

h. Presentarse engañosamente como empresas de energía limpia comprometidas con la reducción de emisiones y,

i. Promocionar engañosamente sus inversiones en tecnologías alternativas como capaces de reducir las emisiones a gran escala en el corto plazo.

43. La conducta de los Demandados ha causado daños a la salud y la propiedad pública, así como a la capacidad de todos los puertorriqueños de disfrutar cómodamente de la vida y la propiedad. La campaña de engaño de los Demandados ha sido generalizada y duradera. Ha influido en las decisiones de compra e inversión del público durante décadas, mediante el impulso de una mayor demanda de combustibles fósiles. También, redujo la demanda y la inversión en energía limpia, y retrasó la transición a la energía limpia. Este aumento de la demanda condujo directamente a un aumento prolongado de las emisiones de gases de efecto invernadero y es un factor sustancial que ocasiona los daños causados por el clima en Puerto Rico.

44. Estas lesiones constituyen la alteración del orden público bajo las leyes de Puerto Rico porque, sin limitación, interfieren irrazonablemente con la salud pública, la seguridad pública, la paz pública, la seguridad y la conveniencia pública. Igualmente, las lesiones causadas obstruyen el libre uso de la propiedad de manera que interfiera con el disfrute cómodo de la vida y la propiedad; son alteraciones para el bienestar de las comunidades y vecindarios en todo el Estado Libre Asociado; destruyen y degradan la propiedad y la infraestructura públicas y privadas; afectan negativamente a los recursos naturales, incluidas playas, zonas costeras, arrecifes marinos y especies, recursos terrestres; afectan a un gran número de personas, incluidos todos los ciudadanos del Estado Libre Asociado; y de otro modo interfieren injustificadamente con los derechos comunes del público en general.

45. La conducta de los Demandados es la causa inmediata de las lesiones de Puerto Rico. Los Demandados sabían que el consumo continuo de combustibles fósiles conduciría a una crisis climática. Sin embargo, no advirtieron y optaron por participar en una sofisticada campaña de engaño que tuvo el propósito y el efecto de sostener y

sobredimensionar el consumo de combustibles fósiles. Los daños climáticos de Puerto Rico son el resultado directo y previsible de la conducta de los Demandados.

46. La continua interferencia de los Demandados con los derechos públicos es sustancial e irrazonable. El daño a Puerto Rico es grave y más de lo que Puerto Rico debería soportar sin compensación. Los actos y omisiones engañosos de los Demandados también carecen de utilidad social porque no tiene utilidad engañar y confundir al público.

47. Los Demandados son, por lo tanto, una causa directa, próxima y sustancial de una interferencia irrazonable y sustancial con los derechos comunes de los residentes de Puerto Rico, así como de todos los daños que se derivan de esa alteración del orden público.

48. La conducta de los Demandados, tal como se establece en este documento, se cometió de forma maliciosa, con grave desprecio por la vida, la seguridad y la propiedad de los demás. Por lo tanto, el Demandante solicita una indemnización por los daños causados al medio ambiente y los recursos naturales de Puerto Rico, así como la infraestructura y la propiedad pública como consecuencia de los actos y omisiones de los Demandados, cuyos daños exceden los mil millones de dólares.

**ii.**
**Segunda Causa de Acción**
**Daños y Perjuicios Extracontractuales**
**por actos y omisiones culposos o negligentes**

49. El anterior Art. 1802 del Código Civil de 1930, 31 LPRA sec. 5141, disponía que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización".

50. El vigente Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801, contiene una disposición similar a la antes transcrita que lee como sigue: "La persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo".

51. En Puerto Rico se ha adoptado una causa de acción para reclamar daños ecológicos, tanto patrimoniales como morales. *Rivera v. SLG Díaz*, 165 DPR 408 (2005). En esta causa de acción, se puede solicitar indemnización *in natura* o según la disminución del valor de la propiedad.

52. Los actos y omisiones ilícitos de los Demandados, que continúan hasta el día de hoy, han violado y continúan violando su deber de diligencia razonable porque, *entre otras cosas*:

a. Era previsible y previsto por los Demandados que el consumo sin control de combustibles fósiles provocaría impactos climáticos dañinos en islas bajas, como Puerto Rico;

b. Era previsible y previsto por los Demandados que la industria de los combustibles fósiles pudiera mantener o aumentar el consumo total de combustibles fósiles generando incertidumbre sobre la existencia del cambio climático, inundando el mercado con teorías científicas desacreditadas sobre el cambio climático, ocultando el papel de los combustibles fósiles para impulsar la crisis climática y restar importancia a los riesgos del cambio climático para el planeta y sus comunidades;

c. En comparación con los consumidores promedio, el público y el Estado Libre Asociado, los Demandados tenían un conocimiento superior de los riesgos nocivos que planteaban los productos de combustibles fósiles en todo momento relevante para esta Demanda;

d. Los Demandados tuvieron la oportunidad y la capacidad de evitar o mitigar esos riesgos, entre otras cosas, advirtiendo adecuadamente sobre los impactos climáticos del consumo de combustibles fósiles y deteniendo sus campañas de desinformación climática;

e. Durante varias décadas, los Demandados se han beneficiado enormemente de su falta de advertencia y engaño, lo que ha mantenido y aumentado el consumo de combustibles fósiles y,

f. No existe ningún interés público o valor social en permitir que los Demandados difundan conscientemente información falsa y engañosa sobre los peligros de los combustibles fósiles o la existencia, causas y consecuencias del cambio climático.

53. Los actos y omisiones de los Demandados descritos en esta demanda constituyen conducta culposa y negligente en violación del 31 LPRA § 10801.

54. Estos actos y omisiones han perjudicado y seguirán perjudicando al Estado Libre Asociado de Puerto Rico, a sus ciudadanos y a sus recursos naturales y ambientales, así como a la infraestructura y propiedad pública, durante mucho tiempo en el futuro. Las acciones de los Demandados causaron directa e inmediatamente los daños sufridos por el Estado Libre Asociado de Puerto Rico y sus ciudadanos.

55. Los actos culposos y negligentes de los demandados han causado daños al Gobierno de Puerto Rico que se estiman en no menos de mil millones de dólares.

**iii.**
**Tercera Causa de Acción**
**Responsabilidad estricta en la distribución y venta de productos defectuosos por falta de advertencias adecuadas, 31 LPRA § 10807**

56. El Demandante reafirma e incorpora por referencia todas y cada una de las alegaciones contenidas en los párrafos anteriores.

57. El Código Civil de Puerto Rico establece que "[l]as personas que venden en el flujo del comercio un producto que por su diseño o fabricación es irrazonablemente peligroso, responden de los daños que dicho producto causa, aunque no incurran en culpa o negligencia". 31 LPRA sec. 10807.

58. De manera que una persona tendrá que compensar por los daños causados cuando un producto se convierte en uno inseguro o cuando los beneficios del mismo no superan sus riesgos inherentes. *Rodríguez Méndez v. Laser Eye*, 195 DPR 769 (2016). Además, un dueño de un producto responde en daños cuando su producto falla en ofrecerle al usuario o consumidor aquellas advertencias o instrucciones que sean adecuadas en torno a los peligros o riesgos inherentes en el manejo o uso del mismo que sean previsibles para el fabricante. *Aponte Rivera v. Sears Roebuck*, 144 DPR 830 (1998).

59. Cada Demandado tenía, y continúa teniendo, el deber de ejercer un cuidado razonable en la comercialización, promoción, distribución y venta de productos de combustibles fósiles. Todos los Demandados tenían, y continúan teniendo, el deber de ejercer un cuidado razonable en la producción y difusión de información sobre los impactos de productos de combustibles fósiles en el clima para los usuarios de esos productos, el público y los responsables. A pesar de saber en todo momento pertinente a esta demanda que la quema de combustibles fósiles genera contaminación de gases

de efecto invernadero que provoca el cambio climático global y sus consecuencias concomitantes, los Demandados no proporcionaron advertencias proporcionales a los riesgos asociados con el uso previsto de sus productos. Igualmente, promocionaron indebidamente sus productos mediante la omisión de los peligros de los que eran conscientes, e implementaron sofisticadas campañas de comunicación y relaciones públicas para engañar al público sobre las consecuencias del uso de combustibles fósiles. Hasta el día de hoy, los Demandados continúan engañando al público mediante la promoción de manera falsa y engañosa de sus productos como beneficiosos para el clima y a ellos mismos como defensores del cambio hacia un futuro con bajas emisiones de carbono, sin advertir que el consumo de sus productos es el principal impulsor del cambio climático. Estos actos y omisiones, como se pretendía, aumentaron la demanda de combustibles fósiles y retrasaron la transición energética para dejar de usar combustibles fósiles, y por lo tanto exacerbaron las consecuencias dañinas del cambio climático para Puerto Rico.

60. Los Demandados son personas que venden sus productos de combustibles fósiles en el flujo comercial. Según la ley de Puerto Rico, tenían y continúan teniendo el deber de proporcionar advertencias adecuadas sobre los riesgos previsibles del uso de sus productos de los que tienen conocimiento, incluidos los peligros para el sistema climático que plantea el uso ordinario y previsto de sus productos de combustibles fósiles.

61. Los Demandados saben desde hace décadas que el uso ordinario y previsto de sus productos de combustibles fósiles genera gases de efecto invernadero cuya acumulación en la atmósfera plantea graves amenazas al sistema climático, el medio ambiente y la humanidad, incluidas las comunidades costeras como Puerto Rico. El conocimiento temprano y sofisticado de los Demandados sobre los peligros climáticos de los combustibles fósiles excedió con creces el de los consumidores comunes, el público y el Estado Libre Asociado de Puerto Rico, quienes no habrían reconocido esos peligros latentes.

62. No obstante, a pesar de su conocimiento sobre los peligros climáticos de sus productos de combustibles fósiles, los Demandados nunca han emitido advertencias adecuadas sobre esos peligros. Por el contrario, los Demandados organizaron, dirigieron

y financiaron campañas de desinformación para ocultar al público la conexión entre sus productos de combustibles fósiles y el cambio climático, para lo cual gastaron millones de dólares y desplegaron varios grupos de fachada y asociaciones industriales para inducir a los consumidores a seguir comprando combustibles fósiles, independientemente del daño a las comunidades y al medio ambiente.

63.     El hecho de que los Demandados no hayan proporcionado advertencias adecuadas sobre los efectos nocivos de sus productos de combustibles fósiles en el clima y su promoción indebida de sus productos, ha perjudicado y seguirá perjudicando al Estado Libre Asociado de Puerto Rico, a sus ciudadanos y a sus recursos naturales y ambientales durante mucho tiempo en el futuro. De ahí que los demandados le respondan al Estado Libre Asociado de Puerto Rico por los daños causados a sus recursos naturales y al ambiente, así como a su infraestructura y propiedad pública por la venta, promoción y distribución indebida de sus productos sin proporcionar las advertencias adecuadas, cuyos daños se estiman en una cantidad no menor de mil millones de dólares.

**iv.**
**Cuarta Causa de Acción**
**Daños Punitivos**

64.     El Demandante reafirma e incorpora por referencia todas y cada una de las alegaciones contenidas en los párrafos anteriores como si estuvieran establecidas en este documento.

65.     La ley de Puerto Rico prohíbe a los Demandados que intencional, imprudente o negligentemente, introduzcan materia tangible nociva a tierras, bienes inmuebles y recursos naturales que el Estado Libre Asociado de Puerto Rico posee, ocupa y controla.

66.     El Demandante posee, ocupa y controla tierras, bienes inmuebles y recursos naturales en todo Puerto Rico.

67.     A pesar de saber en todo momento pertinente a esta demanda que la quema de combustibles fósiles genera contaminación de gases de efecto invernadero que provoca el cambio climático global y sus consecuencias concomitantes, los Demandados no proporcionaron advertencias proporcionales a los riesgos asociados con el uso previsto de sus productos, promocionaron indebidamente sus productos

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 25 of 119

ocultando al público los peligros de los que eran conscientes, e implementaron sofisticadas campañas de comunicación y relaciones públicas para engañar al público sobre las consecuencias del uso de combustibles fósiles. Hasta el día de hoy, los Demandados continúan engañando al público mediante la promoción de sus productos de forma falsa y engañosamente como beneficiosos para el clima y a ellos mismos como defensores del cambio hacia un futuro con bajas emisiones de carbono, sin advertir que el consumo de sus productos es el principal impulsor del cambio climático. Estos actos y omisiones, según lo previsto, aumentaron y prolongaron artificialmente la demanda de combustibles fósiles y retrasaron la transición energética para dejar de usar combustibles fósiles, y por lo tanto exacerbaron las consecuencias dañinas del cambio climático para Puerto Rico y perjudicaron al Estado Libre Asociado, a sus ciudadanos y a sus recursos naturales y ambientales.

68. El Demandante no concedió permiso a los Demandados para provocar inundaciones, precipitaciones extremas, causada por agua de mar u otros materiales que ingresaran a su propiedad como resultado del uso de productos de combustibles fósiles de los Demandados.

69. La falta de advertencia de los Demandados y la promoción indebida de sus productos de combustibles fósiles, que continúan hasta el día de hoy, causaron directa e inmediatamente los daños sufridos por el Estado Libre Asociado, sus ciudadanos y sus recursos naturales y ambientales.

70. Asimismo, la falta de advertencia de los Demandados y la promoción indebida de sus productos de combustibles fósiles, que continúan hasta el día de hoy, son un factor sustancial que causa que las inundaciones, las precipitaciones extremas, el agua de mar y otros materiales ingresen a la tierra, los bienes inmuebles y los recursos naturales que el Demandante controla, u ocupa.

71. La conducta culpable y negligente de los Demandados, tal como se establece en este documento, se cometió de forma maliciosa, con grave menosprecio por la vida, la seguridad y la propiedad de los demás. "[C]uando el acto u omisión constituye delito, se realiza de forma dolosa o con grave menosprecio a la vida, la seguridad y la propiedad ajena, el juzgador puede imponer una indemnización adicional que no sea superior al monto del daño causado". 31 LPRA sec. 10803. Por lo tanto, la

parte demandante solicita una indemnización por daños punitivos[27] en una cantidad razonable, apropiada y suficiente para sancionar a los Demandados por el bien de la sociedad y para disuadirlos de cometer los mismos actos o actos similares.

**V.**
**Quinta Causa de Acción**
**Actos o prácticas injustas y engañosas en el comercio o las actividades económicas**
**10 LPRA § 259 y 10 LPRA § 268**

72. El Demandante reafirma e incorpora por referencia todas y cada una de las alegaciones contenidas en los párrafos anteriores como si estuvieran establecidas en este documento.

73. A pesar de saber en todo momento pertinente a esta demanda que la quema de combustibles fósiles genera contaminación de gases de efecto invernadero que provoca el cambio climático global y sus consecuencias concomitantes, los Demandados no proporcionaron advertencias proporcionales a los riesgos asociados con el uso previsto de sus productos, promocionaron indebidamente sus productos ocultando al público los peligros de los que eran conscientes, e implementaron sofisticadas campañas de comunicación y relaciones públicas para engañar al público sobre las consecuencias del uso de combustibles fósiles. Hasta el día de hoy, los Demandados continúan engañando al público mediante la promoción falsa y engañosa de sus productos como beneficiosos para el clima y a ellos mismos como defensores del cambio hacia un futuro con bajas emisiones de carbono, sin advertir que el consumo de sus productos es el principal impulsor del cambio climático. Estos actos y omisiones, según lo previsto, aumentaron y prolongaron artificialmente la demanda de combustibles fósiles y retrasaron la transición energética para dejar de usar combustibles fósiles, y por lo tanto exacerbaron las consecuencias nocivas del cambio climático para Puerto Rico.

74. Estas acciones y omisiones constituyen prácticas comerciales desleales y engañosas en violación de 10 LPRA § 259, por lo que conforme al 10 LPRA Sec. 268(b) los Demandados le responden al Estado Libre Asociado de Puerto Rico por los daños ocasionados al incurrir en dichas prácticas ilegales ocurridas en el comercio o en actividades económicas según lo define la Ley de Monopolios y Restricción del Comercio.

---

[27] Véase 31 L.P.R.A. § 5425.

75.     Estos actos y prácticas perjudicaron al Estado Libre Asociado, a sus ciudadanos y a sus recursos naturales y ambientales. Las acciones de los Demandados causaron directa e inmediatamente daños al Estado Libre Asociado, a sus ciudadanos y a sus recursos naturales y ambientales, cuyos daños se estiman en una cantidad no menor a mil millones de dólares.

## V.     Remedios Solicitados

**POR TODO LO CUAL**, el Gobierno de Puerto Rico solicita respetuosamente a este Honorable Tribunal que declare **CON LUGAR** la presente demanda y, en su virtud, emita Sentencia proveyendo los siguientes remedios:

1.     Otorgue una indemnización por daños y perjuicios, conjunta y solidariamente, por un monto no menor a mil millones de dólares;

2.     Conceda daños punitivos por un monto no menor a mil millones de dólares;

3.     Obligue a los Demandados a contribuir a un fondo equitativo para mitigar las molestias actuales que su conducta ilegal ha causado a Puerto Rico, y a pagar los costos de dicha reducción con cargo a dicho fondo, incluyendo, entre otros, los costos de fortalecer la infraestructura pública contra el aumento del nivel del mar y los daños de las tormentas, la restauración de recursos naturales, la financiación de medidas locales de resiliencia climática y la reconstrucción de barreras naturales para proteger a las comunidades del aumento del nivel del mar y las tormentas influenciadas por el clima;

4.     Determine que los actos y prácticas de los Demandados, tal como se describen en la Demanda, constituyen múltiples casos de prácticas ilegales en violación de la Ley de Monopolios y Restricción del Comercio, 10 LPRA § 259, y otorgue al Estado Libre Asociado de Puerto Rico los daños y perjuicios que resulten de dichas prácticas ilícitas de conformidad con 10 LPRA § 268(b);

5.     Prohíba de forma permanente a los Demandados incurrir en las prácticas ilícitas que se describen en la Demanda;

6.     Requiera a los Demandados que paguen las costas, gastos y honorarios de abogados relacionadas a la presente demanda;

7.     Otorgue cualesquiera otros remedios que procedan en derecho.

RESPETUOSAMENTE PRESENTADA.

En San Juan, Puerto Rico, hoy 15 de julio de 2024.

**Bufete Frank Torres-Viada, CSP**
P.O. Box 192084
San Juan, P.R. 00919-2084
Tel. 787- 754-1102
Fax 787 -754-1109

***f/FRANK TORRES-VIADA***
RÚA Núm. 14724
ftv@ftorres-viada.com

***f/JOSÉ A. ANDRÉU FUENTES***
RÚA Núm. 9088
jaf@andreu-sagardia.com

**Puerto Rico Legal Advisers, LLC**
P.O. Box 19586
San Juan, PR 00910
Tel: 787- 625-3300
**info@prlegaladvisers.com**

***f/RAMÓN ROSARIO CORTÉS***
RÚA Núm. 17224
rosario@prlegaladvisers.com

**Sher Edling LLP**
100 Montgomery St., Ste. 1410
San Francisco, CA 94104
Tel. (628) 231-2500
Fax (628) 231-2929

***f/VICTOR M. SHER***
(en proceso de solicitar admisión por cortesía)
vic@sheredling.com

***f/MATTHEW K. EDLING***
(en proceso de solicitar admisión por cortesía)
matt@sheredling.com

***f/KATIE H. JONES***
(en proceso de solicitar admisión por cortesía)
katie@sheredling.com

***f/ANTHONY M. TOHMÉ***
(en proceso de solicitar admisión por cortesía)
anthony@sheredling.com

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 1 de 91

# ANEXO A

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 2 de 91

**I. Los Demandados son responsables de provocar y acelerar el cambio climático.**

1. El calentamiento de la Tierra causado por el hombre es inequívoco. La atmósfera y los océanos se están calentando, el nivel del mar está aumentando, la capa de nieve y hielo está disminuyendo, los océanos se están acidificando y los sistemas hidrológicos se han alterado, entre otros cambios ambientales.[1]

2. El mecanismo por el cual la actividad humana causa el calentamiento global y la alteración del clima está bien establecido: el calentamiento de los océanos y la atmósfera es causado de forma abrumadora por emisiones antropogénicas de gases de efecto invernadero (causadas por el hombre).

3. Los gases de efecto invernadero son en gran medida subproductos de la quema de combustibles fósiles por parte de los seres humanos para producir energía y del uso de combustibles fósiles para crear productos petroquímicos. Si bien hay varios gases de efecto invernadero que contribuyen al cambio climático, el $CO_2$ es el principal gas de efecto invernadero emitido por las actividades humanas.

4. Antes de la Segunda Guerra Mundial, la mayoría de las emisiones antropogénicas de $CO_2$ se debían a prácticas de uso de la tierra, como la silvicultura y la agricultura, que alteraron la capacidad de la tierra y la biosfera global para absorber $CO_2$ de la atmósfera; los impactos de tales actividades en el clima de la Tierra eran relativamente menores.

5. Sin embargo, desde entonces, tanto la tasa anual como el volumen total de emisiones antropogénicas de $CO_2$ han aumentado enormemente tras la llegada de grandes usos del petróleo, el gas y el carbón.

6. El siguiente gráfico ilustra que las emisiones de combustibles fósiles son la fuente dominante de aumento del $CO_2$ atmosférico desde mediados del siglo XX:

[1] IPCC, Global Carbon and Other Biogeochemical Cycles and Feedbacks, in Climate Change 2021: The Physical Science Basis. Contribution of Working Group I in the Sixth Assessment Report 688 (2021).



Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 31 of 119

**Figura 3: Emisiones globales anuales, 1850-2020**[2]

7. La reciente aceleración de las emisiones de combustibles fósiles ha provocado el correspondiente aumento pronunciado de la concentración atmosférica de $CO_2$. Desde 1960, la concentración de $CO_2$ en la atmósfera ha aumentado de menos de 320 partes por millón ("ppm") a aproximadamente 419 ppm.[3] La tasa de crecimiento del $CO_2$ atmosférico también ha ido aumentando. De 1960 a 1970, el $CO_2$ atmosférico aumentó en un promedio de aproximadamente 1 ppm por año; en los últimos cinco años, ha aumentado alrededor de 2,5 ppm por año.[4]

8. El siguiente gráfico indica el estrecho vínculo entre el fuerte aumento de las emisiones procedentes de la quema de combustibles fósiles y el pronunciado aumento de las concentraciones atmosféricas de $CO_2$.

---

[2] Global Carbon Project, Global Carbon Budget 2021 83 (Nov. 4, 2021), https://www.globalcarbonproject.org/carbonbudget/21/files/GCP_CarbonBudget_2021.pdf.
[3] Global Monitoring Laboratory, Trends in Atmospheric Carbon Dioxide, NOAA (last visited Sept. 30, 2022), https://www.esrl.noaa.gov/gmd/ccgg/trends.
[4] Ibid.



**Figura 4: Concentración de $CO_2$ atmosférico y emisiones anuales**[5]

9. Debido al aumento de la quema de productos de combustibles fósiles, las concentraciones de gases de efecto invernadero en la atmósfera han alcanzado un nivel sin precedentes desde hace al menos tres millones de años.[6]

10. A medida que los gases de efecto invernadero se acumulan en la atmósfera, la Tierra irradia menos energía al espacio. Esta acumulación y la alteración asociada del equilibrio energético de la Tierra tiene innumerables consecuencias ambientales y físicas, que incluyen, entre otras, las siguientes:

a. Calentamiento de la temperatura media de la superficie de la Tierra, tanto a nivel local como global, y aumento de la frecuencia e intensidad de las olas de calor; hasta la fecha, la temperatura media global del aire ha aumentado aproximadamente 1,09 °C (1,9 °F) por encima de las temperaturas preindustriales; las temperaturas en determinados lugares han aumentado más;

b. Aumento del nivel del mar, debido a la expansión térmica del calentamiento de las aguas del océano y la escorrentía procedente del deshielo de los glaciares y las capas de hielo;

c. Inundaciones y anegamiento de tierras e infraestructuras, aumento de la erosión, aumento de las olas y mareas, aumento de la frecuencia y gravedad de las marejadas ciclónicas, intrusión de agua salada y otros impactos del aumento del nivel del mar;

[5] Rebecca Lindsey, Climate Change: Atmospheric Carbon Dioxide, NOAA (June 23, 2022), https://www.climate.gov/news-features/understanding-climate/climate-change-atmospheric-carbon-dioxide.
[6] Science Daily, More $CO_2$ Than Ever Before in 3 Million Years, Shows Unprecedented Computer Simulation (Apr. 3, 2019), https://www.sciencedaily.com/releases/2019/04/190403155436.htm.

       d. Cambios en el clima global generalmente hacia períodos secos más prolongados intercalados con menos períodos de precipitaciones y más severos, y los impactos asociados en la cantidad y calidad de los recursos hídricos disponibles para los sistemas humanos y ecológicos;

e. Acidificación de los océanos, debido a la mayor absorción de dióxido de carbono atmosférico por los océanos;

f. Mayor frecuencia e intensidad de las precipitaciones y fenómenos meteorológicos extremos debido al aumento de la capacidad de la atmósfera para retener la humedad y al aumento de la evaporación;

g. Cambios en los ecosistemas terrestres y marinos y los consiguientes impactos en la variedad de flora y fauna; e

h. Impactos adversos en la salud humana asociados con el clima extremo, el calor extremo, la disminución de la calidad del aire y las enfermedades transmitidas por vectores.

11. Como se analiza a continuación, estas consecuencias de la conducta ilícita y engañosa de los Demandados y su exacerbación de la crisis climática ya están impactando a Puerto Rico, sus comunidades y sus recursos naturales, y seguirán aumentando en gravedad en Puerto Rico. Sin la exacerbación por parte de los Demandados del calentamiento global causado por su conducta engañosa e ilícita como se alega en este documento, los cambios físicos y ambientales actuales causados por el calentamiento global habrían sido mucho menores que los observados hasta la fecha. De manera similar, los efectos que se producirán en el futuro también serían mucho menos perjudiciales o se evitarían por completo.[7]

12. Desde al menos 1965 hasta el presente, los Demandados inflaron indebidamente el mercado de productos de combustibles fósiles al promover agresivamente el uso de productos de combustibles fósiles a pesar de conocer los peligros asociados con esos productos, y al engañar a los consumidores y al público sobre las consecuencias del uso normal de productos de combustibles fósiles, incluyendo no advertir y tergiversar y ocultar los peligros de dichos productos. En consecuencia, se han emitido al medio ambiente una cantidad sustancialmente mayor de gases de efecto invernadero antropogénicos de los que se habrían emitido sin esa conducta ilícita y engañosa, exacerbando los efectos de esas emisiones de lo que se habrían

[7] See, e.g., Peter U. Clark et al., Consequences of Twenty-First-Century Policy for Multi-Millennial Climate and Sea-Level Change, 6 Nature Climate Change 360, 365 (2016) ("Nuestro modelo sugiere que la huella de carbono humana de alrededor de [470 mil millones de toneladas] para el año 2000... ya ha comprometido a la Tierra a un aumento del nivel del mar promedio global de ~1.7m (rango de 1.2 a 2.2 m).").

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 6 de 91

producido de otra manera y causando mayores daños a Puerto Rico. La conducta ilícita, engañosa y desmesurada de los Demandados, como se alega en este documento, causó una porción sustancial de la emisión de gases de efecto invernadero en la atmósfera global. concentraciones, y las perturbaciones pasadas, actuales y futuras al medio ambiente (y los consiguientes daños a Puerto Rico, sus comunidades y sus recursos) asociados con ellas.

13. Los Demandados, individualmente y en conjunto, han contribuido de manera sustancial y mensurable a los daños relacionados con la crisis climática en Puerto Rico.

## II. Los Demandados hicieron todo lo posible para comprender y conocían, o deberían haber conocido, los peligros asociados con sus productos de combustibles fósiles.

14. La industria de los combustibles fósiles conoce los posibles efectos de calentamiento de las emisiones de gases de efecto invernadero desde la década de 1950, desarrollando una comprensión sofisticada del cambio climático que superó con creces el conocimiento del público, los consumidores comunes y el Estado Libre Asociado. Aunque oculto en ese momento, el conocimiento de la industria fue descubierto más tarde por periodistas de Inside Climate News y Los Angeles Times, entre otros.[8] En 1954, el geoquímico Harrison Brown y sus colegas del Instituto de Tecnología de California escribieron al API para informar a la asociación comercial que las mediciones preliminares de los archivos naturales de carbono en los anillos de los árboles indicaban que los combustibles fósiles habían provocado que los niveles de dióxido de carbono atmosférico aumentaran aproximadamente un 5 % desde 1840.[9] El API financió a los científicos para varios proyectos de investigación, y las mediciones de dióxido de carbono continuaron durante al menos un año y posiblemente más, aunque los resultados nunca fueron publicados ni puestos a disposición del público.[10]

15. En 1957, H.R. Brannon de Humble Oil (predecesor en interés de ExxonMobil) midió un aumento del dióxido de carbono atmosférico similar al medido por Harrison Brown. Brannon comunicó esta información al API. Brannon conocía las medidas de Brown, las comparó con las suyas y descubrió que coincidían. Brannon publicó sus resultados en la literatura científica, que estaba disponible para los Demandados y/o sus predecesores en interés.[11]

---

[8] See discussion infra ¶¶ 137–38.

[9] See Benjamin Franta, Early Oil Industry Knowledge of $CO_2$ and Global Warming, 8 Nature Climate Change 1024, 1024–25 (2018).

[10] Id.

[11] H.R. Brannon, Jr. et al., Radiocarbon Evidence on the Dilution of Atmospheric and Oceanic Carbon by Carbon from Fossil Fuels, 38 Am. Geophysical Union Transactions 643, 643–50 (1957).

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 35 of 119

16. En 1959, el API organizó una celebración del centenario de la industria petrolera estadounidense en la Universidad de Columbia en la ciudad de Nueva York.[12] Asistieron representantes de alto nivel de los Demandados. Uno de los oradores principales fue el físico nuclear Edward Teller. Teller advirtió a la industria que "un aumento de temperatura correspondiente a un aumento del 10 [%] en el dióxido de carbono será suficiente para derretir la capa de hielo y sumergir. . . [t]odas las ciudades costeras". Teller añadió que, dado que "unporcentaje considerable de la raza humana vive en regiones costeras, creo que esta contaminación química es más grave de lo que la mayoría de la gente cree".[13]

17. Después de su discurso, se le pidió a Teller que "resumiera brevemente el peligro del aumento del contenido de dióxido de carbono en la atmósfera en este siglo". Respondió que "existe la posibilidad de que los casquetes polares comiencen a derretirse y el nivel de los océanos comience a subir".[14]

18. En 1965, la preocupación por el potencial de los productos de combustibles fósiles de causar un calentamiento global desastroso alcanzó los niveles más altos de la comunidad científica de Estados Unidos. Ese año, el Panel de Contaminación Ambiental del Comité Asesor Científico del Presidente Lyndon B. Johnson informó que un aumento del 25 % en las concentraciones de dióxido de carbono podría ocurrir para el año 2000, que tal aumento podría causar un calentamiento global significativo, que podría producirse el derretimiento de la capa de hielo de la Antártida y un rápido aumento del nivel del mar, y que los combustibles fósiles eran la fuente más clara de contaminación por dióxido de carbono.[15]

19. Tres días después de que se publicara el informe del Comité Asesor Científico del presidente Johnson, el presidente del API, Frank Ikard, se dirigió a los líderes de la industria petrolera en Chicago en la reunión anual de la asociación comercial. Ikard transmitió los hallazgos del informe a los líderes de la industria y dijo:

> Lo esencial del informe es que todavía hay tiempo para salvar a los pueblos del mundo de las consecuencias catastróficas de la contaminación, pero el tiempo se acaba.[16]

Ikard también informó que "para el año 2000, el equilibrio térmico se habrá modificado tanto que posiblemente cause cambios marcados en el clima más allá de los esfuerzos locales o incluso

[12] See Allan Nevins & Robert G. Dunlop, Energy and Man: A Symposium (Appleton-Century-Crofts, New York 1960). See also Franta, Early Oil Industry Knowledge of $CO_2$ and Global Warming at 1024–25.
[13] Edward Teller, Energy Patterns of the Future, in Energy and Man: A Symposium 53–72 (1960).
[14] Id.
[15] President's Science Advisory Committee, Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel 9, 119–24 (Nov. 1965), https://hdl.handle.net/2027/uc1.b4315678.
[16] See Franta, Early Oil Industry Knowledge of $CO_2$ and Global Warming at 1024–25.

nacionales" y citó la conclusión del informe de que "la contaminación procedente de los motores de combustión interna es tan grave y aumenta tan rápido que es probable que un medio alternativo no contaminante para impulsar automóviles, autobuses y camiones se convierta en una necesidad nacional".[17]

20. Así, en 1965, los Demandados y sus predecesores en interés sabían que la comunidad científica había descubierto que los productos de combustibles fósiles, si se utilizaban de manera despilfarradora, causarían calentamiento global para finales de siglo, y que dicho calentamiento global tendría amplias y costosas consecuencias.

21. En 1968, el API recibió un informe del Instituto de Investigación de Stanford, al que había contratado para evaluar el estado de la investigación sobre contaminantes ambientales, incluido el dióxido de carbono.[18] La evaluación respaldó las conclusiones del Consejo Asesor Científico del presidente Johnson de tres años antes, donde afirmó: "Es casi seguro que se producirán cambios significativos de temperatura para el año 2000, y... no parece haber duda de que el daño potencial a nuestro medio ambiente podría ser grave". Los científicos advirtieron sobre el "derretimiento de la capa de hielo de la Antártida" e informaron al API que "los estudios pasados y presentes sobre el $CO_2$ son detallados y parecen explicar adecuadamente el estado actual del $CO_2$ en la atmósfera". Lo que faltaba, dijeron los científicos, era trabajar en "tecnología de contaminación del aire y... sistemas en los que las emisiones de $CO_2$ estarían bajo control".[19]

22. En 1969, el Instituto de Investigación de Stanford entregó al API un informe complementario sobre la contaminación del aire, en el que proyectaba con alarmante particularidad que las concentraciones atmosféricas de $CO_2$ alcanzarían las 370 partes por millón ("ppm") en el año 2000.[20] Esta proyección resultó coincidir casi exactamente con las concentraciones reales de $CO_2$ medidas en 2000 de 369,64 ppm.[21] El informe relacionóexplícitamente el aumento de los niveles de $CO_2$ con la combustión de combustibles fósiles, y consideró "poco probable que el aumento observado del $CO_2$ atmosférico se haya debido a cambios en la biosfera".

---

17 Id.
18 Elmer Robinson & R.C. Robbins, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, Stanford Rsch. Inst. (Feb. 1968), https://www.smokeandfumes.org/documents/document16.
19 Ibid.
20 Elmer Robinson & R.C. Robbins, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants Supplement, Stanford Rsch. Inst. (June 1969).
21 NASA Goddard Institute for Space Studies, Global Mean $CO_2$ Mixing Ratios (ppm): Observations, https://data.giss.nasa.gov/modelforce/ghgases/Fig1A.ext.txt.

23. En virtud de su pertenencia y participación en el API en ese momento, los Demandados recibieron o deberían haber recibido informes del Instituto de Investigación de Stanford y/o resúmenes de esos informes, y fueron notificados de sus conclusiones.

24. En 1972, los miembros del API, incluidos los Demandados, recibieron un informe de situación sobre todos los proyectos de investigación ambiental financiados por el API. El informe resumió el informe del SRI de 1968 que describía el impacto de los productos de combustibles fósiles (incluidos los de los Demandados) en el medio ambiente, incluido el calentamiento global y sus consecuencias concomitantes. Los Demandados y/o sus predecesores en interés que recibieron este informe incluyeron, entre otros: American Standard of Indiana (BP), Asiatic (Shell), Atlantic Richfield (BP), British Petroleum (BP), Chevron Standard of California (Chevron), Esso Research (ExxonMobil), Ethyl (anteriormente afiliada a Esso, que estaba subsumida por ExxonMobil), Getty (ExxonMobil), Gulf (Chevron, entre otras), Humble Standard of New Jersey (ExxonMobil, Chevron, BP), Mobil (ExxonMobil), Pan American (BP), Shell, Standard of Ohio (BP), Texaco (Chevron), Union (Chevron), Skelly (ExxonMobil), Colonial Pipeline (la propiedad ha incluido las entidades BP, ExxonMobil y Chevron, entre otras), Continental (ConocoPhillips), Dupont (antiguo propietario de Conoco), Phillips (ConocoPhillips), y Caltex (Chevron).[22]

25. En 1977, James Black, de la División de Investigación de Productos de Exxon, se presentó ante el Comité de Gestión de Exxon Corporation con respecto al efecto invernadero. Al año siguiente, Black se presentó ante otro grupo interno de Exxon, PERCC. En una carta al vicepresidente de Exxon Research and Engineering, Black resumió sus presentaciones.[23] Informó que “la opinión científica actual está abrumadoramente a favor de atribuir el aumento del dióxido de carbono atmosférico al consumo de combustibles fósiles”, y que duplicar el dióxido de carbono atmosférico, según el mejor modelo climático disponible, “produciría un aumento de la temperatura media de aproximadamente 2 °C a 3 °C sobre la mayor parte de la Tierra”, con dos o tres veces más calentamiento en los polos. La siguiente figura, tomada del informe de Black, ilustra la comprensión de Exxon de la escala de tiempo y la magnitud del calentamiento global que causarían sus productos.

---

[22] American Petroleum Institute, Committee for Air and Water Conservation, Environmental Research: A Status Report (Jan. 1972), http://files.eric.ed.gov/fulltext/ED066339.pdf.

[23] Letter from J.F. Black, Exxon Research and Engineering Co., to F.G. Turpin, Exxon Research and Engineering Co., The Greenhouse Effect, ClimateFiles (June 6, 1978), http://www.climatefiles.com/exxonmobil/1978-exxon-memo-on-greenhouse-effect-for-exxon-corporation-management-committee.



**Figura 5: Calentamiento global futuro predicho internamente por Exxon en 1977**[24]

26. Los efectos de ese calentamiento global, según Black, incluirían "más lluvias", lo que "beneficiaría a algunas áreas y perjudicaría a otras". "Algunos países se beneficiarían, pero otros podrían ver reducida o destruida su producción agrícola". "Sin embargo, incluso las naciones favorecidas se verían perjudicadas por un tiempo, ya que sus patrones agrícolas e industriales se han establecido sobre la base del clima actual". Black informó que "actualmente se estima que la humanidad tiene un plazo de entre 5 y 10 años para obtener la información necesaria" y "establecer lo que se debe hacer", momento en el que "las decisiones difíciles sobre cambios en las estrategias energéticas podrían volverse críticas".[25]

27. También en 1977, Henry Shaw, del Centro de Viabilidad de Tecnología de Ingeniería e Investigación de Exxon, asistió a una reunión de científicos y funcionarios gubernamentales en Atlanta, Georgia, sobre el desarrollo de programas de investigación para estudiar el dióxido de carbono y el calentamiento global. El memorando interno de Shaw a John W. Harrison de Exxon informó que "[l]os efectos climáticos de la liberación de dióxido de carbono pueden ser el principal factor limitante en la producción de energía a partir de combustibles fósiles[.]"26

---

[24] Ibid. La empresa predijo un calentamiento global de 3°C para el año 2050, con un calentamiento de 10°C en las regiones polares. La diferencia entre las curvas discontinuas y sólidas antes de 1977 representa el calentamiento global que Exxon creía que ya podría estar ocurriendo.

[25] Ibid.

[26] Henry Shaw, Environmental Effects of Carbon Dioxide, Climate Investigations Ctr. (Oct. 31, 1977), https://www.industrydocuments.ucsf.edu/docs/tpwl0228.

28. En 1979, WL Ferrall de Exxon distribuyó un memorando interno.[27] Según ese memorando, "La teoría más extendida [sobre el calentamiento global] es que: El aumento [del dióxido de carbono] se debe a la quema de combustibles fósiles; [e]l aumento de la concentración de $CO_2$ provocará un calentamiento de la superficie terrestre; [y] la tendencia actual del consumo de combustibles fósiles causará efectos ambientales dramáticos antes del año 2050… El problema potencial es grande y urgente". El memorando añade que, si no se ponen límites a la producción de combustibles fósiles,

> Alrededor de 2010 se producirían cambios de temperatura notables, cuando la concentración [de dióxido de carbono] alcance las 400 ppm [partes por millón]. Alrededor de 2035 se producirán cambios climáticos importantes, cuando la concentración se acerque a las 500 ppm. Alrededor de 2050 se producirá una duplicación de la concentración preindustrial [es decir, 580 ppm]. Esta duplicación provocaría cambios dramáticos en el medio ambiente mundial[.][28]

Esas proyecciones resultaron notablemente precisas: las concentraciones promedio anuales de $CO_2$ en la atmósfera superaron las 400 ppm en 2015 por primera vez en millones de años.[29] Limitar la concentración de dióxido de carbono en la atmósfera a 440 ppm, o un aumento del 50 % con respecto a los niveles preindustriales que, según el memorando "se supone que es un nivel relativamente seguro para el medio ambiente", requeriría que las emisiones de combustibles fósiles alcancen su punto máximo en los años 1990 y rápido despliegue de sistemas de energía no fósiles. El memorando calculaba que el ochenta por ciento de los recursos de combustibles fósiles tendrían que dejarse bajo tierra para evitar que se dupliquen las concentraciones de dióxido de carbono en la atmósfera. Algunos combustibles fósiles, como el petróleo de esquisto, no podrían explotarse sustancialmente en absoluto.

29. Pero en lugar de hacer caso a las repetidas advertencias sobre los impactos catastróficos del cambio climático resultantes de la quema de combustibles fósiles, en noviembre de 1979, Henry Shaw de Exxon escribió a Harold Weinberg de Exxon instando a "un programa defensivo muy agresivo en… ciencia atmosférica y clima porque existe una buena probabilidad de que se apruebe una legislación que afecte a nuestro negocio".[30] Shaw afirmó que era necesario ampliar el esfuerzo de investigación para "influir en una posible legislación sobre controles ambientales" y "responder" a los grupos ambientalistas, que ya se habían opuesto a los

---

[27] Letter from W.L. Ferrall, Exxon Research and Engineering Co., to Dr. R.L. Hirsch, Controlling Atmospheric $CO_2$, Climate Investigations Ctr. (Oct. 16, 1979), https://www.industrydocuments.ucsf.edu/docs/mqwl0228.
[28] Ibid.
[29] Nicola Jones, How the World Passed a Carbon Threshold and Why It Matters, Yale Env't 360 (Jan. 26, 2017), http://e360.yale.edu/features/how-the-world-passed-a-carbon-threshold-400ppm-and-why-it-matters.
[30] Memorandum from H. Shaw to H.N. Weinberg, Research in Atmospheric Science, Climate Investigations Ctr. (Nov. 19, 1979), https://www.industrydocuments.ucsf.edu/docs/yqwl0228.

programas de combustibles sintéticos basados en las emisiones de $CO_2$. Shaw sugirió la formación de un "pequeño grupo de trabajo" para evaluar un programa potencial sobre $CO_2$ y clima, lluvia ácida, partículas cancerígenas y otros problemas de contaminación causados por los combustibles fósiles.[31]

30. En 1979, el API y sus miembros, incluidos los Demandados, convocaron un grupo de trabajo para monitorear y compartir investigaciones climáticas de vanguardia entre la industria petrolera. El grupo se llamó inicialmente Grupo de Trabajo sobre CO2 y Clima, pero en 1980 cambió su nombre por el de Grupo de Trabajo sobre Clima y Energía (en adelante, "Grupo de Trabajo sobre CO2"). Entre los miembros había científicos e ingenieros de alto nivel de casi todas las principales empresas multinacionales y de petróleo y gas de EE. UU., incluidas Exxon, Mobil (ExxonMobil), Amoco (BP), Phillips (ConocoPhillips), Texaco (Chevron), Shell, Sohio (BP), Standard Oil de California (Chevron), y Gulf Oil (Chevron), entre otras. El Grupo de Trabajo se encargó de monitorear la investigación académica y gubernamental, evaluar las implicaciones de la ciencia emergente para las industrias del petróleo y el gas, e identificar dónde se podrían realizar reducciones en las emisiones de gases de efecto invernadero provenientes de los productos de combustibles fósiles de los Demandados.[32]

31. En 1979, el API preparó un documento de información sobre dióxido de carbono y clima para el Grupo de Trabajo sobre CO2, en el que afirmaba que las concentraciones de $CO_2$ estaban aumentando de forma constante en la atmósfera y prediciendo cuándo podrían detectarse los primeros efectos claros del calentamiento global.[33] El API informó a sus miembros que, aunque se produciría un calentamiento global, probablemente no se detectaría hasta aproximadamente el año 2000 porque, según creía el API, sus efectos estaban temporalmente enmascarados por una tendencia de enfriamiento natural. Sin embargo, el API advirtió a sus miembros que esta tendencia de enfriamiento se revertiría alrededor de 1990, sumándose al calentamiento causado por el $CO_2$.

32. En 1980, el Grupo de Trabajo sobre $CO_2$ del API invitó al Dr. John Laurmann, "un reconocido experto en el campo del $CO_2$ y el clima", a hacer una presentación ante sus

[31] Ibid.
[32] Neela Banerjee, Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too, Inside Climate News (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco.
[33] Memorandum from R.J. Campion to J.T. Burgess, The API's Background Paper on $CO_2$ Effects, Climate Investigations Ctr. (Sep. 6, 1979), https://www.industrydocuments.ucsf.edu/docs/lqwl0228.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 13 de 91

miembros.[34] La reunión duró siete horas e incluyó un "debate técnico completo" sobre el calentamiento global causado por los combustibles fósiles, incluida "la base científica y la evidencia técnica de la acumulación de $CO_2$, el impacto en la sociedad, los métodos de modelización y sus consecuencias, las incertidumbres y las implicaciones políticas y conclusiones que se pueden extraer del conocimiento actual". Estuvieron presentes representantes de Standard Oil of Ohio (predecesora de BP), Texaco (ahora Chevron), Exxon y API, y las actas de la reunión se distribuyeron a todo el Grupo de Trabajo sobre $CO_2$ del API. Laurmann informó al Grupo de Trabajo sobre el "consenso científico sobre el potencial de una gran respuesta climática futura al aumento de los niveles de $CO_2$" y que había "pruebas empíricas sólidas de que [el aumento de dióxido de carbono] [fue] causado por la liberación antropogénica de $CO_2$, principalmente de la quema de combustibles fósiles". A menos que se controlara la producción y el uso de combustibles fósiles, el dióxido de carbono atmosférico duplicaría los niveles preindustriales para 2038, con "impactos probables" a lo largo de la siguiente trayectoria:

> AUMENTO DE 1 °C (2005): APENAS PERCEPTIBLE
>
> AUMENTO DE 2,5 °C (2038): PRINCIPALES CONSECUENCIAS ECONÓMICAS, FUERTE DEPENDENCIA REGIONAL
>
> AUMENTO DE 5 °C (2067): EFECTOS CATASTRÓFICOS A NIVEL MUNDIAL

Laurmann advirtió al Grupo de Trabajo sobre $CO_2$ que un calentamiento global de 2,5 °C "detendría el crecimiento económico mundial[.]" Laurmann también sugirió que se deberían tomar medidas de inmediato y preguntó: "¿Es hora de actuar?" y señalando que si lograr una fuerte introducción en el mercado de nuevas fuentes de energía requeriría mucho tiempo (es decir, décadas), entonces "no habría margen" para retrasarlo. Las actas de la reunión del Grupo de Trabajo sobre $CO_2$ muestran que uno de los objetivos del Grupo de Trabajo era "ayudar a desarrollar reglas básicas para [...] la limpieza de combustibles con relación a la creación de $CO_2$", y el Grupo de Trabajo debatió los requisitos para un "cambio de fuentes de energía" en todo el mundo, y abandonar los combustibles fósiles.[35]

33. En 1980, Imperial Oil Limited (una filial canadiense de ExxonMobil) informó a los directivos y al personal ambiental de múltiples empresas afiliadas de Esso y Exxon que"no había duda" de que los combustibles fósiles estaban agravando la acumulación de $CO_2$ en la

[34] Letter from Jimmie J. Nelson, American Petroleum Institute, to AQ-9 Task Force, The CO2 Problem; Addressing Research Agenda Development, Climate Investigations Ctr. (Mar. 18, 1980), https://www.industrydocuments.ucsf.edu/docs/gffl0228.
[35] Ibid.

atmósfera.[36] Imperial señaló que "existe tecnología para eliminar el $CO_2$ de los gases de chimenea, pero la eliminación de solo el 50 % del $CO_2$ duplicaría el costo de la generación de energía".37

34. En diciembre de 1980, Henry Shaw, de Exxon, distribuyó un memorando sobre el "Efecto Invernadero del $CO_2$".[38] Shaw afirmó que la futura acumulación de dióxido de carbono era función del uso de combustibles fósiles y que los cálculos internos realizados en Exxon indicaban que el dióxido de carbono atmosférico se duplicaría alrededor del año 2060. Según los modelos climáticos "más aceptados", informó Shaw, esta duplicación del dióxido de carbono "muy probablemente" daría como resultado un calentamiento global de aproximadamente 3 °C, con un efecto mayor en las regiones polares. Los cálculos que predecían un aumento de temperatura más bajo, como 0,25 °C, "no eran muy apreciados por la comunidad científica", dijo Shaw. Shaw también señaló que la capacidad de los océanos para absorber calor podría retrasar (pero no prevenir) el aumento de la temperatura "unas décadas", y que las fluctuaciones naturales y aleatorias de la temperatura ocultarían el calentamiento global debido al $CO_2$ hasta aproximadamente el año 2000. El memorando incluía la figura a continuación, que ilustra el calentamiento global anticipado por Exxon, así como la idea de la empresa de que se produciría un calentamiento global significativo antes de exceder el rango de variabilidad natural.

[36] Imperial Oil Ltd., Review of Environmental Protection Activities for 1978–1979 (Aug. 6, 1980), http://www.documentcloud.org/documents/2827784-1980-Imperial-Oil-Review-of-Environmental.html#document/p2.
[37] Ibid.
[38] Memorandum from Henry Shaw to T.K. Kett, Exxon Research and Engineering Company's Technological Forecast: $CO_2$ Greenhouse Effect (Dec. 18, 1980), https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-Summarizing-Current-Models-And.html.



**Figura 6: Calentamiento global futuro predicho internamente por Exxon en 1980**[39]

El memorando informaba que ese calentamiento global provocaría "un aumento de las precipitaciones […] y una mayor evaporación", lo que tendría un "impacto dramático en la humedad del suelo y, a su vez, en la agricultura". Algunas áreas se convertirían en desiertos y el Medio Oeste estadounidense se volvería "mucho más seco". "[L]as malezas y plagas", informaba el memorando, "tenderían a prosperar con el aumento de la temperatura promedio global". También podrían surgir otros "graves problemas globales", como el derretimiento de la capa de hielo de la Antártida occidental, que "podría provocar un aumento del nivel del mar del orden de 5 metros". El memorando pedía que la "sociedad" pagara la factura, estimando que algunas medidas de adaptación no costarían más que "un pequeño porcentaje" del Producto Nacional Bruto (es decir, 400.000 millones de dólares en 2018).[40] Exxon predijo que no se adaptarían medidas políticas nacionales hasta alrededor de 1989, cuando el Departamento de Energía terminaría un estudio de diez años sobre el dióxido de carbono y el calentamiento global.[41] Shaw también informó que Exxon había estudiado varias respuestas para evitar o reducir la acumulación de dióxido de carbono, entre ellas "detener toda combustión de combustibles fósiles al ritmo de 1980" e "investigar la introducción en el mercado de tecnologías de combustibles no

[39] Ibid. La empresa anticipó una duplicación del dióxido de carbono alrededor de 2060 y que los océanos retrasarían el efecto de calentamiento unas décadas, lo que provocaría un calentamiento de aproximadamente 3°C para finales de siglo.
[40] Ibid.; see Gross National Product, Fed. Reserve Bank of St. Louis (updated Mar. 26, 2020), https://fred.stlouisfed.org/series/GNPA.
[41] Memorandum from Henry Shaw to T.K. Kett, Exxon Research and Engineering Company's Technological Forecast: $CO_2$ Greenhouse Effect (Dec. 18, 1980), https://www.documentcloud.org/documents/2805573-1980-Exxon-Memo-Summarizing-Current-Models-And.html.

fósiles". El memorando estimaba que dichas tecnologías de energía no fósil "necesitarían unos 50 años para introducirse y alcanzar aproximadamente la mitad del mercado [energético] total".[42]

35. En febrero de 1981, la Oficina de Investigación por Contrato de Exxon preparó y distribuyó un "Estudio de alcance sobre el $CO_2$" a los dirigentes de Exxon Research and Engineering Company.[43] El estudio examinó la investigación actual de Exxon sobre el dióxido de carbono y consideró si ampliar aún más la investigación de Exxon sobre el dióxido de carbono o el calentamiento global en ese momento. El estudio recomendó no expandir las actividades de investigación de Exxon en esas áreas porque sus programas de investigación actuales eran suficientes para lograr los objetivos de la empresa de monitorear de cerca la investigación federal, generar credibilidad y valor de relaciones públicas y desarrollar experiencia interna con respecto al $CO_2$ y el calentamiento global. Sin embargo, el estudio recomendó que Exxon centralice sus actividades en el seguimiento, análisis y difusión de investigaciones externas sobre el $CO_2$ y el calentamiento global. El estudio afirmaba que James Black, de Exxon, estaba supervisando activamente y manteniendo a la empresa informada sobre los desarrollos de investigación externos, incluidos aquellos sobre modelos climáticos y "efectos inducidos por $CO_2$". El estudio también señaló que otras empresas de la industria de los combustibles fósiles estaban "auditando las reuniones gubernamentales sobre el tema". En cuanto a las "opciones para reducir la acumulación de $CO_2$ en la atmósfera", el estudio señaló que si bien capturar $CO_2$ de los gases de combustión (es decir, los gases de escape producidos por la combustión) era tecnológicamente posible, el costo era alto y "la conservación de energíao el cambio a fuentes de energía renovables representa las únicas opciones que podrían tener sentido".[44]

36. Así, en 1981, Exxon y otras empresas de combustibles fósiles estaban monitoreando activamente todos los aspectos de la investigación sobre el $CO_2$ y el calentamiento global, tanto a nivel nacional como internacional, y Exxon había reconocido que sería necesario un cambio hacia fuentes de energía renovables para evitar una gran acumulación de $CO_2$ en la atmósfera y el consiguiente calentamiento global.

37. El científico de Exxon, Roger Cohen, advirtió a sus colegas en un memorando interno de 1981 que "los futuros desarrollos en la recopilación y análisis de datos globales, junto con los avances en la modelación climática, pueden proporcionar pruebas sólidas de un efecto

---

[42] Ibid.
[43] Letter from G.H. Long, Exxon Research and Engineering Co., to P.J. Lucchesi et al., Atmospheric $CO_2$ Scoping Study, Climate Investigations Ctr. (Feb. 5, 1981), https://www.industrydocuments.ucsf.edu/docs/yxfl0228.
[44] Ibid.

retardado del $CO_2$ de una magnitud verdaderamente sustancial", y que en determinadas circunstancias sería "muy probable que reconozcamos sin ambigüedades la amenaza para el año 2000".[45] Cohen había expresado su preocupación de que el memorando subestimara los efectos potenciales de las incesantes emisiones de $CO_2$ procedentes de los productos de combustibles fósiles de los Demandados, afirmando que: "es claramente posible que [la División de Planificación de Exxon] . . . produzca efectos que de hecho serán catastróficos (al menos para una fracción sustancial de la población mundial)".[46]

38. En 1981, Henry Shaw de Exxon, el principal investigador climático de la empresa en ese momento, preparó un resumen de la posición actual de Exxon sobre el efecto invernadero para Edward David Jr., presidente de Exxon Research and Engineering, en el que se afirmaba en la parte relevante:

- "El $CO_2$ atmosférico se duplicará en 100 años si los combustibles fósiles crecen un 1,4 % anual.
- Aumento de la temperatura media global de 3 °C y de 10 °C en los polos si se duplica el $CO_2$.
  - Grandes cambios en las precipitaciones/agricultura
  - El hielo polar podría derretirse"[47]

39. En 1982, otro informe preparado para el API por científicos del Observatorio Geológico Lamont-Doherty de la Universidad de Columbia reconoció que la concentración atmosférica de $CO_2$ había aumentado significativamente en comparación con el comienzo de la revolución industrial: de aproximadamente 290 ppm a aproximadamente 340 ppm en 1981. El informe también reconoció que, a pesar de las diferencias en las predicciones de los modelos climáticos, había consenso científico en que "una duplicación del $CO_2$ atmosférico desde . . . el valor de la revolución preindustrial daría como resultado un aumento promedio de la temperatura global de (3,0 ± 1,5) °C [5,4 ± 2,7 °F]". Además, advertía que "calentamiento de este tipo puede tener graves consecuencias para la comodidad y la supervivencia del hombre, ya que los patrones de aridez y precipitaciones pueden cambiar, la altura del nivel del mar puede aumentar considerablemente y el suministro mundial de alimentos puede verse afectado".[48] La propia

---

[45] Memorandum from R.W. Cohen to W. Glass, ClimateFiles (Aug. 18, 1981), http://www.climatefiles.com/exxonmobil/1981-exxon-memo-on-possible-emission-consequences-of-fossil-fuel-consumption.

[46] Ibid.

[47] Memorandum from Henry Shaw to Dr. E.E. David, $CO_2$ Position Statement, Inside Climate News (May 15, 1981) (footnote omitted), https://insideclimatenews.org/documents/exxon-position-co2-1981.

[48] American Petroleum Institute, Climate Models and CO2 Warming: A Selective Review and Summary (Columbia Univ., Mar. 1982), https://assets.documentcloud.org/documents/2805626/1982-API-Climate-Models-and-CO2-Warming-a.pdf.

investigación de modelos de Exxon lo confirmó, y los resultados de la empresa se publicaron posteriormente en al menos tres artículos científicos revisados por expertos.[49]

40. También en 1982, el Director de Asuntos Ambientales de Exxon distribuyó un manual sobre el cambio climático a una "amplia circulación [de] la dirección de Exxon [...] tenía como objetivo fam AUMENTO DEL $CO_2$ ATMOSFÉRICO Y AUMENTO DE LA TEMPERATURA GLOBAL PROMEDIO COMO UNA FUNCIÓN DE TIEMPO estaba "restringido al personal de Exxon y no debía distribuirse externamente". El manual recopiló datos científicos sobre el cambio climático, confirmó que la quema de combustibles fósiles es el principal contribuyente antropogénico al calentamiento global y estimó una duplicación del $CO_2$ (es decir, 580 ppm) para 2070 con un "aumento de temperatura más probable" de más de 2 °C durante el nivel de 1979, como se muestra en la siguiente figura.

**Figura 7: Predicción interna de Exxon sobre el aumento de $CO_2$ y calentamiento global futuro desde 1982[51]**

El informe también advertía sobre la "distribución global desigual del aumento de las precipitaciones y de la evaporación", y explicaba que "las perturbaciones en el actual equilibrio

[49] See Memorandum from Roger W. Cohen, Exxon Research and Engineering Co., to A.M. Natkin, Exxon Corp. Office of Science and Technology, ClimateFiles (Sept. 2, 1982), http://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-co2-greenhouse-effect-research (discutiendo artículos de investigación y resumiendo los hallazgos de la investigación en modelado climático).

[50] Memorandum from M.B. Glaser, $CO_2$ "Greenhouse" Effect, Exxon Research and Engineering Company (Nov. 12, 1982), https://insideclimatenews.org/wp-content/uploads/2015/09/1982-Exxon-Primer-on-CO2-Greenhouse-Effect.pdf.

[51] Ibid. La empresa predijo que para alrededor de 2070 (curva izquierda) las concentraciones atmosféricas de dióxido de carbono se duplicarían con respecto a los niveles preindustriales, con un aumento de temperatura de más de 2°C sobre el nivel de 1979 (curva derecha). El mismo documento indicó que Exxon estimó que para 1979 ya podría haber ocurrido un efecto de calentamiento global de aproximadamente 0.25°C.

mundial de la distribución del agua tendrían un impacto dramático en la humedad del suelo y, a su vez, en la agricultura", y que el Medio Oeste estadounidense se vería afectado por sequías. Además de los efectos sobre la agricultura mundial, afirma el informe, "hay algunos efectos potencialmente catastróficos que deben considerarse". El derretimiento de la capa de hielo de la Antártida podría provocar un aumento global del nivel del mar de cinco metros, lo que "provocaría inundaciones en gran parte de la costa este de EE. UU., incluido el estado de Florida y Washington, DC". Las malezas y plagas "tenderían a prosperar con aumento de la temperatura global". El manual advertía sobre "mecanismos de retroalimentación positiva" en las regiones polares, que podrían acelerar el calentamiento global, como depósitos de turba "que contienen grandes reservas de carbono orgánico" que quedan "expuestos a la oxidación" y liberan su carbono a la atmósfera. "Del mismo modo", advertía el manual, "la descongelación también podría liberar grandes cantidades de carbono actualmente secuestrado como hidratos de metano" en el fondo del mar. "Todos los sistemas biológicos se verían afectados" y "los efectos económicos más graves podrían afectar a la agricultura".

41. El informe recomendó estudiar "la erosión del suelo, la salinización o el colapso de los sistemas de riego" para comprender cómo la sociedad podría verse afectada y responder al calentamiento global, así como los "efectos sobre la salud" y el "estrés asociado con hambruna o migración relacionadas con el clima[.]" El informe estimó que emprender "algunas medidas de adaptación" (no todas) costaría "un pequeño porcentaje del producto nacional bruto estimado a mediados del próximo siglo" (es decir, 400.000 millones de dólares en 2018).[52] Para evitar tales impactos, el informe hace un análisis del Instituto Tecnológico de Massachusetts y el Laboratorio Nacional Oak Ridge, que estudió las alternativas energéticas y los requisitos para introducirlas en su uso generalizado, y que recomendó que "se inicie un desarrollo vigoroso de fuentes de energía no fósiles" lo antes posible."[53] El manual también señalaba que otros gases de efecto invernadero relacionados con la producción de combustibles fósiles, como el metano,contribuirían significativamente al calentamiento global, y que las preocupaciones sobre el $CO_2$ se reducirían si el uso de combustibles fósiles se redujera debido al "alto precio, la escasez [o] falta de disponibilidad." "La mitigación del 'efecto invernadero' requeriría reducciones importantes en la

---

[52] See Gross National Product, Fed. Reserve Bank of St. Louis (updated Mar. 26, 2020), https://fred.stlouisfed.org/series/GNPA.

[53] Memorandum from M.B. Glaser, $CO_2$ "Greenhouse" Effect, Exxon Research and Engineering Company (Nov. 12, 1982), https://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf.

quema de combustibles fósiles", afirmaba el manual. El manual se distribuyó ampliamente entre los dirigentes de Exxon.

42. En septiembre de 1982, el director del Laboratorio de Ciencias Teóricas y Matemáticas de Exxon, Roger Cohen, escribió a Alvin Natkin de la Oficina de Ciencia y Tecnología de Exxon para resumir la investigación interna de Exxon sobre modelos climáticos.[54] Cohen informó:

> [E]n los últimos años ha surgido un claro consenso científico con respecto a los efectos climáticos esperados del aumento de $CO_2$ atmosférico. El consenso es que duplicar el $CO_2$ atmosférico con respecto a su valor preindustrial daría como resultado un aumento promedio de la temperatura global de (3,0 ± 1,5)°C. . . Se prevé que el aumento de temperatura se distribuirá de manera no uniforme en la Tierra, con elevaciones de temperatura superiores al promedio en las regiones polares y aumentos relativamente pequeños cerca del ecuador. Existe un acuerdo unánime en la comunidad científica en que un aumento de temperatura de esta magnitud provocaría cambios significativos en el clima terrestre, incluida la distribución de las precipitaciones y alteraciones de la biosfera. El tiempo necesario para duplicar el $CO_2$ atmosférico depende del consumo mundial futuro de combustibles fósiles.

Cohen describió los propios experimentos de modelización climática de Exxon, e informó que produjeron "un aumento de la temperatura promedio global que cae dentro del rango del consenso científico", fueron "consistentes con las predicciones publicadas de modelos climáticos más complejos" y "también estaban de acuerdo con las estimaciones de la distribución de la temperatura global durante un determinado período prehistórico cuando la Tierra era mucho más caliente que hoy". "En resumen", escribió Cohen, "los resultados de nuestra investigación están de acuerdo con el consenso científico sobre el efecto del aumento del $CO_2$ atmosférico en el clima". Cohen señaló que los resultados serían presentados a la comunidad científica por el colaborador de Exxon, Martin Hoffert, en una reunión del Departamento de Energía, así como por Brian Flannery, de Exxon, en el Simposio Ewing, patrocinado por Exxon, más tarde ese año.

43. En octubre de 1982, en el cuarto Simposio bienal Maurice Ewing en el Observatorio Geofísico Lamont-Doherty, al que asistieron miembros del API y Exxon Research and Engineering Company, el presidente del Observatorio, EE. David dio un discurso titulado "Inventar el futuro: la energía y el 'efecto invernadero' del $CO_2$".[55] Sus comentarios incluyeron la siguiente declaración: "Pocas personas dudan de que el mundo ha entrado en una transición energética que deja de depender de los combustibles fósiles y avanza hacia una combinación de

[54] Memorandum from Roger W. Cohen, Exxon Research and Engineering Co., to A.M. Natkin, Exxon Corp. Office of Science and Technology, ClimateFiles (Sept. 2, 1982), http://www.climatefiles.com/exxonmobil/1982-exxon-memo-summarizing-climate-modeling-and-co2-greenhouse-effect-research.

[55] Dr. E.E. David, Jr., President, Exxon Research and Engineering Co., Remarks at the Fourth Annual Ewing Symposium, Tenafly, NJ, ClimateFiles (Oct. 26, 1982), http://www.climatefiles.com/exxonmobil/inventing-future-energy-co2-greenhouse-effect.

recursos renovables que no planteará problemas de acumulación de $CO_2$". Continuó hablando de la oportunidad humana de abordar el cambio climático antropogénico antes del punto de no retorno:

> Es irónico que las mayores incertidumbres sobre la acumulación de $CO_2$ no estén en predecir lo que hará el clima, sino en predecir lo que hará la gente. . . Parece que todavía tenemos tiempo para generar la riqueza y el conocimiento que necesitaremos para inventar la transición hacia un sistema energético estable.

44. A principios de la década de 1980, bajo la dirección de Exxon, el científico climático de Exxon, Henry Shaw, pronosticó las emisiones de $CO_2$ derivadas del uso de combustibles fósiles. Esas estimaciones se incorporaron a las proyecciones energéticas de Exxon para el siglo XXI y se distribuyeron entre las distintas divisiones de Exxon. Las conclusiones de Shaw incluían la expectativa de que las concentraciones atmosféricas de $CO_2$ se duplicarían en 2090 según el modelo de Exxon, con un aumento concomitante de la temperatura global promedio de 2,3 a 5,6 °F. Shaw comparó los resultados de su modelo con los de la EPA, la Academia Nacional de Ciencias y el Instituto de Tecnología de Massachusetts, indicando que el modelo de Exxon predijo un retraso mayorque cualquiera de los otros modelos, aunque su predicción de aumento de temperatura fue a mediados de rango de las cuatro proyecciones.[56]

45. Durante la década de 1980, muchos Demandados formaron sus propias unidades de investigación centradas en la modelización climática. El API, incluido el Grupo de Trabajo sobre $CO_2$ del API, proporcionó un foro para que los Demandados compartieran sus esfuerzos de investigación y corroboraran sus hallazgos relacionados con las emisiones antropogénicas de gases de efecto invernadero.[57]

46. Durante este tiempo, las declaraciones de los Demandados expresaron una comprensión de su obligación de considerar y mitigar las externalidades de la promoción, comercialización y venta incesantes de sus productos de combustibles fósiles. Por ejemplo, en 1988, Richard Tucker, presidente de Mobil Oil, presentó en la Reunión Nacional del Instituto Americano de Ingenieros Químicos, el principal foro educativo para ingenieros químicos, donde afirmó:

> La humanidad, que ha creado el sistema industrial que ha transformado la civilización, también es responsable del medio ambiente, que a veces está en riesgo debido a consecuencias no deseadas de la industrialización. . . . Mantener

[56] Neela Banerjee, More Exxon Documents Show How Much It Knew About Climate 35 Years Ago, Inside Climate News (Dec. 1, 2015), https://insideclimatenews.org/news/01122015/documents-exxons-early-co2-position-senior-executives-engage-and-warming-forecast.

[57] Neela Banerjee, Exxon's Oil Industry Peers Knew About Climate Dangers in the 1970s, Too, Inside Climate News (Dec. 22, 2015), https://insideclimatenews.org/news/22122015/exxon-mobil-oil-industry-peers-knew-about-climate-change-dangers-1970s-american-petroleum-institute-api-shell-chevron-texaco/.

> la salud de este sistema de soporte vital se está convirtiendo en una de las principales prioridades. . . . [T]odos debemos ser ambientalistas.
>
> El pacto ambiental requiere acción en muchos frentes. . . el problema del ozono en la atmósfera baja, el problema del ozono en la atmósfera superior y el efecto invernadero, por nombrar algunos. . . . Nuestra estrategia debe ser reducir la contaminación antes de que se genere, para prevenir los problemas en su origen.
>
> Prevenir significa diseñar una nueva generación de combustibles, lubricantes y productos químicos. . . . Prevención significa diseñar catalizadores y procesos que minimicen o eliminen la producción de subproductos no deseados. . . . La prevención a escala global puede incluso requerir una reducción drástica de nuestra dependencia de los combustibles fósiles y un cambio hacia la energía solar, el hidrógeno y la energía nuclear segura. Puede ser posible (simplemente posible) que la industria energética se transforme tan completamente que los observadores la declaren una nueva industria. . . . La fuerza bruta, las respuestas de baja tecnología y el dinero por sí solos no resolverán los desafíos que enfrentamos en la industria energética.[58]

47. En 1987, Shell publicó un "informe interno para las empresas del Royal Dutch/Shell Group" titulado "Contaminación del aire: una perspectiva de la industria petrolera". En este informe, la empresa describió que el efecto invernadero se produce "en gran medida como resultado de la quema de combustibles fósiles y la deforestación".[59] Shell reconoció además la "preocupación de que mayores aumentos en los niveles de dióxido de carbono puedan causar cambios climáticos, en particular un aumento de la temperatura general, con importantes consecuencias ambientales, sociales y económicas".[60]

48. En 1988, el Grupo de Trabajo sobre el Efecto Invernadero de Shell publicó un informe interno confidencial, "El efecto invernadero", que reconocía la naturaleza antropogénica del calentamiento global: "Se cree que el dióxido de carbono producido por el hombre liberado y acumulado en la atmósfera calienta la Tierra a través del llamado efecto invernadero". Los autores también señalaron que la quema de combustibles fósiles es el principal impulsor de la acumulación de $CO_2$ y advirtieron que el calentamiento "crearía cambios significativos en el nivel del mar, las corrientes oceánicas, los patrones de precipitación, la temperatura regional y el clima". Señalaron además el potencial de "consecuencias operativas directas" del aumento del nivel del mar en "instalaciones costa afuera, instalaciones y operaciones costeras (por ejemplo, plataformas, puertos, refinerías, depósitos)".[61]

---

[58] Richard E. Tucker, High Tech Frontiers in the Energy Industry: The Challenge Ahead, AIChE National Meeting (Nov. 30, 1988), https://hdl.handle.net/2027/pur1.32754074119482?urlappend=%3Bseq=528.

[59] Shell Briefing Service, Air pollution: an oil industry perspective (1987), at 4, https://www.documentcloud.org/documents/24359057-shell-briefing-service-air-pollution-an-oil-industry-perspective-nr1-1987.

[60] Id. at 5.

[61] Shell Internationale Petroleum, Greenhouse Effect Working Group, The Greenhouse Effect (May 1988), https://www.documentcloud.org/documents/4411090-Document3.html#document/p9/a411239.

49. De manera similar a las alertas tempranas de los científicos de Exxon, el informe de Shell señaló que "para cuando el calentamiento global sea detectable, podría ser demasiado tarde para tomar contramedidas efectivas para reducir los efectos o incluso estabilizar la situación". Los autores afirmaron que "las posibles implicaciones para el mundo son... . . tan grandes que las opciones políticas deben considerarse mucho antes" y que la investigación debería "dirigirse más al análisis de las opciones políticas y energéticas que a estudios de a qué nos enfrentaremos exactamente".

50. En 1989, Esso Resources Canada (ExxonMobil) encargó un informe sobre los impactos del cambio climático en las instalaciones de gas natural existentes y propuestas en el valle y el delta del río Mackenzie, incluidas las instalaciones de extracción en el mar de Beaufort y un gasoducto que cruza el territorio del noroeste de Canadá.[62] Informó que "grandes zonas del valle de Mackenzie podrían verse afectadas dramáticamente por el cambio climático" y que "la mayor preocupación en Norman Wells [ciudad petrolera en los Territorios del Noroeste, Canadá] deberían ser los cambios en el permafrost que probablemente ocurrirán en condiciones del calentamiento climático".[63] El informe concluyó que, a la luz de los modelos climáticos que muestran una "tendencia general hacia un clima más cálido y húmedo", el funcionamiento de esas instalaciones se vería comprometido por el aumento de las precipitaciones, el aumento de la temperatura del aire, los cambios en las condiciones del permafrost y, significativamente, el aumento del nivel del mar y los daños por erosión.[64] Los autores recomendaron tener en cuenta esas eventualidades en la planificación del desarrollo futuro y también advirtieron que "un aumento en el nivel del mar podría causar mayores inundaciones y daños por erosión en la isla Richards".

51. Ken Croasdale, investigador principal del hielo de Imperial Oil, filial de Exxon, afirmó ante una audiencia de ingenieros en 1991 que los gases de efecto invernadero están aumentando "debido a la quema de combustibles fósiles. Nadie discute este hecho".65

52. La industria de los combustibles fósiles estuvo a la vanguardia de la investigación sobre el dióxido de carbono durante gran parte de la segunda mitad del siglo XX. Desarrolló

---

[62] See Stephen Lonergan & Kathy Young, An Assessment of the Effects of Climate Warming on Energy Developments in the Mackenzie River Valley and Delta, Canadian Arctic, 7 Energy Exploration & Exploitation 359–81 (1989).
[63] Id. at 369, 376.
[64] Id. at 360, 377–78.
[65] Ronald C. Kramer, Carbon Criminals, Climate Crimes 66 (1st ed. 2020).

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 24 de 91

tecnología innovadora y de vanguardiay trabajó con muchos de los mejores investigadores del campo para producir estudios y modelos excepcionalmente sofisticados.

53. Los Demandados también examinaron meticulosamente escenarios plausibles si no actuaban frente a su conocimiento interno. Por ejemplo, Shell evaluó en un documento interno confidencial de planificación de 1989 la cuestión del "cambio climático: el efecto invernadero, el calentamiento global", que el documento identificaba como "la cuestión más importante para la industria energética".[66] El documento comparó un escenario en el que la sociedad "aborda el problema potencial" con otro en el que no lo hace. Reconociendo que "[c]ambiar los niveles de emisiones... y cambiar la concentración de CO2 atmosférico se ha comparado con cambiar un VLCC", incluso "esfuerzos sustanciales" para 2010 tendrían "apenas ningún impacto en la concentración de CO2". Sin embargo, en años posteriores los impactos son "sorprendentemente diferentes"; Los primeros esfuerzos "no evitarán que surja el problema, pero... podrían mitigarlo". El documento describía las consecuencias de no abordar el problema de inmediato:

> Estos cambios parecen pequeños, pero enmascaran cambios de temperatura más dramáticos que tendrían lugar en latitudes templadas. Habría un clima más violento: más tormentas, más sequías, más diluvios. El nivel medio del mar aumentaría al menos 30 cm. Los patrones agrícolas cambiarían de manera más dramática. Algo tan simple como un cambio moderado en el patrón de lluvias altera los ecosistemas, y muchas especies de árboles, plantas, animales e insectos no podrían moverse ni adaptarse.
>
> Sin embargo, los cambios tendrían mayor impacto en los humanos. Antiguamente el hombre podía responder con los pies. Hoy en día no hay ningún lugar a donde ir porque la gente ya está allí. Quizás los de los países industrializados podrían hacer frente a un aumento del nivel del mar (los ejemplos holandeses), pero para los países pobres tales defensas no son posibles. El potencial problema de los refugiados... podría no tener precedentes. Los africanos irían a Europa, los chinos a la Unión Soviética, los latinos a Estados Unidos y los indonesios a Australia. Los límites contarían poco, abrumados por los números. Los conflictos abundarían. La civilización podría resultar algo frágil.[67]

54. En otro documento confidencial de planificación interna de 1989, Shell anticipó que las "presiones del público y de los medios" para "adoptar[] programas ambientales" tales como "objetivos mucho más estrictos para las emisiones de $CO_2$" podrían provocar "respuestas efectivas de los consumidores" que "conducirán a conflictos intensos y presiones impredecibles sobre las empresas".[68] El escenario preveía que "[l]as preocupaciones sobre el calentamiento global y el agotamiento deprimirán la producción de combustibles fósiles y su cuota de mercado

[66] Shell, Scenarios 1989–2010: Challenge and Response (Oct. 1989), at 33, https://www.documentcloud.org/documents/23735737-1989-oct-confidential-shell-group-planning-scenarios-1989-2010-challenge-and-response-disc-climate-refugees-and-shift-to-non-fossil-fuels.

[67] Id. at 36.

[68] See Shell UK, UK Scenarios 1989 (Nov. 1989), at 31, 34, https://embed.documentcloud.org/documents/24359062-snippets-of-confidential-shell-uk-november-1989-scenarios

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 53 of 119

disminuirá a medida que se promuevan activamente las energías renovables", dado que "[d]onde pueda haber una verdadera elección para el consumidor, será una fuerza dominante, especialmente cuando el interés se ve aumentado por un claro impacto ambiental".[69]

55. En otro escenario más publicado en un informe interno de 1998, Shell pinta una escena inquietantemente profética:

> En 2010, una serie de tormentas violentas causan grandes daños en la costa este de EE. UU. Aunque no está claro si las tormentas son causadas por el cambio climático, la gente no está dispuesta a correr más riesgos. La industria de seguros se niega a aceptar responsabilidad, lo que desató un feroz debate sobre quién es responsable: la industria de seguros o el gobierno. Después de todo, dos informes sucesivos del IPCC desde 1993 han reforzado la conexión humana con el cambio climático. . . Después de las tormentas, una coalición de ONG medioambientales presenta una demanda colectiva contra el gobierno de Estados Unidos y las empresas de combustibles fósiles por ignorar lo que los científicos (incluidos los suyos propios) han estado diciendo durante años: que se debe hacer algo. Crece la reacción social al uso de combustibles fósiles y los individuos se convierten en "vigilantes ambientalistas" de la misma manera que, una generación antes, se habían vuelto ferozmente antitabaco. Se intensifican las campañas de acción directa contra las empresas. Los consumidores jóvenes, especialmente, exigen acción.[70]

56. Las empresas de combustibles fósiles no se limitaron a considerar los impactos del cambio climático en escenarios. A mediados de la década de 1990, ExxonMobil, Shell e Imperial Oil (ExxonMobil) emprendieron conjuntamente el Proyecto de Energía Marina Sable en Nueva Escocia. La propia Declaración de Impacto Ambiental del proyecto declaraba: "El impacto de un aumento del nivel del mar debido al calentamiento global puede ser particularmente significativo en Nueva Escocia. Los registros de mareógrafos a largo plazo en varios lugares a lo largo de la costa de Nueva Escocia han demostrado que el nivel del mar ha aumentado durante el último siglo. . . . Para el diseño de estructuras costeras y marinas, se puede asumir un aumento estimado en el nivel del agua, debido al calentamiento global, de 0,5 m [1,64 pies] durante la vida útil propuesta del proyecto (25 años)".[71]

57. Las investigaciones sobre el cambio climático realizadas por los Demandados y sus asociaciones industriales reconocieron con frecuencia incertidumbres en sus modelos climáticos. Sin embargo, esas incertidumbres se referían simplemente a la magnitud y el momento de los impactos climáticos resultantes del consumo de combustibles fósiles, no a que eventualmente se produjeran cambios significativos. Los investigadores de los Demandados y los investigadores de sus asociaciones industriales albergaban pocas dudas de que el cambio

---

[69] Id. at 34.
[70] Royal Dutch/Shell Group, Group Scenarios 1998–2020 115, 122 (1998), http://www.documentcloud.org/documents/4430277-27-1-Compiled.html.
[71] ExxonMobil, Sable Project Development Plan, vol. 3, 4-77, http://soep.com/about-the-project/development-plan-application.

climático estaba ocurriendo y que los productos de combustibles fósiles eran y son la causa principal.

58.     A pesar de la abrumadora información sobre las amenazas a las personas y al planeta que plantea el uso continuo e incesante de sus productos de combustibles fósiles, los Demandados no actuaron como razonablemente deberían haberlo hecho para mitigar o evitar esos terribles impactos adversos. En cambio, los Demandados adoptaron la posición, como se describe a continuación, de que tenían una licencia para continuar con la búsqueda ilimitada de ganancias de esos productos. Esta posición fue una abdicación de la responsabilidad de los Demandados hacia los consumidores y el público, incluido el Estado Libre Asociado, de actuar según su conocimiento único de los peligros razonablemente previsibles de la producción y el consumo incesantes de sus productos de combustibles fósiles.

**III.     Los Demandados no revelaron daños conocidos asociados con la extracción, promoción y consumo de sus productos de combustibles fósiles y, en cambio, actuaron afirmativamente para ocultar esos daños y participaron en campañas para proteger y ampliar engañosamente el uso de sus productos de combustibles fósiles.**

59.     En 1988, los Demandados habían acumulado un conjunto convincente de conocimientos sobre el papel de los gases de efecto invernadero antropogénicos, específicamente los emitidos por el uso normal de productos de combustibles fósiles, como causantes del calentamiento global y sus impactos en cascada, incluidas las alteraciones del ciclo hidrológico, las precipitaciones extremas, sequía, olas de calor y consecuencias asociadas para las comunidades humanas y el medio ambiente. Al enterarse de que sus productos estaban causando un cambio climático global y efectos nefastos en el planeta, los Demandados enfrentaron la decisión de tomar medidas para limitar los daños que los productos de combustibles fósiles estaban causando y continuarían causando a los habitantes de la Tierra, incluido el pueblo de Puerto Rico.

60.     Antes o después, los Demandados podrían y razonablemente deberían haber tomado cualquier número de medidas para mitigar los daños causados por los productos de combustibles fósiles. Sus propios comentarios revelan una conciencia de las medidas que deberían haberse tomado. Los Demandados deberían haber advertido a la sociedad civil y a los consumidores de Puerto Rico sobre los peligros que conocían los Demandados del consumo incesante de productos de combustibles fósiles, haber dicho la verdad sobre lo que sabían sobre la conexión entre el uso derrochador de esos productos y haber tomado medidas para facilitar la transición a fuentes de energía y combustible con bajas emisiones de carbono. Como mínimo, los

Demandados deberían haber emitido advertencias acordes con su propia comprensión de los riesgos que plantean los usos esperados y previstos de sus productos, y haber dicho la verdad sobre esos riesgos.

61. Varios eventos clave durante el período entre 1988 y 1992 parecen haber impulsado a los Demandados a cambiar sus tácticas de investigación general y discusión interna sobre el cambio climático a una campaña pública destinada a engañar a los consumidores y al público, incluidos los de Puerto Rico. Estas incluyen:

a. En 1988, los científicos de la Administración Nacional de Aeronáutica y del Espacio ("NASA") confirmaron que las actividades humanas en realidad estaban contribuyendo al calentamiento global.[72] El 23 de junio de ese año, la presentación de esta información por parte del científico climático de la NASA, James Hansen, al Congreso generó una importante cobertura noticiosa y publicidad para el anuncio, incluida la cobertura en la portada de The New York Times.

b. El 28 de julio de 1988, el senador Robert Stafford y cuatro copatrocinadores bipartidistas introdujeron la S. 2666, "Ley de Protección Ambiental Global", para regular el $CO_2$ y otros gases de efecto invernadero. En las diez semanas siguientes se presentaron otros cuatro proyectos de ley bipartidistas para reducir significativamente la contaminación por $CO_2$ y, en agosto, el candidato presidencial estadounidense George H.W. Bush prometió que su presidencia combatiría el efecto invernadero con "el efecto Casa Blanca".[73] La voluntad política en Estados Unidos para reducir las emisiones antropogénicas de gases de efecto invernadero y mitigar los daños asociados con los productos de combustibles fósiles de los Demandados estaba ganando impulso.

c. En diciembre de 1988, las Naciones Unidas formaron el Grupo Intergubernamental de Expertos sobre el Cambio Climático (en inglés, the Intergovernmental Panel on Climate Change, o "IPCC"), un panel científico dedicado a proporcionar a los gobiernos del mundo un análisis científico objetivo del cambio climático y sus impactos ambientales, políticos y económicos.

[72] See Peter C. Frumhoff et al., The Climate Responsibilities of Industrial Carbon Producers, 132 Climatic Change 161 (2015).
[73] The White House and the Greenhouse, N.Y. Times (May 9, 1989), http://www.nytimes.com/1989/05/09/opinion/the-white-house-and-the-greenhouse.html.

   d. En 1990, el IPCC publicó su Primer Informe de Evaluación sobre el cambio climático antropogénico,[74] que concluyó que (1) "existe un efecto invernadero natural que ya mantiene la Tierra más caliente de lo que estaría de otra manera", y (2) que

> Las emisiones resultantes de las actividades humanas están aumentando sustancialmente las concentraciones atmosféricas de los gases de efecto invernadero dióxido de carbono, metano, clorofluorocarbonos (CFC) y óxido nitroso. Estos aumentos intensificarán el efecto invernadero, lo que provocará, en promedio, un calentamiento adicional de la superficie de la Tierra. El principal gas de efecto invernadero, el vapor de agua, aumentará en respuesta al calentamiento global y lo intensificará aún más.[75]

El IPCC volvió a confirmar esas conclusiones en un suplemento de 1992 al Primer Informe de Evaluación.[76]

e. Las Naciones Unidas comenzaron a prepararse para la Cumbre para la Tierra de 1992 en Río de Janeiro, Brasil, una reunión importante y de interés periodístico de 172 gobiernos del mundo, de los cuales 116 enviaron a sus jefes de estado. La Cumbre dio como resultado la Convención Marco de las Naciones Unidas sobre el Cambio Climático ("CMNUCC"), un tratado ambiental internacional que proporciona protocolos para futuras negociaciones destinadas a "estabilizar las concentraciones de gases de efecto invernadero en la atmósfera a un nivel que evite interferencias antropogénicas peligrosas con el sistema climático".[77]

62. Esos acontecimientos mundiales marcaron un cambio en el debate público sobre el cambio climático y el inicio de esfuerzos internacionales para frenar las emisiones antropogénicas de efecto invernadero, acontecimientos que tuvieron graves implicaciones y habrían disminuido la rentabilidad de los productos de combustibles fósiles de los Demandados.

63. En lugar de colaborar con la comunidad internacional actuando para prevenir, o al menos disminuir, las contribuciones de los productos de combustibles fósiles al calentamiento global y sus impactos, incluido el aumento del nivel del mar, las alteraciones del ciclo hidrológico y las consecuencias asociadas para Puerto Rico y otras comunidades, los Demandados se embarcaron en una campaña de décadas diseñada para perpetuar y maximizar la dependencia continua de los productos de combustibles fósiles.

---

[74] See IPCC, Reports, ipcc.ch/reports.
[75] IPCC, Climate Change: The IPCC Scientific Assessment xi (1990), https://www.ipcc.ch/report/climate-change-the-ipcc-1990-and-1992-assessments.
[76] IPCC, 1992 IPCC Supplement to the First Assessment Report (1992), https://www.ipcc.ch/report/climate-change-the-ipcc-1990-and-1992-assessments.
[77] United Nations, United Nations Framework Convention on Climate Change art. 2 (1992), https://unfccc.int/resource/docs/convkp/conveng.pdf.

64. La campaña de los Demandados, que se centró en ocultar, desacreditar y/o tergiversar información que tendía a apoyar la restricción del consumo (y por lo tanto la disminución de la demanda) de los productos de combustibles fósiles de los Demandados y la transición de la sociedad hacia una huella de carbono y un futuro más bajos, tomó varias formas. La campaña permitió a los Demandados acelerar su práctica comercial de explotar las reservas de combustibles fósiles y, al mismo tiempo, externalizar los costos sociales y ambientales de sus productos de combustibles fósiles. Esas actividades contradecían directamente el reconocimiento previo de los propios Demandados de que la ciencia del cambio climático antropogénico era clara y que se necesitaban medidas para evitar o mitigar consecuencias nefastas para el planeta y comunidades como las del Estado Libre Asociado.

65. Los Demandados, por sí solos y conjuntamente a través de la industria y grupos fachada como el API, el Information Council for the Environment ("ICE") y el Global Climate Coalition ("GCC"), financiaron, concibieron, planificaron y llevaron a cabo una campaña sostenida y generalizada de negación y desinformación sobre la existencia del cambio climático y la contribución de sus productos al mismo. La campaña incluía un patrón a largo plazo de tergiversaciones directas y omisiones materiales a los consumidores, así como un plan para influir indirectamente en los consumidores afectando la opinión pública mediante la difusión de investigaciones engañosas a la prensa, el gobierno y el mundo académico. Aunque los Demandados eran competidores en el mercado, se combinaron y colaboraron entre sí y con el API en esta campaña pública para desviar y reprimir el conocimiento público con el fin de aumentar las ventas y proteger las ganancias. El esfuerzo incluyó la promoción de productos peligrosos de combustibles fósiles a través de campañas publicitarias que no advertían sobre los riesgos existenciales asociados con el uso de esos productos y que estaban diseñadas para influir en los consumidores para que siguieran usando los productos de combustibles fósiles de los Demandados independientemente del daño que esos productos causaran a las comunidades y el medio ambiente.

66. Por ejemplo, en 1988, Joseph Carlson, gerente de asuntos públicos de Exxon, afirmó en un memorando interno que Exxon "está brindando liderazgo a través del API en el desarrollo de la posición de la industria petrolera" sobre "el efecto invernadero".[78] Luego, pasó a describir la "Posición de Exxon", que incluía dos principios importantes de mensajería, entre

[78] Memorandum from Joseph M. Carlson, The Greenhouse Effect (Aug. 3, 1988), https://assets.documentcloud.org/documents/3024180/1998-Exxon-Memo-on-the-Greenhouse-Effect.pdf.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 30 de 91

otros: (1) "[d]estacar la incertidumbre en las conclusiones científicas sobre el potencial aumento del Efecto Invernadero"; y (2) "[r]esistir la exageración y el sensacionalismo [sic] del potencial efecto invernadero que podría conducir a un desarrollo no económico de recursos de combustibles no fósiles"[79]

67. Al reflexionar sobre su época como consultor de Exxon en la década de 1980, el profesor Martin Hoffert, exfísico de la Universidad de Nueva York que investigó el cambio climático, expresó su pesar por la "campaña del programa de negación de la ciencia climática" de Exxon en su testimonio jurado ante el Congreso:

> [N]uestra investigación [en Exxon] fue consistente con los hallazgos del Grupo Intergubernamental sobre Cambio Climático de las Naciones Unidas sobre los impactos humanos de la quema de combustibles fósiles, que es que están teniendo una influencia cada vez más perceptible en el clima de la Tierra. . . . En todo caso, el cambio climático adverso debido a niveles elevados de CO2 está avanzando más rápido que el promedio de las proyecciones leves anteriores del IPCC y es totalmente consistente con lo que sabíamos a principios de los años 1980 en Exxon. . . . Me sentí muy angustiado por la campaña del programa de negación de la ciencia climática que la oficina principal de Exxon lanzó en la época en que dejé de trabajar como consultor (pero no colaborador) para Exxon. Los anuncios que Exxon publicó en los principales periódicos planteando dudas sobre el cambio climático se contradecían con el trabajo científico que habíamos realizado y seguimos haciendo. Exxon estaba promoviendo públicamente puntos de vista que sus propios científicos sabían que estaban equivocados, y nosotros lo sabíamos porque éramos el grupo principal que trabajaba en esto.[80]

68. Un informe de Shell de 1994 titulado "El efecto invernadero mejorado: una revisión de los aspectos científicos" del asesor ambiental de Royal Dutch Shell, Peter Langcake, contrasta marcadamente con el informe de 1988 de la empresa sobre el mismo tema. Mientras que antes los autores recomendaban considerar soluciones políticas desde el principio, Langcake advirtió sobre los "efectos económicos potencialmente dramáticos de medidas políticas desacertadas". Si bien el informe reconocía las conclusiones del IPCC como la visión predominante, Langcake aún enfatizaba la incertidumbre científica, señalando, por ejemplo, que "el vínculo postulado entre cualquier aumento de temperatura observado y las actividades humanas debe verse en relación con la variabilidad natural, que todavía es en gran medida impredecible."[81]

---

[79] Ibid.
[80] Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change, Hearing Before the Subcomm. on Civil Rights and Civil Liberties of the Comm. on Oversight and Reform, 116th Cong. 7–8 (Oct. 23, 2019) (Declaración de Martin Hoffert, ex consultor de Exxon, Profesor Emérito de Física en la Universidad de Nueva York), https://oversight.house.gov/legislation/hearings/examining-the-oil-industry-s-efforts-to-suppress-the-truth-about-climate-change.
[81] P. Langcake, Shell Internationale Petroleum, The Enhanced Greenhouse Effect: A Review of the Scientific Aspects (Dec. 1994), https://www.documentcloud.org/documents/4411099-Document11.html#document/p15/a411511.

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 59 of 119

69. De acuerdo con esta estrategia de comunicación, Shell había emitido en 1992 una publicación para amplia distribución externa que pretendía describir los "hechos científicos básicos" del "potencial efecto invernadero aumentado".[82] Este documento restó importancia al consenso científico (que Shell reconoció internamente) al referirse a los “relativamente pocos fundamentos científicos establecidos” con respecto a las causas del cambio climático.[83] También sugirió engañosamente que una “causa particular” del calentamiento global era “difícil” de identificar, a pesar de que Shell había identificado el uso de sus productos como un contribuyente significativo al efecto invernadero en la década anterior.[84] Por ejemplo, en 1985, un científico medioambiental de Shell en el Reino Unido publicó un artículo en el que expone el hecho científico de que “[l]a quema de combustibles fósiles que han tardado millones de años en formarse ha alterado efectivamente el equilibrio [del ciclo del carbono], lo que ha llevado a una aumento de CO2 en la atmósfera”.[85]

70. En 1991, el ICE, entre cuyos miembros se encontraban afiliados, predecesores y/o subsidiarios de los Demandados, lanzó una campaña nacional de negación científica del cambio climático con anuncios de página completa en periódicos, comerciales de radio, un calendario de giras de relaciones públicas, correspondencia” y herramientas de investigación. para medir el éxito de la campaña. Entre las estrategias de la campaña se incluía “reposicionar el calentamiento global como teoría (no como hecho)”. Su público objetivo incluía a hombres mayores con menos educación que estén “predispuestos a favorecer la agenda de ICE, y que probablemente apoyen aún más esa agenda después de la exposición a nueva información”.[86]

71. Un objetivo de la campaña publicitaria del ICE era cambiar la opinión pública y las percepciones de los consumidores sobre el riesgo climático. Un memorando de Richard Lawson, presidente de la Asociación Nacional del Carbón, predecesora de la Asociación Nacional de Minería, notó que “[l]as encuestas de opinión pública revelan que el 60 % del

[82] Jan Kuyper, Shell Group Planning, Business Environment Occasional Paper, Potential Augmented Greenhouse Effect: Basic Scientific Facts (Sept. 1992), at 3, https://www.documentcloud.org/documents/24359060-1992-internal-shell-group-planning-report-potential-augmented-greenhouse-effect-and-depletion-of-the-ozone-layer
[83] Id. at 5.
[84] Ibid.
[85] T.G. Wilkinson, Why and How to Control Energy Pollution: Can Harmonisation Work?, 8 Conservation & Recycling 7, 19 (1985), https://www.documentcloud.org/documents/24359067-1985-03-why-and-how-to-control-energy-pollution-by-tg-wilkinson-shell.
[86] Union of Concerned Scientists, Deception Dossier #5: Coal’s “Information Council on the Environment” Sham (1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf.

pueblo estadounidense ya cree que el calentamiento global es un problema ambiental grave. Nuestra industria no puede quedarse al margen en este debate”.[87]

72. Las siguientes imágenes son ejemplos de anuncios impresos financiados por el ICE que desafían la validez de la ciencia climática y pretenden oscurecer el consenso científico sobre el cambio climático antropogénico.[88]

**Figura 8: Consejo de Información para el Medio Ambiente Anuncios**

73. En 1996, Exxon emitió una publicación llamada “Calentamiento global: ¿quién tiene razón? Datos sobre un debate que ha generado más preguntas que respuestas”. En el prefacio de la publicación, el director ejecutivo de Exxon, Lee Raymond, afirmó incorrectamente que "no es necesario tomar medidas drásticas de inmediato, ya que muchos científicos coinciden en que hay tiempo suficiente para comprender mejor el sistema climático". La publicación describió el efecto invernadero como “incuestionablemente real y definitivamente algo bueno”, ignorando las graves consecuencias que resultarían de la influencia del aumento de la concentración de $CO_2$ en el clima de la Tierra . En cambio, caracterizó el efecto invernadero simplemente como “lo que hace habitable la atmósfera terrestre”. Contradiciendo directamente el propio conocimiento interno de Exxon y la ciencia revisada por pares, la publicación atribuyó el aumento de la temperatura desde finales del siglo XIX a “fluctuaciones naturales que ocurren durante largos períodos de tiempo” en lugar de a las emisiones antropogénicas que el propio Exxon y otros científicos habían confirmado que eran responsables. La publicación también

[87] Naomi Oreskes, My Facts Are Better Than Your Facts: Spreading Good News About Global Warming (2010), in Peter Howlett et al., How Well Do Facts Travel?: The Dissemination of Reliable Knowledge 136–66 (Cambridge University Press, 2011).

[88] Union of Concerned Scientists, Deception Dossier #5: Coal’s “Information Council on the Environment” Sham at 47-49 (1991), http://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-5_ICE.pdf.

cuestionó falsamente los modelos informáticos que proyectaban los impactos futuros del consumo constante de productos de combustibles fósiles, incluidos los desarrollados por los propios empleados de Exxon, por haber "resultado ser inexactos". La publicación contradecía los numerosos informes preparados y distribuidos entre el personal de Exxon y el API, afirmando que "los indicios son que un mundo más cálido sería mucho más benigno de lo que muchos imaginan … un calentamiento moderado reduciría las tasas de mortalidad en los Estados Unidos, por lo que un clima ligeramente más cálido sería más saludable". Raymond concluyó su prefacio atacando a los defensores de limitar el uso de los productos de combustibles fósiles de su empresa, acusándolos de "basarse en mala ciencia, lógica defectuosa o suposiciones poco realistas", a pesar del importante papel que los propios científicos de Exxon habían desempeñado en la recopilación de esos mismos fundamentos científicos.[89]

74. En un discurso presentado en el Congreso Mundial del Petróleo celebrado en Beijing en 1997, en el que estuvieron presentes muchos de los Demandados, el director ejecutivo de Exxon, Lee Raymond, reiteró esas opiniones. Esta vez, presentó una falsa dicotomía entre mercados energéticos estables y la reducción de la comercialización, promoción y venta de productos de combustibles fósiles que los Demandados sabían que eran peligrosos. Afirmó:

> Algunas personas sostienen que deberíamos reducir drásticamente nuestro uso de combustibles fósiles por razones medioambientales. . . Mi creencia [es] que tales propuestas no son ni prudentes ni prácticas. Sin alternativas económicas disponibles en el horizonte, los combustibles fósiles seguirán suministrando la mayor parte de la energía del mundo y de esta región en el futuro previsible.
>
> Los gobiernos también deben proporcionar un clima de inversión estable. . . Deberían evitar la tentación de intervenir en los mercados energéticos de manera que den ventaja a un competidor sobre otro o a un combustible sobre otro.
>
> También debemos tener en cuenta que la mayor parte del efecto invernadero proviene de fuentes naturales. . . Saltar a recortar radicalmente esta pequeña porción del pastel de efecto invernadero con la premisa de que afectará al clima desafía el sentido común y carece de fundamento en nuestra comprensión actual del sistema climático.
>
> Acordemos que hay muchas cosas que realmente no sabemos sobre cómo cambiará el clima en el siglo XXI y más adelante. . . Es muy poco probable que la temperatura a mediados del próximo siglo se vea afectada significativamente ya sea que las políticas se implementen ahora o dentro de 20 años. Es una mala política pública imponer regulaciones y restricciones muy costosas cuando aún no se ha demostrado su necesidad.[90]

---

89 Exxon Corp., Global Warming: Who's Right? (1996), https://www.documentcloud.org/documents/2805542-Exxon-Global-Warming-Whos-Right.html.

90 Lee R. Raymond, Chairman and Chief Executive Officer, Exxon Corp., Address at the World Petroleum Congress (Oct. 13, 1997), https://assets.documentcloud.org/documents/2840902/1997-Lee-Raymond-Speech-at-China-World-Petroleum.pdf.

75. El director ejecutivo de Imperial Oil (ExxonMobil), Robert Peterson, negó falsamente la conexión establecida entre los productos de combustibles fósiles de los Demandados y el cambio climático antropogénico en la revista Imperial Oil Review del verano de 1998, "A Cleaner Canada":

> [E]ste tema [refiriéndose al cambio climático] no tiene absolutamente nada que ver con la contaminación y la calidad del aire. El dióxido de carbono no es un contaminante sino un ingrediente esencial de la vida en este planeta. . . . [L]a cuestión de si la captura de gases de 'efecto invernadero' provocará o no un calentamiento del planeta. . . no tiene conexión alguna con nuestro clima cotidiano.No hay absolutamente ningún acuerdo entre los climatólogos sobre si el planeta se está calentando o no, o, en caso afirmativo, sobre si el calentamiento es el resultado de factores provocados por el hombre o de variaciones naturales en el clima. . . . Me siento muy seguro al decir que la opinión de que la quema de combustibles fósiles provocará un cambio climático global sigue siendo una hipótesis no demostrada.[91]

76. Mobil (ExxonMobil) pagó por una serie de “publirreportajes”, anuncios ubicados en la sección editorial de The New York Times y destinados a parecer editoriales en lugar de anuncios pagados. Muchos de esos publirreportajes comunicaron dudas sobre la realidad y la gravedad del cambio climático causado por el hombre, incluso cuando los científicos de la industria concluyeron simultáneamente que el cambio climático era real, grave y causado por la actividad humana. Los anuncios abordaban diversos aspectos del debate público sobre el cambio climático y buscaban socavar las justificaciones para abordar las emisiones de gases de efecto invernadero como una ciencia no resuelta. El publirreportaje de 1997 a continuación[92] argumentó que el análisis económico de las restricciones de emisiones era defectuoso y no concluyente y, por lo tanto, justificaba retrasar la acción sobre el cambio climático.

[91] Robert Peterson, A Cleaner Canada in Imperial Oil Review (1998), https://www.desmogblog.com/sites/beta.desmogblog.com/files/A%20Cleaner%20Canada%20Imperial%20Oil.pdf.
[92] Mobil, When Facts Don’t Square with the Theory, Throw Out the Facts, N.Y. Times A31 (Aug. 14, 1997), https://www.documentcloud.org/documents/705550-mob-nyt-1997-aug-14-whenfactsdontsquare.html.

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 63 of 119

# Cuando los hechos no concuerdan con la teoría, hay que descartarlos

Eso parece caracterizar la actitud de la Administración ante dos de sus propios estudios que muestran que los esfuerzos internacionales para frenar el calentamiento global podrían provocar un gran aumento en los precios de la energía.

Durante meses, la administración, sin tomar riesgos, ha prometido proporcionar detalles del plan de reducción de emisiones que presentará en la reunión sobre cambio climático que se celebrará en Kioto, Japón, a finales de este año. También prometió evaluar los aspectos económicos de esa política y medir su impacto. Estos resultados son importantes porque las propuestas presentadas hasta ahora por otros países serían perturbadoras y costosas para la economía de los Estados Unidos.

Sin embargo, cuando por fin se generaron los resultados de sus propios modelos económicos, la administración comenzó a distanciarse de las conclusiones y de los modelos que los produjeron. La principal asesora económica de la administración dijo que los modelos económicos no pueden dar una "respuesta definitiva" sobre el impacto del control de las emisiones. El esfuerzo, dijo, es "inútil". En el mejor de los casos, los modelos solo pueden proporcionar una "gama de impactos potenciales".

Francamente, estamos perplejos. La Casa Blanca prometió exponer al público los datos económicos. Sin embargo, la principal asesora de la administración dijo que ese análisis no se basará en modelos y que "excluirá... cifras detalladas". Si no se facilitan cifras ni se recurre a modelos, ¿qué tipo de examen económico riguroso pueden esperar el Congreso y el público?

También nos desconcierta la ambivalencia sobre los modelos. La administración resta importancia a la utilidad de los modelos económicos para prever los impactos de costos dentro de 10-15 años. Sin embargo, sus negociadores aceptan, como si fuera la pura la verdad, las predicciones de calentamiento global de 50-100 años que fueron generadas por modelos climáticos, muchos de los cuales fueron criticados como seriamente defectuosos.

El segundo estudio, realizado por el Laboratorio Nacional de Argonne en virtud de un contrato con el Departamento de Energía, examinó qué ocurriría si Estados Unidos tuviera que comprometerse a subir los precios de la energía según los planes de reducción de emisiones que varias naciones habían avanzado el año pasado. El informe concluía que tales aumentos provocarían "reducciones significativas en la producción y el empleo" en seis industrias: aluminio, cemento, química, papel y pasta de papel, refinación de petróleo y acero.

Según el estudio, la industria química sería la más afectada, y se calcula que hasta el 30 % de la capacidad de fabricación de productos químicos de Estados Unidos se trasladaría a países en desarrollo. Las pérdidas de empleo podrían ascender a unos 200.000 en esa industria, con otros 100.000 en el sector siderúrgico. Y a pesar de la pérdida sustancial de puestos de trabajo y capacidad de fabricación en Estados Unidos, la reducción neta de emisiones podría ser insignificante ya que los países en desarrollo no estarán obligados por los objetivos de emisiones de un tratado sobre el calentamiento global.

Al restar importancia a las conclusiones de Argonne, el Departamento de Energía señaló que el estudio utilizó precios de energía obsoletos (mediados de 1996), no reflejó las ganancias que se derivarían del comercio internacional de emisiones y no tuvo en cuenta los beneficios de la aceleración del desarrollo de la eficiencia energética y de las tecnologías con bajas emisiones de carbono.

Lo que no mencionó es en qué consisten esas nuevas tecnologías ni cuándo podemos esperar que se sientan sus beneficios. En cuanto al comercio de emisiones, muchos economistas han teorizado sobre el papel que podrían desempeñar en la reducción de emisiones, pero pocos abordaron la viabilidad de implementar y supervisar un esquema así.

Aplaudimos los objetivos que Estados Unidos quiere lograr en estas próximas negociaciones: que el acuerdo final sea "flexible, rentable, realista, alcanzable y, en última instancia, de alcance mundial", pero hasta que veamos los detalles de la política de la administración, nos preocupa que los planes se elaboren sin un análisis económico riguroso. Hay demasiado en juego como para simplemente ignorar los hechos que no concuerdan con las teorías preconcebidas.

Mobil® The energy to make a difference™

**Figura 9: Publirreportaje de Mobil de 1997**

77. Muchos otros publirreportajes de Exxon y Mobil caracterizaron falsa o engañosamente el estado de la investigación científica climática ante los lectores de la página de opinión de The New York Times. Una muestra de estas declaraciones falsas incluye:

- "No sabemos lo suficiente sobre los factores que afectan el calentamiento global y el grado en que, si es que lo hay, las emisiones provocadas por el hombre (es decir, el dióxido de carbono) contribuyen al aumento de la temperatura de la Tierra".[93]

- “Las emisiones de gases de efecto invernadero, que tienen un efecto de calentamiento, se compensan con otro producto de la combustión, las partículas, que provocan enfriamiento”.[94]

- “Incluso después de dos décadas de progreso, los climatólogos todavía no están seguros de cómo (o incluso si) la acumulación de gases de efecto invernadero provocados por el hombre está relacionada con el calentamiento global. Podría pasar al menos una década antes de que los modelos climáticos sean capaces de vincular sin ambigüedades el calentamiento causado por el efecto invernadero con las acciones humanas. Aún quedan importantes respuestas científicas por delante”.[95]

- "[E]s imposible para los científicos atribuir los pequeños aumentos recientes de la temperatura de la superficie a causas humanas".[96]

78. Un análisis cuantitativo de las comunicaciones climáticas de ExxonMobil entre 1989 y 2004 determinó que, mientras que el 83 % de los artículos revisados por pares de la empresa y el 80 % de sus documentos internos reconocían la realidad y los orígenes humanos del

---

[93] Mobil, Climate Change: A Prudent Approach, in N.Y. Times (Nov. 13, 1997), https://www.documentcloud.org/documents/705548-mob-nyt-1997-11-13-climateprudentapproach.html.

[94] Mobil, Less Heat, More Light on Climate Change (July 18, 1996), https://www.documentcloud.org/documents/705544-mob-nyt-1996-jul-18-lessheatmorelight.html.

[95] Mobil, Climate Change: Where We Come Out, in N.Y. Times (Nov. 20, 1997), https://www.documentcloud.org/documents/705549-mob-nyt-1997-11-20-ccwherewecomeout.html.

[96] ExxonMobil, Unsettled Science (Mar. 23, 2000), reproduced in https://www.theguardian.com/environment/2021/nov/18/the-forgotten-oil-ads-that-told-us-climate-change-was-nothing.

cambio climático, el 81 % de sus publirreportajes comunicaban dudas sobre esos conclusiones.[97] La tendencia de ExxonMobil a contradecir su propia investigación revisada por pares en declaraciones destinadas a audiencias no profesionales también apareció en una escala de año tras año. Sobre la base de esta discrepancia "estadísticamente significativa" entre las comunicaciones internas y externas, los autores concluyeron que "ExxonMobil engañó al público".[98]

79.     Los Demandados, individualmente y a través del API, otras asociaciones comerciales y varios grupos fachada, montaron una campaña pública engañosa para continuar promoviendo y comercializando indebidamente sus productos de combustibles fósiles, a pesar de su propio conocimiento y del creciente consenso científico nacional e internacional sobre los peligros de continuar haciéndolo.

80.     Una de las organizaciones clave formadas por los Demandados para coordinar la respuesta de la industria de los combustibles fósiles a la creciente conciencia mundial sobre el cambio climático fue la Asociación Internacional de Conservación Ambiental de la Industria del Petróleo (en inglés, the International Petroleum Industry Environmental Conservation Association, o "IPIECA"). En 1987, la IPIECA formó un "Grupo de Trabajo sobre Cambio Climático Global" presidido por Duane LeVine, director de ciencia y desarrollo estratégico de Exxon. El grupo de trabajo también incluyó a Brian Flannery de Exxon, Leonard Bernstein de Mobil, Terry Yosie de API y representantes de BP, Shell y Texaco (Chevron). En 1990, el Grupo de Trabajo envió un memorando estratégico creado por LeVine a cientos de empresas petroleras de todo el mundo, incluidos los Demandados. Este memorando explicaba que, para prevenir un

---

[97] Geoffrey Supran & Naomi Oreskes, Assessing ExxonMobil's Climate Change Communications (1977–2014), 12 Envtl. Research Letters, IOP Publishing Ltd. 12 (2017), https://iopscience.iop.org/article/10.1088/1748-9326/aa815f/pdf.

[98] Ibid.

cambio global que abandone la quema de combustibles fósiles para obtener energía, la industria debería enfatizar las incertidumbres en la ciencia climática, solicitar más investigación y promover políticas favorables a la industria que dejarían intacto el negocio de los combustibles fósiles.[99]

81. El Global Climate Coalition ("GCC"), en nombre de los Demandados y otras empresas de combustibles fósiles, también financió campañas publicitarias engañosas y distribuyó material engañoso para generar incertidumbre pública en torno al debate climático, buscando inflar el mercado de los combustibles fósiles.[100] Creada en 1989, los miembros fundadores de la GCC incluyeron a Exxon, Shell, Phillips Petroleum Company (ConocoPhillips) y el API. BP y Chevron también participaron como miembros de la GCC. Su posición sobre el cambio climático contradecía décadas de informes científicos internos de sus miembros al afirmar que las tendencias naturales, y no la combustión humana de combustibles fósiles, eran responsables del aumento de las temperaturas globales:

> La GCC cree que la preponderancia de la evidencia indica que la mayor parte, si no la totalidad, del calentamiento observado es parte de [una] tendencia de calentamiento natural que comenzó hace aproximadamente 400 años. Si hay un componente antropogénico en este calentamiento observado, la GCC cree que debe ser muy pequeño y debe superponerse a una tendencia de calentamiento natural mucho mayor.[101]

82. La promoción por parte de la GCC de un escepticismo abierto sobre el cambio climático también contravino su evaluación interna de que tales teorías carecían de respaldo científico. A pesar de un manual interno que reconoce que varias "teorías contrarias" (es decir, el escepticismo sobre el cambio climático) no "ofrecen argumentos convincentes contra el modelo

---

[99] Benjamin A. Franta, Big Carbon's Strategic Response to Global Warming, 1950-2020 140 (2022), https://purl.stanford.edu/hq437ph9153.

[100] Ibid.

[101] Global Climate Coalition, Global Climate Coalition: An Overview 2 (Nov. 1996), http://www.climatefiles.com/denial-groups/global-climatecoalition-collection/1996-global-climate-coalition-overview/.

convencional de cambio climático inducido por las emisiones de gases de efecto invernadero", la GCC excluyó esta sección de la versión publicada del informe de antecedentes[102] y, en cambio, financió y promovió algunas de esas mismas teorías contrarias. Entre 1989 y 1998, la GCC gastó 13 millones de dólares en publicidad como parte de una campaña para ofuscar la comprensión del público sobre la ciencia climática y socavar su confianza en los científicos del clima.[103]

83. Por ejemplo, en un informe de 1994, la GCC afirmó que "las observaciones aún no han confirmado evidencia de calentamiento global que pueda atribuirse a actividades humanas", que "[l]a afirmaciónde que se han producido o se producirán impactos graves del cambio climático en el futuro simplemente no ha sido probada", por lo que "no hay base para el diseño de acciones políticas efectivas que eliminen el potencial de cambio climático".[104] En 1995, la GCC publicó un folleto titulado "Cambio climático: su pasaporte a los hechos", que decía: "Aunque han llegado a la prensa popular muchas advertencias sobre las consecuencias de un posible calentamiento de la atmósfera terrestre provocado por el hombre durante los próximos 100 años, no queda evidencia científica de que un calentamiento tan peligroso cause realmente ocurre."[105]

84. En 1997, William O'Keefe, presidente de la GCC y vicepresidente ejecutivo del API, escribió falsamente en un artículo de opinión del Washington Post : "[l]os científicos del clima no dicen que la quema de petróleo, gas y carbón esté calentando constantemente la

---

[102] Memorandum from Gregory J. Dana, Assoc. of Int'l Auto. Mfrs., to AIAM Technical Committee, Global Climate Coalition (GCC) - Primer on Climate Change Science - Final Draft (Jan. 18, 1996), http://www.webcitation.org/6FyqHawb9.

[103] Wendy E. Franz, Kennedy School of Government, Harvard University, Science, Skeptics and Non-State Actors in the Greenhouse, ENRP Discussion Paper E-98-18 13 (Sept. 1998), https://www.belfercenter.org/sites/default/files/legacy/files/Science%20Skeptics%20and%20Non-State%20Actors%20in%20the%20Greenhouse%20-%20E-98-18.pdf.

[104] GCC, Issues and Options: Potential Global Climate Change, Climate Files (1994), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1994-potential-global-climate-change-issues.

[105] GCC, Climate Change: Your Passport to the Facts, Climate Files (1995), http://www.climatefiles.com/denial-groups/global-climate-coalition-collection/1995-climate-change-facts-passport.

tierra."[106] Esta declaración contradecía el consenso científico establecido, así como el propio conocimiento de los Demandados. Sin embargo, los Demandados no hicieron nada para corregir el registro público y, en cambio, continuaron financiando el escepticismo climático anticientífico de la GCC.

85. Además de difundir públicamente información falsa y engañosa del consenso científico sobre el clima, la GCC también buscó socavar la credibilidad de la ciencia climática desde dentro del IPCC. Después de convertirse en revisor del Segundo Informe de Evaluación del IPCC en 1996, la GCC utilizó su posición para acusar al autor convocante de un capítulo clave del Informe de modificar sus conclusiones. La GCC afirmó que el autor, el climatólogo Ben Santer, había participado en una "limpieza científica" que "subestimaba las incertidumbres sobre las causas y los efectos del cambio climático. . . aumentar el aparente apoyo científico a la atribución de los cambios climáticos a las actividades humanas".[107] La GCC también dispuso difundir la acusación entre legisladores, periodistas, editores de revistas científicas e incluso la página de opinión del Wall Street Journal .[108] Este esfuerzo "fue ampliamente percibido como un intento por parte de la CCG de socavar la credibilidad del IPCC".[109]

86. A finales de la década de 1990, los Demandados dejaron de negar abiertamente el calentamiento antropogénico y pasaron a vender una forma más sutil de escepticismo sobre el cambio climático. Los Demandados se alarmaron por los enormes juicios legales que ahora enfrentan las grandes tabacaleras como resultado de décadas dedicadas a negar públicamente los

---

[106] William O'Keefe, A Climate Policy, in The Washington Post (July 5, 1997), https://www.washingtonpost.com/archive/opinions/1997/07/05/a-climate-policy/6a11899a-c020-4d59-a185-b0e7eebf19cc/.
[107] Franz, Science, Skeptics and Non-State Actors in the Greenhouse at 14.
[108] Naomi Oreskes & Erik Conway, Merchants of Doubt: How a Handful of Scientists Obscured the Truth on Issues from Tobacco Smoke to Global Warming, New York: Bloomsbury Press 205–13 (2011). See also S. Fred Singer, Climate Change and Consensus, Science vol. 271, no. 5249 (Feb. 2, 1996); Frederick Seitz, A Major Deception on 'Global Warming', Wall Street Journal (June 12, 1996).
[109] Franz, Science, Skeptics, and Non-State Actors in the Greenhouse at 15.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 41 de 91

riesgos para la salud por fumar cigarrillos, y un empleado de Shell explicó que la empresa "no quería caer en la misma trampa que las empresas tabacaleras" que han quedado atrapadas en todas sus mentiras".[110] Los Demandados comenzaron a cambiar su estrategia de comunicación, alegando que habían aceptado la ciencia climática desde el principio.[111] Varias grandes empresas de combustibles fósiles, incluidas BP y Shell, abandonaron la GCC (aunque todos los Demandados siguieron siendo miembros del API).[112] En ese momento, los Demandados afirmaron públicamente aceptar la realidad del cambio climático antropogénico al tiempo que insistían en que los costos de la acción climática eran inaceptablemente altos a la luz de las incertidumbres aún no resueltas en la ciencia del clima, especialmente en torno a la gravedad y el marco temporal de los impactos climáticos futuros. Como reflejo de esta nueva estrategia, el vicepresidente ejecutivo del API (y portavoz de la GCC), William O'Keefe, anunció en noviembre de 1998 que "estamos comprometidos a ser parte de la solución al riesgo climático y a participar activamente en el debate para forjar una política clara y defendible". "[E]l debate no se trata de acción o inacción", escribió O'Keefe, "sino qué conjunto de acciones es coherente con nuestro estado de conocimiento y bienestar económico".[113] En lugar de negar públicamente la necesidad de abordar el cambio climático, la nueva estrategia de comunicación de los Demandados buscó impedir acciones políticas que pudieran disminuir el consumo de productos de combustibles fósiles.

87. A pesar de su cambio de actitud pública, los Demandados continuaron subrepticiamente organizando y financiando programas diseñados para engañar al público sobre el peso y la veracidad del consenso científico sobre el clima. En 1998, el API convocó a un

---

[110] Nathaniel Rich, Losing Earth: A Recent History, London: Picador 186 (2020).
[111] Franta, Big Carbon's Strategic Response to Global Warming, 1950-2020, at 170.
[112] Id. at 177.
[113] API: U.S. oil industry recognizes climate change risk, Oil & Gas Journal 28 (Nov. 2, 1998).

Equipo de Comunicaciones sobre Ciencia del Clima Global (en inglés, the Global Climate Science Communications Team, o "GCSCT") cuyos miembros incluían al principal cabildero ambiental de Exxon, un representante de relaciones públicas del API y representantes de Chevron. No había científicos en el "Equipo de Comunicaciones sobre la Ciencia del Clima Global". Steve Milloy (un actor clave en la campaña de engaño de la industria tabacalera) y su organización, el Centro de Avance de las Ciencias del Sonido (en inglés, The Advancement of Sound Science Coalition, o "TASSC"), fueron miembros fundadores del GCSCT. El TASSC era un grupo ciudadano falso creado por la industria tabacalera para sembrar incertidumbre al desacreditar el vínculo científico entre la exposición al humo de cigarrillos ajenos y el aumento de las tasas de cáncer y enfermedades cardíacas. Philip Morris había lanzado el TASSC al seguir el consejo de su empresa de relaciones públicas, que le advirtió que la propia empresa tabacalera no sería una voz creíble en la cuestión del tabaquismo y la salud pública. El TASSC, a través del API y con la aprobación de los Demandados, también se convirtió en un grupo fachada para la industria de los combustibles fósiles, utilizando las mismas tácticas que había perfeccionado mientras operaba en nombre de las empresas tabacaleras para sembrar dudas sobre la ciencia climática. Aunque el TASSC se hizo pasar por un grupo de base de ciudadanos preocupados, fue financiado por los Demandados. Por ejemplo, entre 2000 y 2004, Exxon donó $50.000 al Centro de Ciencias del Avance del Sonido de Milloy; y $60.000 adicionales para el Free Enterprise Education Institute y $50.000 para el Free Enterprise Action Institute, ambos registrados en la dirección particular de Milloy.[114] El GCSCT representó una continuación de las acciones concertadas de los Demandados para sembrar dudas y confusión sobre el cambio climático con el fin de promover los intereses comerciales de los Demandados.

---

[114] Union of Concerned Scientists, Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science (July 16, 2007), https://www.ucsusa.org/resources/smoke-mirrors-hot-air.

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 71 of 119

88. A partir de 1998, el GCSCT continuó los esfuerzos de los Demandados por engañar al público sobre los peligros del uso de combustibles fósiles mediante la redacción de un plan para convencer al público de que la base científica del cambio climático estaba en duda. El plan multimillonario y plurianual, entre otros elementos, buscaba: (a) "[d]esarrollar e implementar un programa nacional de relaciones con los medios para informar a los medios sobre las incertidumbres en la ciencia climática para generar cobertura mediática nacional, regional y local sobre las incertidumbres científicas"; (b) "[d]esarrollar un kit de información sobre ciencia climática global para los medios de comunicación que incluya artículos revisados por pares que socaven la 'sabiduría convencional' sobre la ciencia climática"; (c) "[p]roducir. . . un flujo constante de columnas de opinión"; y (d) "[d]esarrollar e implementar un programa de divulgación directa para informar y educar a los miembros del Congreso... y profesores/estudiantes de escuela sobre las incertidumbres en la ciencia climática"[115] para garantizar un mercado continuo y sin obstáculos para sus productos de combustibles fósiles.

89. Exxon, Chevron y el API dirigieron y contribuyeron al desarrollo del plan, que establecía claramente los criterios mediante los cuales los contribuyentes sabrían cuándo sus esfuerzos por generar dudas habían tenido éxito. "La victoria", escribieron, "se logrará cuando... los ciudadanos promedio 'comprendan' (reconozcan) las incertidumbres en la ciencia climática" y "el reconocimiento de las incertidumbres se convierta en parte de la 'sabiduría convencional'".[116] En otras palabras, el plan era parte del objetivo de los Demandados de utilizar la desinformación para sembrar dudas sobre la realidad del cambio climático en un esfuerzo por mantener la demanda de los consumidores de sus productos de combustibles fósiles y sus grandes ganancias.

---

[115] Email from Joe Walker to Global Climate Science Team, Draft Global Climate Science Communications Plan (Apr. 3, 1998), https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.
[116] Ibid.

90. Para promover las estrategias descritas en este memorando, los Demandados hicieron declaraciones engañosas sobre el cambio climático, la relación entre el cambio climático y sus productos de combustibles fósiles y la urgencia del problema. Los Demandados hicieron estas declaraciones en foros públicos y en anuncios publicados en periódicos y otros medios de circulación sustancial en Puerto Rico, incluso en publicaciones nacionales como The New York Times, Wall Street Journal y Washington Post.

91. Phillip Cooney, abogado del API de 1996 a 2001, testificó en una audiencia en el Congreso en 2007 que era "típico" que el API financiara grupos de expertos y de defensa que minimizaban el papel de los combustibles fósiles en el cambio climático. Entre los grupos a los que el API proporcionó financiación se encontraban el Instituto Heartland, el Instituto de Empresas Competitivas y el American Council on Capital Formation, cada uno de los que publicó publicaciones que desafiaban el consenso científico de que los combustibles fósiles estaban provocando el cambio climático y se oponían a las restricciones a la extracción y producción de los Demandados. y venta de combustibles fósiles.[117]

92. Otra estrategia clave en los esfuerzos de los Demandados por desacreditar el consenso científico sobre el cambio climático y el IPCC fue financiar a científicos que, aunque acreditados, tenían opiniones marginales que se volvieron aún más cuestionables dadas las fuentes de financiación de sus investigaciones. Esos científicos obtuvieron parte o la totalidad de su presupuesto de investigación de los Demandados directamente o a través de organizaciones financiadas por los Demandados como el API,[118] pero con frecuencia no lo revelaron a sus

[117] DeSmog, Competitive Enterprise Institute, https://www.desmog.com/competitive-enterprise-institute/; DeSmog, Heartland Institute, https://www.desmog.com/heartland-institute/; Desmog, American Council for Capital Formation, https://www.desmog.com/american-council-for-capital-formation/.

[118] E.g., Willie Soon & Sallie Baliunas, Proxy Climatic and Environmental Changes of the Past 1000 Years, 23 Climate Rsch. 88, 105 (Jan. 31, 2003), http://www.int-res.com/articles/cr2003/23/c023p089.pdf.

aseguradores de la industria de combustibles fósiles.[119] Al menos uno de esos científicos, el Dr. Wei-Hock Soon, acordó contractualmente permitir que los donantes revisaran su investigación antes de su publicación, y su institución de alojamiento acordó no revelar el acuerdo de financiación sin el permiso previo de sus donantes de combustibles fósiles.[120] Los Demandados pretendían que la investigación de los científicos que financiaron fuera distribuida entre los consumidores y que estos confiaran en dicha investigación al comprar los productos de los Demandados, incluidos los consumidores en Puerto Rico.

93. La creación de una falsa percepción de desacuerdo en la comunidad científica (a pesar del consenso que sus propios científicos, expertos y administradores habían reconocido previamente) evidentemente ha perturbado canales vitales de comunicación entre los científicos y el público. Una encuesta de 2007 de la Universidad de Yale y Gallup determinó que, si bien el 71 % de los estadounidenses creía personalmente que el calentamiento global estaba ocurriendo, solo el 48 % creía que había un consenso entre la comunidad científica, y el 40 % creía que había mucho desacuerdo entre los científicos sobre si el calentamiento global estaba sucediendo.[121] Ocho años después, una encuesta de 2015 de la Universidad Yale-George Mason determinó que "[s]olo uno de cada diez estadounidenses entiende que casi todos los científicos del clima (más del 90 %) están convencidos de que el calentamiento global causado por el hombre está

---

[119] E.g., Smithsonian Statement: Dr. Wei-Hock (Willie) Soon, Smithsonian (Feb. 26, 2015), https://web.archive.org/web/20181105223030/https://www.si.edu/newsdesk/releases/smithsonian-statement-dr-wei-hock-willie-soon.

[120] Union of Concerned Scientists, Climate Deception Dossier #1: Dr. Wei-Hock Soon's Smithsonian Contracts, (July 2015), https://www.ucsusa.org/sites/default/files/attach/2015/07/The-Climate-Deception-Dossiers.pdf [https://perma.cc/JL2V-XYGL] & https://s3.amazonaws.com/ucs-documents/global- warming/Climate-Deception-Dossier-1_Willie-Soon.pdf.

[121] American Opinions on Global Warming: A Yale/Gallup/Clearvision Poll, Yale Program on Climate Change Communication (July 31, 2007), http://climatecommunication.yale.edu/ publications/american-opinions-on-global-warming.

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 74 of 119

ocurriendo, y solo la mitad... . . creen que la mayoría lo cree".[122] Además, determinó que el 33 % de los estadounidenses cree que el cambio climático se debe principalmente a causas naturales, en comparación con el 97 % de los artículos revisados por pares que reconocen que el calentamiento global es real y al menos en parte causado por el hombre.[123] La falta de progreso, e incluso de retroceso, en la comprensión pública de la ciencia climática durante este período (durante el que los Demandados profesaron aceptar las conclusiones de la ciencia climática convencional) atestigua el éxito de la campaña de engaño de los Demandados para frustrar la difusión de experiencia científica precisa al público sobre los efectos del consumo de combustibles fósiles.

94. 2007 fue el mismo año en que el IPCC publicó su Cuarto Informe de Evaluación, en el que concluyó que "hay un nivel de confianza muy alto en que el efecto neto de las actividades humanas desde 1750 ha sido de calentamiento".[124] El IPCC definió "confianza muy alta" como una probabilidad de al menos 9 entre 10.[125]

95. Los Demandados, individualmente y a través de sus membresías en asociaciones comerciales, trabajaron directamente, y a menudo de manera deliberadamente oculta, para ocultar y tergiversar los peligros conocidos de los productos de combustibles fósiles ante los consumidores, el público y el Estado Libre Asociado.

96. Los Demandados han financiado docenas de grupos de expertos, grupos fachada y fundaciones de dinero oscuro que impulsan la negación del cambio climático. Estos incluyen el Competitive Enterprise Institute, el Heartland Institute, Frontiers for Freedom, el Committee for

[122] Leiserowitz, et al., Climate Change in the American Mind (Yale Program on Climate Change Comm. & Geo. Mason U., Ctr. for Climate Change Comm eds., Oct. 2015), https://climatecommunication.yale.edu/wp-content/uploads/2015/11/Climate-Change-American-Mind-October-20151.pdf.
[123] Id. at 7.
[124] IPCC, Summary for Policymakers: A Report of Working Group I to the Fourth Assessment Report 3 (2007), https://www.ipcc.ch/site/assets/uploads/2018/02/ar4-wg1-spm-1.pdf.
[125] Ibid.

a Constructive Tomorrow y la Heritage Foundation. De 1998 a 2014, ExxonMobil gastó casi 31 millones de dólares en financiar numerosas organizaciones que tergiversaron el consenso científico de que los productos de combustibles fósiles estaban causando el cambio climático, el aumento del nivel del mar y daños a Puerto Rico, entre otras comunidades.[126] Varios Demandados han sido vinculados con otros grupos que socavan la base científica que vincula los productos de combustibles fósiles con el cambio climático y el aumento del nivel del mar, incluidos el Frontiers of Freedom Institute y el George C. Marshall Institute.

97. Exxon reconoció su propio éxito anterior al sembrar incertidumbre y desacelerar la mitigación mediante la financiación de grupos de negación climática. En su Informe de ciudadanía corporativa de 2007, Exxon declaró: "En 2008, dejaremos de contribuir a varios grupos de investigación de políticas públicas cuya posición sobre el cambio climático podría desviar la atención del importante debate sobre cómo el mundo asegurará la energía necesaria para el crecimiento económico de una manera ambientalmente responsable".[127] A pesar de este pronunciamiento, Exxon siguió asociada financieramente con varios de esos grupos después de la publicación del informe.

98. En un video grabado en secreto de 2021, un ejecutivo de Exxon admitió: "¿Luchamos agresivamente contra parte de la ciencia? Sí. ¿Nos unimos a algunos de estos grupos en la sombra para trabajar en contra de algunos de los primeros esfuerzos? Sí, eso es verdad. No hay nada ilegal en eso. Estábamos cuidando nuestras inversiones. Estábamos velando por nuestros accionistas". [128]

[126] ExxonSecrets.org, ExxonMobil Climate Denial Funding 1998–2014, http://exxonsecrets.org/html/index.php (last visited Oct. 14, 2022).
[127] ExxonMobil, 2007 Corporate Citizenship Report 41 (Dec. 31, 2007), http://www.documentcloud.org/documents/2799777-ExxonMobil-2007-Corporate-Citizenship-Report.html.
[128] Jeff Brady, Exxon Lobbyist Caught on Video Talking About Undermining Biden's Climate Push, NPR (July 1, 2021), https://www.npr.org/2021/07/01/1012138741/exxon-lobbyist-caught-on-video-talks-about-undermining-bidens-climate-push

99. En septiembre de 2015, periodistas de Inside Climate News informaron que Exxon Mobil tenía conocimientos sofisticados sobre las causas y consecuencias del cambio climático y el papel que desempeñaban sus productos en provocar el cambio climático ya en la década de 1970.[129] Estos periodistas descubrieron el conocimiento superior de ExxonMobil a través de una investigación exhaustiva de miles de documentos archivados y entrevistas con ex empleados de ExxonMobil.

100. Entre octubre y diciembre de 2015, varios periodistas del Proyecto periodístico sobre la Energía y el Medio Ambiente de la Escuela de Periodismo de la Universidad de Columbia y de Los Angeles Times también expusieron el hecho de que ExxonMobil y otros miembros de la industria de los combustibles fósiles tenían un conocimiento superior de las causas y consecuencias del cambio climático y el papel que desempeñaron sus productos en provocar el cambio climático ya en la década de 1970.[130] Estos periodistas descubrieron el conocimiento superior de ExxonMobil a través de una investigación exhaustiva de documentos archivados, entrevistas con ex empleados de ExxonMobil y una revisión de revistas científicas.

101. En noviembre de 2017, el Centro de Derecho Ambiental Internacional emitió un informe que revela que los Demandados, incluido el API, tenían un conocimiento superior de las causas y consecuencias del cambio climático y el papel que desempeñaron los productos de combustibles fósiles en provocar el cambio climático desde la década de 1970.[131]

---

[129] Neela Banerjee et al., Exxon: The Road Not Taken, InsideClimate News (Sept. 16, 2015), https://insideclimatenews.org/content/Exxon-The-Road-Not-Taken.

[130] The Los Angeles Times publicó una serie de tres articulos entre octubre y diciembre de 2015. See Katie Jennings et al., How Exxon went from leader to skeptic on climate change research, L.A. Times (Oct. 23, 2015), https://graphics.latimes.com/exxon-research; Sara Jerving et al., What Exxon knew about the Earth's melting Arctic, L.A. Times (Oct. 9, 2015), https://www.latimes.com/nation/la-na-what-exxon-knew-20151009-story.html; Amy Lieberman & Susanne Rust, Big Oil braced for global warming while it fought regulations, L.A. Times (Dec. 31, 2015), https://graphics.latimes.com/oil-operations.

[131] Caroll Muffett & Steven Feit, Smoke and Fumes: The Legal and Evidentiary Basis for Holding Big Oil Accountable for the Climate Crisis, Ctr. for Int'l Envtl. Law 10 (2017), https://www.ciel.org/reports/smoke-and-fumes.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 49 de 91

102. Los Demandados podrían haber contribuido al esfuerzo global para mitigar los impactos de las emisiones de gases de efecto invernadero, por ejemplo, emitiendo advertencias proporcionales a los riesgos que conocían del uso despilfarrador de sus productos y cesando sus actividades que buscaban socavar y retrasar las estrategias prácticas y técnicas que habrían permitido y apoyado una transición hacia un futuro con bajas emisiones de carbono. En cambio, los Demandados emprendieron un esfuerzo trascendental para engañar a los consumidores y al público sobre los peligros existenciales de quemar combustibles fósiles, todo con el propósito y efecto de perpetuar e hiperinflar el consumo de combustibles fósiles y retrasar la llegada de fuentes de energía alternativas no basadas en combustibles fósiles.

103. Como resultado de la conducta ilícita, falsa y engañosa de los Demandados, los consumidores de los productos de combustibles fósiles de los Demandados y el público, en Puerto Rico como en otros lugares, han sido engañados deliberada e innecesariamente sobre: el papel de los productos de combustibles fósiles en causar el calentamiento global, el aumento del nivel del mar, las alteraciones del ciclo hidrológico y el aumento de las precipitaciones extremas, las olas de calor, la sequía y otras consecuencias de la crisis climática; la aceleración del calentamiento global desde mediados del siglo XX y su continuación; y el hecho de que el continuo aumento en el consumo de combustibles fósiles crea graves amenazas ambientales y costos económicos significativos para las comunidades costeras, incluido Puerto Rico. Los consumidores y el público en Puerto Rico y otros lugares también han sido engañados sobre la profundidad y amplitud de la evidencia científica sobre el cambio climático antropogénico y, en particular, sobre la fuerza del consenso científico que demuestra el papel de los combustibles fósiles en causar tanto el cambio climático como una amplia gama de impactos potencialmente

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 78 of 119

destructivos, incluido el aumento del nivel del mar, alteraciones del ciclo hidrológico, precipitaciones extremas, olas de calor, sequías y consecuencias asociadas.

104. Al sembrar dudas sobre las consecuencias futuras del consumo irrestricto de combustibles fósiles, la campaña de engaño de los Demandados retrasó con éxito la transición a fuentes de energía alternativas, que los Demandados pronosticaron podrían penetrar la mitad de un mercado energético competitivo en 50 años si se les permitiera desarrollarse sin obstáculos. Esta demora provocó la emisión de enormes cantidades de gases de efecto invernadero evitables, garantizando así que el daño causado por el cambio climático será sustancialmente más grave que si los Demandados hubieran actuado con franqueza, en proporción a su conocimiento interno de los riesgos climáticos.

## IV. En contraste con sus declaraciones públicas, las acciones internas de los Demandados demuestran su conocimiento y su intención de sacar provecho del uso incesante de productos de combustibles fósiles.

105. En contraste con sus esfuerzos públicos que cuestionan la validez del consenso científico sobre el cambio climático antropogénico, los actos y omisiones de los Demandados evidencian su reconocimiento interno de la realidad del cambio climático y sus probables consecuencias. Esas acciones incluyen, entre otras, realizar inversiones multimillonarias en infraestructura para sus propias operaciones que reconozcan la realidad del cambio antropogénico relacionado con el clima que se avecina. Esas inversiones incluyeron (entre otras): elevar las plataformas petroleras marinas para protegerlas contra el aumento del nivel del mar; reforzar las plataformas petroleras marinas para resistir el aumento de la fuerza de las olas y la gravedad de las tormentas; desarrollar tecnología e infraestructura para extraer, almacenar y transportar combustibles fósiles en un ambiente ártico en calentamiento; y desarrollar y patentar

diseños de equipos destinados a extraer petróleo crudo y/o gas natural en áreas antes inaccesibles debido a la presencia de capas de hielo polares.[132]

106. Por ejemplo, en 1973, Exxon obtuvo una patente para un carguero capaz de atravesar el hielo marino[133] y para un petrolero[134] diseñado específicamente para su uso en áreas del Ártico que antes eran inalcanzables.

107. En 1974, Chevron obtuvo una patente para una plataforma móvil de perforación ártica diseñada para soportar interferencias significativas de masas de hielo laterales,[135] permitiendo perforar en áreas con mayor movimiento de témpanos de hielo debido a la temperatura elevada.

108. Ese mismo año, Texaco (Chevron) trabajó para obtener una patente para un método y aparato para reducir las fuerzas del hielo en una estructura marina propensa a congelarse en hielo debido a condiciones climáticas naturales,[136] permitiendo perforar en áreas árticas previamente inalcanzables que serían accesibles estacionalmente.

109. Shell obtuvo una patente similar a la de Texaco (Chevron) en 1984.[137]

110. En 1989, Norske Shell, la filial noruega de Royal Dutch Shell, modificó los diseños de una plataforma de gas natural que se planeaba construir en el Mar del Norte para tener

---

[132] Amy Lieberman & Susanne Rust, Big Oil Braced for Global Warming While It Fought Regulations, Los Angeles Times (Dec. 31, 2015), https://graphics.latimes.com/oil-operations/

[133] ExxonMobil Research Engineering Co., Patent US3727571A: Icebreaking cargo vessel (granted Apr. 17, 1973), https://www.google.com/patents/US3727571.

[134] ExxonMobil Research Engineering Co., Patent US3745960A: Tanker vessel (granted July 17, 1973), https://www.google.com/patents/US3745960.

[135] Chevron Research & Technology Co., Patent US3831385A: Arctic offshore platform (granted Aug. 27, 1974), https://www.google.com/patents/US3831385.

[136] Texaco Inc., Patent US3793840A: Mobile, arctic drilling and production platform (granted Feb. 26, 1974), https://www.google.com/patents/US3793840.

[137] Shell Oil Co., Patent US4427320A: Arctic offshore platform (granted Jan. 24, 1984), https://www.google.com/patents/US4427320.

en cuenta el aumento previsto del nivel del mar. Esos cambios de diseño fueron finalmente llevados a cabo por los contratistas de Shell, lo que añadió costos sustanciales al proyecto.[138]

a.    Se demostró que el campo Troll, frente a la costa noruega en el Mar del Norte, contenía grandes depósitos naturales de petróleo y gas en 1979, poco después de que los reguladores noruegos de petróleo y gas aprobaran a Norske Shell para operar una parte del campo.

b.    En 1986, el parlamento noruego otorgó a Norske Shell autoridad para completar la primera fase de desarrollo de los depósitos de gas del campo Troll, y Norske Shell comenzó a diseñar la plataforma de gas "Troll A", con la intención de comenzar a operar la plataforma aproximadamente en 1995. Teniendo en cuenta el gran tamaño de los depósitos de gas en el campo Troll, se proyectó que la plataforma Troll A operaría durante aproximadamente 70 años.

c.    La plataforma fue diseñada originalmente para estar a aproximadamente 100 pies sobre el nivel del mar, la cantidad necesaria para mantenerse por encima de las olas en una tormenta de fuerza que ocurre una vez cada cien años.

d.    En 1989, los ingenieros de Shell revisaron sus planes para aumentar la altura de la plataforma sobre el agua entre 3 y 6 pies, específicamente para tener en cuenta los mayores niveles promedio del mar previstos y el aumento de la intensidad de las tormentas debido al calentamiento global durante los 70 años de vida operativa de la plataforma.[139]

e.    Shell proyectó que los 3 a 6 pies adicionales de construcción sobre el agua aumentarían el costo de la plataforma Troll A hasta en 40 millones de dólares.

---

[138]    Greenhouse Effect: Shell Anticipates a Sea Change, N.Y. Times (Dec. 20, 1989), http://www.nytimes.com/1989/12/20/business/greenhouse-effect-shell-anticipates-a-sea-change.html.

[139]    Id.; Amy Lieberman & Susanne Rust, Big Oil Braced for Global Warming While It Fought Regulations, Los Angeles Times (Dec. 31, 2015), https://graphics.latimes.com/oil-operations/

**V. Las acciones de los Demandados han exacerbado los costos de adaptarse y mitigar los impactos adversos de la crisis climática.**

111. A medida que la contaminación por gases de efecto invernadero se acumula en la atmósfera, algunos de los cuales no se disipan potencialmente durante miles de años (es decir, $CO_2$), los cambios climáticos y los consiguientes cambios ambientales adversos se agravan, y sus frecuencias y magnitudes aumentan. A medida que esos cambios ambientales adversos se agravan y aumentan sus frecuencias y magnitudes, también lo hacen los daños físicos, ambientales, económicos y sociales que resultan de ellos.

112. Por lo tanto, la demora en la introducción de fuentes de energía alternativas y los esfuerzos relacionados para frenar las emisiones antropogénicas de gases de efecto invernadero han aumentado los daños ambientales y la magnitud y el costo de abordar esos daños, incluido Puerto Rico, que ya han ocurrido o están atrapados por emisiones anteriores.

113. Por lo tanto, la campaña de los Demandados para ocultar la ciencia del cambio climático para proteger y expandir el uso de combustibles fósiles agravó enormemente y continúa agravando los daños sufridos por Puerto Rico y sus residentes.

114. Los costos de la inacción sobre el cambio climático antropogénico y sus efectos ambientales adversos no pasaron desapercibidos para los Demandados. En un discurso pronunciado en 1997 por John Browne, ejecutivo del grupo BP America, en la Universidad de Stanford, Browne describió la responsabilidad y las oportunidades de los Demandados y de toda la industria de los combustibles fósiles para reducir el uso de productos de combustibles fósiles y mitigar los daños asociados con el uso y consumo de dichos productos:

> Una nueva era exige una nueva perspectiva de la naturaleza de la sociedad y la responsabilidad.
>
> Necesitamos ir más allá del análisis y tomar medidas. Es un momento de cambio y de repensar la responsabilidad corporativa. . . .
> [E]xiste ahora un consenso efectivo entre los principales científicos del mundo y

personas serias y bien informadas fuera de la comunidad científica de que existe una influencia humana discernible en el clima y un vínculo entre la concentración de dióxido de carbono y el aumento de la temperatura.

La predicción del IPCC es que durante el próximo siglo las temperaturas podrían aumentar entre 1 y 3,5 grados centígrados [1,8 °F-6,3 °F], y que el nivel del mar podría aumentar entre 15 y 95 centímetros [5,9 y 37,4 pulgadas]. Parte de ese impacto probablemente sea inevitable, porque es el resultado de las emisiones actuales. . . .

[S]ería imprudente y potencialmente peligroso ignorar la creciente preocupación.

El momento de considerar las dimensiones políticas del cambio climático no es cuando se prueba de manera concluyente el vínculo entre los gases de efecto invernadero y el cambio climático. . . pero cuando la posibilidad no puede descartarse y es tomada en serio por la sociedad de la que formamos parte. . . .

Nosotros [la industria de los combustibles fósiles] tenemos la responsabilidad de actuar y espero que a través de nuestras acciones podamos contribuir a un proceso mucho más amplio que es deseable y necesario.

BP acepta esa responsabilidad y, por lo tanto, estamos tomando algunas medidas específicas.

Controlar nuestras propias emisiones.

Financiar la investigación científica continua.

Tomar iniciativas para su implementación conjunta.

Desarrollar combustibles alternativos a largo plazo.

Y contribuir al debate de políticas públicas en busca de respuestas globales más amplias al problema.[140]

115. A pesar del conocimiento de los Demandados de los daños previsibles, mensurables y significativos asociados con el consumo y uso desenfrenado de sus productos de combustibles fósiles, en Puerto Rico como en otros lugares, y a pesar del conocimiento de los Demandados de las tecnologías y prácticas que podrían haber ayudado a reducir los peligros previsibles asociados con sus productos de combustibles fósiles, los Demandados continuaron

[140] John Browne, BP Climate Change Speech to Stanford, ClimateFiles (May 19, 1997), http://www.climatefiles.com/bp/bp-climate-change-speech-to-stanford.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 55 de 91

comercializando y promoviendo de manera engañosa e incorrecta el uso intensivo de combustibles fósilesy organizaron campañas para ocultar la conexión entre sus productos de combustibles fósiles y la crisis climática, aumentando dramáticamente el costo de la reducción. Esta campaña tenía como objetivo llegar e influir en los consumidores de Puerto Rico, junto con los consumidores de otros lugares. En todos los momentos relevantes, los Demandados estaban profundamente familiarizados con la necesidad de reducir el uso de sus productos de combustibles fósiles y las emisiones globales de gases de efecto invernadero asociadas, mitigar los daños asociados con el uso y consumo de sus productos y promover el desarrollo de fuentes de energía alternativas y limpias. Ejemplos de ese reconocimiento incluyen, entre otros, los siguientes:

f. En 1961, Phillips Petroleum Company presentó una solicitud de patente para un método para purificar gas, entre otras cosas, ya que "el gas natural que contiene hidrocarburos de gasolina puede contener cantidades indeseables de azufre y otros compuestos como dióxido de carbono que no son deseables en el producto de gasolina terminado. "[141]

g. En 1963, Esso (Exxon Mobil) obtuvo múltiples patentes sobre tecnologías para pilas de combustible,[142] incluso sobre el diseño de una pila de combustible y los electrodos necesarios,[143] y sobre un proceso para aumentar la oxidación de un combustible, concretamente metanol, para producir electricidad en una pila de combustible.[144]

---

[141] Phillips Petroleum Co., Patent US3228874A: Method for recovering a purified component from a gas (filed Aug. 22, 1961), https://patents.google.com/patent/US3228874.

[142] Las pilas de combustible utilizan la energía química del hidrógeno u otros combustibles para producir electricidad.. See U.S. Dep't of Energy, Fuel Cells, https://www.energy.gov/eere/fuelcells/fuel-cells (last visited Oct. 16, 2022).

[143] ExxonMobil Research Engineering Co., Patent US3116169A: Fuel cell and fuel cell electrodes (granted Dec. 31, 1963), https://www.google.com/patents/US3116169.

[144] ExxonMobil Research Engineering Co., Patent US3113049A: Direct production of electrical energy from liquid fuels (granted Dec. 3, 1963), https://www.google.com/patents/US3113049.

h.    En 1970, Esso (Exxon Mobil) obtuvo una patente para un "motor y sistema de propulsión poco contaminantes" que utilizaba un quemador interno y un compresor de aire para reducir las emisiones contaminantes, incluidas las de $CO_2$, de los motores de combustión de gasolina (el sistema también aumentó la eficiencia) de los productos de combustibles fósiles utilizados en dichos motores, reduciendo así la cantidad de productos de combustibles fósiles necesarios para operar motores equipados con esta tecnología).[145]

i.    En 1980, Imperial Oil escribió en su "Revisión de las actividades de protección ambiental para 1978-79": "No hay duda de que el aumento en el uso de combustibles fósiles y la disminución de la cubierta forestal están agravando el problema potencial del aumento de $CO_2$ en la atmósfera. Existe tecnología para eliminar el $CO_2$ de los gases de himenea, pero la eliminación de solo el 50 % del $CO_2$ duplicaría el costo de la generación de energía".[146]

j.    Un informe de la empresa de 1987 producido por Shell sobre "Combustibles sintéticos y energía renovable" señaló que, si bien las "perspectivas inmediatas" eran "limitadas", "sin embargo, es buscando oportunidades comerciales ahora y en el futuro cercano que se obtendrá la valiosa experiencia necesaria para ganar un mayor desarrollo". El informe también señala que "la tarea de reemplazar los recursos petroleros probablemente se volverá cada vez más difícil y costosa y habrá una necesidad creciente de desarrollar alternativas eficientes y convenientes. Inicialmente, estos complementarán y eventualmente reemplazarán a los valiosos productos derivados del petróleo. Muchas opciones energéticas potenciales aún se desconocen o se encuentran en etapas muy tempranas de investigación y desarrollo. Las nuevas fuentes de energía tardan décadas en hacer una contribución global importante. Por lo tanto, es

---

[145] ExxonMobil Research Engineering Co., Patent US3513929A: Low-polluting engine and drive system (granted May 26, 1970), https://www.google.com/patents/US3513929.
[146] Imperial Oil Ltd., Review of Environmental Protection Activities for 1978–1979 2 (Aug. 6, 1980), http://www.documentcloud.org/documents/2827784-1980-Imperial-Oil-Review-of-Environmental.html#document/p2.

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 85 of 119

necesario un compromiso sostenido durante el resto de este siglo para garantizar que las nuevas tecnologías y las que actualmente se encuentran en una etapa relativamente temprana de desarrollo estén disponibles para satisfacer las necesidades energéticas en el próximo siglo”.[147]

k. Un artículo de 1989 en una publicación de Exxon Corporate Research para uso de la empresa únicamente decía: “Las emisiones de CO2 contribuyen aproximadamente a la mitad del forzamiento que conduce a una posible mejora del efecto invernadero. Dado que la generación de energía a partir de combustibles fósiles domina las emisiones modernas de CO2, las estrategias para limitar el crecimiento de CO2 se centran a corto plazo en la eficiencia energética y a largo plazo en el desarrollo de fuentes de energía alternativas. Si se practican a un nivel que reduzca significativamente el crecimiento de los gases de efecto invernadero, estas acciones tendrían un impacto sustancial en la sociedad y nuestra industria: en el corto plazo debido a la reducción de la demanda de los productos actuales, y en el largo plazo debido a la transición a sistemas energéticos completamente nuevos”.[148]

116. Los Demandados podrían haber tomado medidas prácticas y rentables para mitigar los riesgos que plantean los productos de combustibles fósiles. Esas alternativas podrían haber incluido, entre otras medidas:

a. Reconocer y compartir la validez de la evidencia científica sobre el cambio climático antropogénico y los daños que causará a las personas, las comunidades (incluido el Estado Libre Asociado) y el medio ambiente. La aceptación de esa evidencia junto con las advertencias y acciones asociadas habría hecho avanzar la agenda desde determinar si se debe combatir el cambio climático y el aumento del nivel del mar hasta decidir cómo combatirlo;

---

[147] Synthetic Fuels and Renewable Energy, Shell Service Briefing, no. 2, 1987, https://assets.documentcloud.org/documents/4411089/Document2.pdf.

[148] Brian Flannery, Greenhouse Science, Connections: Corporate Research, Exxon Research and Engineering Company (Fall 1989), http://www.climatefiles.com/exxonmobil/1989-exxon-mobil-article-technologys-place marketing-mix.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 58 de 91

habría evitado gran parte de la confusión pública que se produjo durante más de 30 años, al menos desde 1988; y habría contribuido a una transición más temprana y rápida hacia fuentes de energía compatibles con la minimización de consecuencias climáticas catastróficas.

b. Comunicarse francamente con los accionistas, bancos, aseguradores de los Demandados, con los consumidores, el público, los reguladores y el Estado Libre Asociado, y advertirles sobre los peligros del calentamiento global por los productos de combustibles fósiles de los Demandados que eran conocidos por los Demandados, lo que habría permitido a esos grupos hacer decisiones materiales e informadas sobre si y cómo abordar el cambio climático y el aumento del nivel del mar en relación con los productos de los Demandados, incluido si invertir y cuánto invertir en fuentes de energía limpias alternativas en comparación con los combustibles fósiles;

c. Abstenerse de esfuerzos afirmativos, ya sea directamente, a través de coaliciones o grupos fachada, para distorsionar el debate público y hacer que muchos consumidores y líderes empresariales y políticos piensen que la ciencia relevante era mucho menos segura de lo que realmente era; y

d. Compartir su investigación científica interna con consumidores y el público, y con otros científicos y líderes empresariales, para aumentar la comprensión pública de los fundamentos científicos del cambio climático y su relación con los productos de combustibles fósiles de los Demandados.

117. A pesar de su conocimiento de los daños previsibles asociados con el consumo de los productos de combustibles fósiles de los Demandados, y a pesar de la existencia y el conocimiento de la industria de los combustibles fósiles de oportunidades que habrían reducido

los peligros previsibles asociados con esos productos, los Demandados promovieron y ocultaron los peligros de utilizar sus productos de combustibles fósiles de manera injusta y falsa.

**VI.    Los Demandados continúan engañando sobre el impacto de sus productos de combustibles fósiles en el cambio climático a través de campañas de ecoblanqueo y otros anuncios engañosos en Puerto Rico y otros lugares.**

118.    La campaña coordinada de desinformación y engaño de los Demandados continúa hoy, incluso cuando se ha fortalecido el consenso científico sobre las causas y consecuencias del cambio climático. Los Demandados han afirmado falsamente a través de campañas publicitarias en Puerto Rico y/o campañas destinadas a llegar a Puerto Rico que sus negocios invierten de manera sustancial en tecnologías con bajas emisiones de carbono y fuentes de energía renovables. En verdad, cada Demandado ha invertido lo mínimo en energía renovable mientras continúa expandiendo su producción de combustibles fósiles. Los consumidores razonables expuestos a los anuncios de los Demandados entenderían que los Demandados se encuentran mucho más comprometidos con las fuentes de energía alternativas de lo que en realidad se encuentran. Cada uno también ha afirmado que algunos de sus productos de combustibles fósiles son "ecológicos" o "no contaminantes" y que el uso de estos productos reducirá o mitigará satisfactoriamente los peligros del cambio climático. Ninguno de los productos de combustibles fósiles de los Demandados es "ecológico" o "no contaminante" porque, en última instancia, todos continúan contribuyendo con el calentamiento global.

119.    Estas campañas engañosas de "ecoblanqueo" tenían como objetivo llegar e influir en el público y los consumidores, incluso en Puerto Rico, y lo hicieron. Su objetivo es capitalizar las inquietudes de los consumidores sobre el cambio climático y hacer que los consumidores de Puerto Rico crean que los Demandados son empresas energéticas sustancialmente diversificadas

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 60 de 91

que realizan inversiones significativas en energía baja en carbono compatible con la reducción del cambio climático catastrófico.

120. Sin embargo, contrariamente a este mensaje, las inversiones de los Demandados en energía baja en carbono son sustancial y materialmente menores de lo que los Demandados indican a los consumidores. Según un análisis reciente, entre 2010 y 2018, BP gastó el 2,3 % del gasto total de capital en fuentes de energía bajas en carbono, Shell gastó el 1,2 % y Chevron y Exxon solo el 0,2 % cada uno[149].

121. En última instancia, aunque los Demandados actualmente afirman apoyar la reducción de las emisiones de gases de efecto invernadero, su conducta deja sin efecto estas declaraciones. Los Demandados continúan incrementando la producción de combustibles fósiles a nivel mundial; invirtiendo en el desarrollo de nuevos combustibles fósiles, incluida la producción de petróleo de esquisto y gas de esquisto, algunos de los proyectos de extracción con mayor emisión de carbono; y planificando una explotación incesante de petróleo y gas de forma indefinida en el futuro.

122. Por ejemplo, la actualización del Plan Corporativo de Exxon para 2023 establece que la empresa espera que su producción de petróleo y gas aumente de 3,8 millones de barriles equivalentes de petróleo por día en 2024 a aproximadamente 4,2 millones de barriles equivalentes de petróleo por día en 2027[150]. Exxon prevé gastos de capital de entre 23.000 y 27.000 millones de dólares anuales hasta 2027, y dice que "buscará" 20.000 millones de dólares en "oportunidades de menores emisiones" vagamente definidas hasta 2027[151]. Solo en 2023,

---

[149] Anjli Raval & Leslie Hook, Oil and Gas Advertising Spree Signals Industry's Dilemma, Financial Times (Mar. 9, 2019), https://www.ft.com/content/5ab7edb2-3366-11e9-bd3a-8b2a211d90d5.

[150] ExxonMobil, Corporate Plan Update Press Release (Dec. 6, 2023), https://d1io3yog0oux5.cloudfront.net/_bec7eef29898003542d79405ad8d25a5/exxonmobil/db/2261/22171/file/Corporate_Plan_Update_-_Press_Release.pdf

[151] Ibid.

Exxon gastó casi tres veces más dinero en la adquisición del productor de combustibles fósiles Pioneer Natural Resources (59.500 millones de dólares) de lo que afirmó que invertirá en "soluciones bajas en carbono" (principalmente tecnología de captura de carbono) hasta 2027[152].

123.    De manera similar, Chevron anunció a finales de 2023 que gastaría entre 18.500 y 19.500 millones de dólares en nuevos proyectos de petróleo y gas en 2024, lo que representa un aumento del 11 % con respecto al año anterior[153]. Por el contrario, Chevron espera gastar solo 2000 millones de dólares en 2024 para "reducir la intensidad de carbono de las operaciones tradicionales y hacer crecer nuevas líneas de negocios energéticos"[154]. Solo en 2023, Chevron gastó más de cinco veces más dinero en la adquisición del productor de combustibles fósiles Hess de lo que afirmó que gastará en proyectos de energía con bajas emisiones de carbono hasta 2028[155].

124.    Asimismo, Shell gastó casi seis veces más dinero en desarrollo de petróleo y gas que en tecnología renovable en 2022[156]. En junio de 2023, Shell retiró su promesa de 2021 de reducir la producción de petróleo cada año durante el resto de la década, y anunció en cambio que mantendría su nivel actual de producción de petróleo hasta 2030 e invertiría 40.000 millones de dólares en producción de petróleo y gas entre 2023 y 2035[157]. Y, aunque Shell afirma que aproximadamente el 12 % de su gasto de capital en 2021 se destinó a su división "Renovables y Soluciones Energéticas", sus propios informes financieros indican que dedicó solo

---

[152] Aryn Baker, How Chevron and Exxon's Latest Fossil Fuel Deals compare to Their Green Spending, Time Magazine (Oct. 25, 2023), https://time.com/6328441/chevron-exxon-fossil-fuel-acquisitions-vs-climate-efforts/
[153] Sabrina Valle, Chevron Increases Project Spending Budget by 11% for 2024, Reuters (Dec. 6, 2023), https://www.reuters.com/business/energy/chevron-forecasts-16-bln-capex-2024-2023-12-06/
[154] Chevron, Chevron Announces $16 Billion 2024 Capex Budget, (Dec. 6, 2023), https://www.chevron.com/newsroom/2023/q4/chevron-announces-2024-capex-budget
[155] Ibid.
[156] Ron Bousso, Exclusive: Shell Pivots Back to Oil to Win Over Investors, Reuters (June 9, 2023), https://www.reuters.com/business/energy/shell-pivots-back-oil-win-over-investors-sources-2023-06-09/
[157] Lottie Limb, Shell Joins BP and Total In U-Turning on Climate Pledges to "Reward Shareholders", euronews.green (June 15, 2023), https://www.euronews.com/green/2023/06/15/shell-joins-bp-and-total-in-u-turning-on-climate-pledges-to-reward-shareholders

aproximadamente el 1,5 % de su gasto de capital al desarrollo de fuentes de energía renovables como la producción de energía eólica y solar, y la gran mayoría del resto del gasto se dirige a proyectos relacionados con el gas natural[158]. Shell también anunció que, a pesar de sus ganancias récord en 2022, no aumentaría el gasto en energías renovables y soluciones energéticas y, en cambio, centraría el nuevo gasto en la producción de combustibles fósiles[159].

125. BP también ha reducido sus objetivos de descarbonización declarados recientemente. En 2020, BP declaró su intención de reducir las emisiones totales upstream de la empresa en un 20 % para el año 2025 y entre un 35 % y un 40 % para el año 2030. Sin embargo, en febrero de 2023, BP redujo esas proyecciones a una reducción del 10 al 15 % para 2025 y a una reducción del 20 al 30 % para 2030[160, 161]. BP también se había comprometido en 2020 a reducir su producción total de petróleo y gas en un 40 % con respecto a los niveles de 2019 para 2030[162]. Sin embargo, nuevamente en 2023, BP disminuyó su objetivo a una reducción del 25 %[163].

126. En 2023, ConocoPhillips anunció que planeaba aumentar su producción de petróleo y gas hasta un 5 % cada año durante la próxima década, y se esperaba un crecimiento significativo de la producción en sus activos de petróleo de esquisto tanto en Estados Unidos

---

[158] Oliver Milman, Shell's actual spending on renewables is fraction of what it claims, group alleges, The Guardian (Feb. 1, 2023) https://www.theguardian.com/business/2023/feb/01/shell-renwable-energy-spending-sec-global-witness

[159] Will Mathis, Shell Hits the Brakes on Growing Renewables Unit After Record 2022 Profit, Bloomberg (Feb. 2, 2023), https://www.bloomberg.com/news/articles/2023-02-02/shell-to-pause-renewables-unit-s-spending-growth-after-record-2022

[160] Evan Halper and Aaron Gregg, BP Dials Back Climate Pledge Amid Soaring Oil Profits, The Washington Post (February 7, 2023), https://www.washingtonpost.com/business/2023/02/07/bp-climate-emissions-oil-profits/

[161] BP, Getting to Net Zero, https://www.bp.com/en/global/corporate/sustainability/getting-to-net-zero.html (last accessed Feb. 5, 2024); BP, BP Integrated Energy Company Strategy Update (Feb. 7, 2023), https://www.bp.com/en/global/corporate/news-and-insights/press-releases/4q-2022-update-on-strategic-progress.html

[162] Shadia Nasralla and Ron Bousso, BP to cut fossil fuels output by 40% by 2030, Reuters, (August 4, 2020) https://www.reuters.com/article/us-bp-outlook/bp-to-cut-fossil-fuels-output-by-40-by-2030-idUSKCN2500NH/

[163] Stanley Reed, BP, in a Reversal, Says It Will Produce More Oil and Gas, The New York Times (Feb. 7, 2023) https://www.nytimes.com/2023/02/07/business/bp-oil-gas-profits.html

como en Canadá[164]. ConocoPhillips también anunció recientemente planes para seguir adelante con el desarrollo del proyecto de perforación petrolera Willow en Alaska, que costará hasta 7000 millones de dólares y producirá aproximadamente 600 millones de barriles de petróleo a lo largo de su vida[165]. En 2022, ConocoPhillips gastó 150 millones de dólares "para apoyar oportunidades bajas en carbono"[166], que representó apenas el 1,4 % de sus 10.200 millones de dólares en gastos de capital para ese año; el resto del cual se dedicó a las operaciones de combustibles fósiles de la empresa[167].

127. Las campañas de ecoblanqueo de los Demandados minimizan engañosamente su propio papel en la causa del cambio climático, incluso sugiriendo que pequeños cambios en las elecciones y el comportamiento de los consumidores pueden abordar adecuadamente el cambio climático. Estas campañas presentan engañosamente a los Demandados como parte de la solución al cambio climático y distraen la atención del hecho de que sus productos de combustibles fósiles son el principal impulsor del calentamiento global.

128. A continuación, se presentan extractos representativos de las campañas de ecoblanqueo de los Demandados, que presentan una imagen falsa de los Demandados como innovadores en energía limpia que toman medidas significativas para abordar el cambio climático. Las acciones de los Demandados para afianzar aún más la producción y el consumo de

---

[164] Liz Hampton and Mrinalika Roy, Conoco Forecasts Big Cash Flow Gains, Up to 5% Output Growth, Reuters (April 12, 2023), https://www.reuters.com/business/energy/conocophillips-expects-spending-average-10-bln-annually-next-decade-2023-04-12/

[165] Ibid; see also ConocoPhillips, ConocoPhillips Makes Final Investment Decision to Develop the Willow Project (Dec. 22, 2023), https://www.conocophillips.com/news-media/story/conocophillips-makes-final-investment-decision-to-develop-the-willow-project/ .

[166] ConocoPhillips, Scope 1 and 2 Emissions Reduction Activities, https://www.conocophillips.com/sustainability/low-carbon-technologies/scope-1-and-2-emissions-reduction-activities/#:~:text=In%202022%2C%20ConocoPhillips%20spent%20about,global%20operations%20through%20the%20MACC.

[167] ConocoPhillips, ConocoPhillips Reports Fourth-Quarter, Full-Year 2022 Results, (Feb. 2, 2023), https://www.conocophillips.com/news-media/story/conocophillips-reports-fourth-quarter-full-year-2022-results-and-176-preliminary-reserve-replacement-ratio-announces-2023-guidance-and-planned-return-of-capital-of-11-billion-declares-quarterly-dividend-and-variable-return-of-cash-distribution/

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 92 of 119

combustibles fósiles contradicen rotundamente sus afirmaciones públicas de responsabilidad corporativa y apoyo a la reducción de las emisiones globales de gases de efecto invernadero. Funcionalmente, los Demandados han eliminado los combustibles fósiles de su marca, pero no de sus operaciones comerciales. Por el contrario, sus anuncios de ecoblanqueo son engañosos para los consumidores de Puerto Rico.

**A. Las campañas de ecoblanqueo engañosas de Exxon**

129. Exxon actualmente publica una serie de anuncios de página completa en ediciones impresas y publicaciones en la edición electrónica de The New York Times, así como en el canal de YouTube de Exxon, en los que Exxon promueve engañosamente sus esfuerzos para desarrollar energía a partir de fuentes alternativas como algas y desechos vegetales, esfuerzos que son extremadamente pequeños en relación con las inversiones que Exxon continúa haciendo en la producción de combustibles fósiles.

130. Por ejemplo, un anuncio en línea en The New York Times, accesible y comercializado para los consumidores de Puerto Rico, promueve el desarrollo de biocombustibles de algas por parte de la empresa. El anuncio dice engañosamente a los consumidores que Exxon está "trabajando para disminuir [su] huella de carbono general" y que el combustible biodiesel "sostenible y respetuoso con el medio ambiente" de la empresa podría reducir las "emisiones de carbono del transporte" en más del 50 %[168].

131. Hace tan solo unos años, en 2018, Exxon afirmó que produciría 10.000 barriles de biocombustible de algas para 2025 y que este combustible podría reducir las "emisiones de carbono del transporte" en más del cincuenta por ciento[169]. En 2019, Exxon continuó anunciando

[168] The Future of Energy? It May Come From Where You Least Expect (ExxonMobil Paid Post), N.Y. Times, https://www.nytimes.com/paidpost/exxonmobil/the-future-of-energy-it-may-come-from-where-you-least-expect.html.
[169] Ibid.

que "estaba cultivando algas para biocombustibles que algún día podrían impulsar aviones, barcos y camiones de combustible, y reducir sus emisiones a la mitad"[170].

132.    Exxon finalmente invirtió solo 350 millones de dólares de los 600 millones de dólares que había prometido para desarrollar la tecnología antes de cerrar silenciosamente el proyecto en diciembre de 2022[171]. Pero incluso 600 millones de dólares probablemente no habrían sido suficientes; los investigadores de algas creen que se necesitarían varios *miles de millones* de dólares para comercializar verdaderamente los biocombustibles, y eso ni siquiera toma en cuenta las "limitaciones biológicas fundamentales" asociadas con esta tecnología[172]. De hecho, Exxon gastó casi la mitad de su inversión real en el desarrollo de biocombustibles de algas en anunciar su compromiso con los biocombustibles de algas[173]. Además de no revelar el alcance muy pequeño de estos esfuerzos, los anuncios de Exxon no reconocen que el combustible biodiesel de Exxon es generalmente una mezcla que utiliza solo entre un 5 % y un 20 % de biocombustible, y el resto está compuesto de combustible fósil.[174]. Por lo tanto, los anuncios de ecoblanqueo de Exxon exageran engañosamente tanto la naturaleza "sostenible" o "respetuosa con el medio ambiente" de su inversión en biodiesel como su alcance.

133.    Los anuncios de Exxon que promocionan sus inversiones en fuentes de energía "sostenibles y respetuosas con el medio ambiente" tampoco mencionan que la inversión de la empresa en energías alternativas es minúscula en comparación con su actual aumento de las

---

[170] Exxon Mobil, Algae Potential, iSpot TV (Oct. 19, 2019), https://www.ispot.tv/ad/ovGn/exxon-mobil-algae-potential

[171] Amy Westervelt, Big Oil Firms Touted Algae as Climate Solution. Now All Have Pulled Funding, The Guardian (March 17, 2023), https://www.theguardian.com/environment/2023/mar/17/big-oil-algae-biofuel-funding-cut-exxonmobil

[172] Ibid. see also Ben Elgin and Kevin Crowley, Exxon Retreats From Major Climate Effort to Make Biofuels From Algae, Bloomberg (Feb. 10, 2023), https://www.bloomberg.com/news/articles/2023-02-10/exxon-retreats-from-major-climate-effort-to-make-biofuels-from-algae

[173] Ibid.

[174] See ExxonMobil, Mobility Reimagined: On the Road to Lower GHG Emissions, at 8, https://corporate.exxonmobil.com/-/media/global/files/energy-and-innovation/road-transportation-white-paper_020623.pdf

actividades habituales de exploración, desarrollo y producción de combustibles fósiles a nivel mundial. Como se explicó anteriormente, Exxon ha gastado de manera consistente (y seguirá gastando) la abrumadora mayoría de sus gastos de capital en mantener y expandir la producción de combustibles fósiles.

134. Para complementar esta campaña engañosa, Exxon ha promovido docenas de anuncios multimedia en plataformas como Instagram, Twitter, Facebook y LinkedIn, donde Exxon tiene millones de seguidores en las redes sociales y su contenido ha recibido cientos de miles de "me gusta" y "vistas". Estos anuncios enfatizan abrumadoramente su supuesto liderazgo en la investigación sobre la reducción de emisiones, los biocombustibles de algas, las soluciones al cambio climático y la investigación sobre energías limpias. Estos anuncios estaban destinados y llegaron al público y los consumidores de Puerto Rico. Un consumidor común y corriente que observara estos anuncios terminaría creyendo que Exxon ha invertido significativamente en el desarrollo y despliegue de tecnologías de energía alternativas, cuando en realidad casi todos los gastos de la empresa están dirigidos al desarrollo presente y futuro de petróleo y gas que precipita al mundo hacia una catástrofe climática. El hecho de que Exxon no informe a los consumidores comunes que sus promocionadas inversiones en energía limpia representan solo un porcentaje minúsculo de sus gastos (y que pretende aumentar la producción y las ventas de combustibles fósiles en el futuro) hace que estos anuncios sean materialmente engañosos.

**B. Las campañas de ecoblanqueo engañosas de Shell**

135. Al igual que Exxon, Shell se ha promocionado engañosamente ante los consumidores de Puerto Rico como conscientes del medio ambiente a través de anuncios en publicaciones como The New York Times. Los anuncios están dirigidos y llegan a los

consumidores de Puerto Rico y tienen como objetivo influir en la demanda de los productos de Shell por parte de los consumidores.

136.    Como parte de la campaña "Make the Future" de Shell, la empresa publicó numerosos anuncios que actualmente se pueden ver en el sitio web de The New York Times[175], en el que la empresa promociona su inversión en nuevas fuentes de energía, incluido el gas natural licuado ("GNL") y el biocombustible, a los que Shell se refiere como "fuentes más limpias".

137.    Uno anuncio de Shell en el Washington Post, "The Making of Sustainable Mobility", se refiere al GNL como "un componente crítico de una combinación energética sostenible" y un "combustible con bajas emisiones de carbono" que podría "ayudar a disminuir" las emisiones de $CO_2$[176]. El anuncio enfatiza el liderazgo de Shell a la hora de "fijar el rumbo" hacia un "futuro de movilidad con bajas emisiones de carbono". De manera similar, otro anuncio de Shell en The Washington Post, "The Mobility Quandary", enfatiza el papel de Shell en el trabajo para contrarrestar el cambio climático a través de inversiones en energía alternativa: "Shell es un actor más importante de lo que cabría esperar en este movimiento incipiente para lograr un futuro de transporte con menos contaminación y más eficiencia"[177].

138.    Las declaraciones de Shell que enfatizan su participación en muchas áreas de investigación, desarrollo y despliegue relacionados con la energía son engañosas; las inversiones y actividades de la empresa son sustancialmente menores de lo que sus anuncios hacen creer a los consumidores. Como se explicó anteriormente, solo el 1,2 % del gasto de capital de Shell

---

[175]  See, e.g., Moving Forward: A Path To Net-Zero Emissions By 2070 (Shell Paid Post), N.Y. Times, https://www.nytimes.com/paidpost/shell/ul/moving-forward-a-path-to-net-zero-emissions-by-2070.html.

[176]  See, e.g., The Making of Sustainable Mobility (Content from Shell), Wash. Post, https://www.washingtonpost.com/brand-studio/shell/the-making-of-sustainable-mobility.

[177]  The Mobility Quandary (Content from Shell), Wash. Post., https://www.washingtonpost.com/brand-studio/shell/the-mobility-quandary ("Another critical component of a sustainable energy mix in transportation is further investment in natural gas, a cleaner-burning fossil fuel . . . .").

entre 2010 y 2018 se destinó a fuentes de energía bajas en carbono, y esa cifra sigue siendo ampliamente superada por la continua expansión del negocio de combustibles fósiles de Shell[178].

139. Los anuncios de Shell sobre “Make the Future” también engañaron a los consumidores sobre hasta qué punto Shell ha invertido en tecnología de energía limpia. Por ejemplo, “The Mobility Quandary” promociona las inversiones de Shell en tecnología de celdas de combustible de hidrógeno, mediante la promoción del hidrógeno como “sostenible a largo plazo” y “una de las fuentes más limpias” que impulsan los vehículos eléctricos, y afirma que “[V]ehículos de celdas de combustible de hidrógeno. . . No emiten nada por sus tubos de escape excepto vapor de agua”[179]. El anuncio de Shell “In for the Long Haul” en The New York Times promueve de manera similar su inversión en celdas de combustible de hidrógeno, así como en biocombustibles, como intentos significativos de mitigar el cambio climático[180].

140. El hecho de que Shell no informe a los consumidores promedio de que sus promocionadas inversiones en energía limpia representan solo un porcentaje minúsculo de sus gastos (y que pretende aumentar la producción y las ventas de combustibles fósiles en el futuro) hace que sus anuncios sean materialmente engañosos.

141. En junio de 2023, la Autoridad de Normas de Publicidad del Reino Unido prohibió la campaña de marketing de Shell en la que se describía a Shell como proveedor de energía renovable, instaladora de carga de vehículos eléctricos e impulsora de la transición energética. La Autoridad de Normas de Publicidad determinó que era probable que los consumidores interpretaran los materiales de marketing como una "afirmación más amplia acerca

---

[178] Raval & Hook, Oil and Gas Spending Spree Signals Industry’s Dilemma, supra note 192.
[179] Shell, The Mobility Quandary, supra note 229.
[180] Moving Forward: A Path to Net-Zero Emissions by 2070 (Content from Shell), N.Y. Times, https://www.nytimes.com/paidpost/shell/ul/moving-forward-a-path-to-net-zero-emissions-by-2070.html.

de que Shell en su conjunto proporciona energía más limpia". Dado que la "gran mayoría" de sus operaciones no eran de energía limpia, la campaña fue engañosa[181].

**C. Las campañas de ecoblanqueo engañosas de BP**

142. BP también se ha presentado engañosamente como una empresa que diversifica su cartera de energía y reduce su dependencia de las ventas de combustibles fósiles, mientras que su cartera de energía alternativa es insignificante en comparación con la cartera de combustibles fósiles en constante expansión de la empresa. Con este fin, BP ha empleado una serie de anuncios engañosos de ecoblanqueo, que pretenden influir en la demanda de sus productos por parte de los consumidores, incluidos los consumidores de Puerto Rico.

143. BP llevó a cabo su extensa campaña publicitaria y de cambio de marca "Beyond Petroleum" de 2000 a 2008 e incluso cambió su logotipo por un resplandor solar, que evoca el recurso renovable del sol. BP utiliza el logotipo del resplandor solar para anunciarse en sus gasolineras de Puerto Rico, donde los consumidores compran gasolina de BP. La campaña publicitaria "Beyond Petroleum" presentaba falsamente a la empresa como una empresa muy comprometida con fuentes de energía bajas en carbono y que ya no invertía, sino que iba "más allá" del petróleo y otros combustibles fósiles. En verdad, BP invirtió un pequeño porcentaje de su gasto de capital total durante este período en investigación de energías alternativas. La gran mayoría de su gasto de capital se centró en la exploración, producción, refinación y comercialización de combustibles fósiles[182]. La empresa finalmente abandonó sus activos solares

---

[181] Ed Davey, Shell's Clean Energy Advertising Campaign is Misleading, UK Watchdog Says, Associated Press (June 7, 2023), https://apnews.com/article/shell-climate-ad-ban-clean-energy-a1322233e3ba7e8fa7760367f13dd58c; see also Advertising Standards Authority, ASA Ruling on Shell UK Ltd t/a Shell, https://climatecasechart.com/wp-content/uploads/non-us-case-documents/2023/20230607_21511_decision.pdf.

[182] See BP, Annual Reports and Accounts 2008, https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-annual-report-accounts-2008.pdf.

y eólicos en 2011 y 2013, respectivamente, e incluso el nombre de "Beyond Petroleum" en 2013[183].

144. En 2019, BP lanzó una campaña publicitaria llamada “Possibilities Everywhere”. Estos anuncios eran engañosos tanto en su descripción de BP como una empresa muy involucrada en sistemas de energía no fósiles, incluidos los eólicos, solares y vehículos eléctricos, como en su descripción del gas natural como respetuoso con el medio ambiente.

145. El anuncio de One Possibilities Everywhere, titulado “Mejores combustibles para impulsar su vida ocupada”, decía:

> Nosotros [] queremos, y necesitamos, [ ] energía para ser más respetuosos con el planeta. En BP, trabajamos para que nuestra energía sea menos contaminante y mejor… En BP, no escatimamos esfuerzos para proporcionar [la] energía adicional que el mundo necesita y al mismo tiempo encontrar nuevas formas de producirla y entregarla con 53 emisiones menos… Estamos llevando energía solar y eólica a hogares desde EE. UU. hasta la India. Estamos aumentando el suministro de gas natural de combustión más limpia… ¿Más energía con menos emisiones? Vemos posibilidades en todas partes para ayudar al mundo a seguir avanzando[184].

El video adjunto mostraba un hogar activo mientras una voz en off decía: “Todos queremos más energía, pero con menos huella de carbono. Por eso en BP trabajamos para generar energía menos contaminante y mejor”[185].

146. Pero la afirmación de BP de que los sistemas de energía no fósiles constituyen una parte sustancial de su negocio era materialmente falsa y engañosa. En el momento del anuncio, BP poseía solo aproximadamente 1,7 gigavatios (“GW”) de capacidad eólica, cifra eclipsada por otras empresas como GE, Siemens y Vestas (con aproximadamente 39 GW, 26 GW y 23 GW de

---

[183] Javier E. David, ‘Beyond Petroleum’ No More? BP Goes Back to Basics, CNBC (Apr. 20, 2013), http://www.cnbc.com/id/100647034.

[184] See BP, Better fuels to Power Your Busy Life, https://web.archive.org/web/20191130155554/https://www.bp.com/en/global/corporate/who-we-are/possibilities-everywhere/energy-for-busy-lives.html.

[185] Id.

capacidad, respectivamente)[186]. En general, la capacidad eólica instalada en Estados Unidos fue de aproximadamente 100 GW, lo que significa que la capacidad instalada de BP representaba apenas el 1 % del mercado[187]. Sin embargo, "Blade Runners", otro anuncio de la campaña "Possibilities Everywhere" de BP, describió a la empresa como "una de las principales empresas de energía eólica en Estados Unidos"[188]. En resumen, la cartera de energía eólica relativamente pequeña de BP era sustancialmente menor que la que se transmitía en los anuncios de la empresa.

147.    Lo mismo ocurre con las actividades de BP en el sector de la energía solar, que consisten principalmente en la compra de la empresa solar Lightsource (rebautizada como Lightsource BP)[189]. El precio total de compra (454 millones de dólares) representa solo un porcentaje minúsculo del gasto de capital anual de BP (16.000 millones de dólares en 2023), casi todo el cual se gasta en la producción de combustibles fósiles[190]. Esto está muy lejos de la afirmación de BP de que estaba buscando "exhaustivamente" "nuevas" formas de producir energía con bajas emisiones y que estaba desempeñando un "papel de liderazgo" en "promover un futuro bajo en carbono". Estas afirmaciones transmiten la impresión engañosa a los consumidores comunes de que BP invierte sustancialmente en el desarrollo y despliegue de tecnología de energía limpia, cuando en realidad casi todos los gastos presentes y futuros de la

---

[186] Para la capacidad eólica de BP, see Press Release, BP Advances Offshore Wind Growth Strategy (Feb. 8, 2021), https://www.bp.com/en/global/corporate/news-and-insights/press-releases/bp-advances-offshore-wind-growth-strategy.html. Para la capacidad eólica de GE, Siemens, y Vestas, see Abby McClain, The 15 Largest Wind Power Companies in the World (July 12, 2022), https://www.zippia.com/advice/largest-wind-power-companies/.
[187] See Elizabeth Ingram, U.S. Wind Capacity Grew 8% in 2019, AWEA says, Renewable Energy World (April 10, 2019), https://www.renewableenergyworld.com/wind-power/u-s-wind-capacity-grew-8-in-2018-awea-says/.
[188]                         See                BP,               Blade               Runners, https://web.archive.org/web/20191130192545/https://www.bp.com/en/global/corporate/who-we-are/possibilities-everywhere/wind-and-natural-gas.html.
[189]    BP Annual Report and Form 20-F 42 (2017), https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-annual-report-and-form-20f-2017.pdf; see also Ron Bousso, BP to Buy Remaining 50% In Solar JV Lightsource BP, Reuters (Nov. 30, 2023), https://www.reuters.com/business/energy/bp-buy-remaining-50-solar-jv-lightsource-bp-2023-11-30/
[190]    See    BP,    BP's    Fourth    Quarter    and    Full    Year    2023    Results, https://www.bp.com/en/global/corporate/investors/results-reporting-and-presentations/quarterly-results-and-webcast.html .

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 72 de 91

empresa están dirigidos al desarrollo de petróleo y gas que precipita al mundo hacia una catástrofe climática. El hecho de que BP no informe a los consumidores comunes que sus promocionadas inversiones en energía limpia representan solo un porcentaje minúsculo de sus gastos (y que pretende aumentar la producción y las ventas de combustibles fósiles en el futuro) hace que estos anuncios sean materialmente engañosos.

148. Sin embargo, en el anuncio web de BP "Rise and Shine", la empresa promociona específicamente su asociación con Lightsource. "Nuestros gurús de la economía creen que [la energía solar] podría representar el 10 % de la energía mundial para 2040", decía el anuncio, y "para ayudar a que eso se haga realidad, nos hemos asociado con la empresa solar más grande de Europa, [Lightsource BP]"[191]. El anuncio destacaba la estación de energía solar flotante de 6,3 MW de Lightsource BP cerca de Londres y el acuerdo de Lightsource BP con Budweiser para suministrar energía renovable a sus cervecerías en el Reino Unido. "Proyectos como estos están mejorando las posibilidades de la energía solar", afirmó BP, "e incluso los días de lluvia no pueden frenar el entusiasmo por esta fuente de energía de rápido crecimiento. Esto se debe a que, independientemente del clima, nuestro gas natural de combustión más limpia puede desempeñar un papel de apoyo para mantener su hervidor listo para la acción"[192].

149. Esta descripción de la energía solar como el gran interés de BP, con el gas natural utilizado solo como respaldo, también es falsa. Las inversiones de BP en gas natural superan sus inversiones en energía solar por un factor de aproximadamente 100 o más, y solo una pequeña fracción de sus productos de gas natural, aproximadamente el 5 % o menos, se utilizan para respaldar las energías renovables. Por lo tanto, la impresión general que dan los anuncios (que

[191] BP, Rise and Shine.
[192] Ibid.

BP invierte sustancialmente en energía solar y que su gas natural se utiliza solo como respaldo) es materialmente engañosa para los consumidores.

**D. Las campañas de ecoblanqueo engañosas de Chevron**

150. Chevron también participó en campañas de ecoblanqueo diseñadas para engañar a los consumidores sobre los productos de Chevron y su compromiso de abordar el cambio climático, incluidos los consumidores de Puerto Rico.

151. En 2001, Chevron desarrolló y compartió un sofisticado sistema de gestión de información para recopilar datos sobre emisiones de gases de efecto invernadero de sus exploraciones y producción para ayudar a regular y establecer objetivos de reducción[193]. Más allá de este avance tecnológico, Chevron promocionó la "energía renovable rentable" como parte de su plan de negocios durante varios años y lanzó una campaña publicitaria en 2010 mediante la promoción del cambio de la empresa hacia la energía renovable. A pesar de esta retórica (y de las ganancias de 27 millones de dólares del grupo de energía renovable Chevron en 2013), Chevron vendió su unidad de energía renovable en 2014[194].

152. La campaña de Chevron de 2007 "¿Will You Join Us?" y su campaña "I Will" de 2008 describieron engañosamente a la empresa como líder en energía renovable. Los anuncios de las campañas presentaban cambios menores en las elecciones de los consumidores (por ejemplo, cambiar las bombillas) como suficientes para abordar problemas ambientales como el cambio climático[195].

---

[193] Press Release, Chevron, Chevron Introduces New System to Manage Energy Use (25 de sept. de 2001), https://web.archive.org/web/20170207205638/https://www.chevron.com/stories/chevron-introduces-new-system-to-manage-energy-use.
[194] Ben Elgin, Chevron Dims the Lights on Green Power, Bloomberg (May 29, 2014), https://www.bloomberg.com/news/articles/2014-05-29/chevron-dims-the-lights-on-renewable-energy-projects.
[195] See Duncan MacLeod, Chevron Will You Join Us?, Inspiration Room (Oct. 9, 2007), http://theinspirationroom.com/daily/2007/chevron-will-you-join-us. See also Jean Halliday, Chevron: We're Not Big Bad Oil, AdAge (Sept. 28, 2007), https://adage.com/article/news/chevron-big-bad-oil/120785.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 74 de 91

153. El objetivo general de las campañas era trasladar la percepción de culpa y responsabilidad por el calentamiento global a los consumidores y hacer que el papel de Chevron y el de la industria de los combustibles fósiles en general pareciera pequeño. La solución engañosa que se promovió entre los consumidores no fue alejarse de los combustibles fósiles, sino implementar pequeños cambios en el comportamiento de los consumidores y seguir dependiendo de los productos de combustibles fósiles. Al presentar las emisiones de gases de efecto invernadero como derivadas de numerosas fuentes además de los combustibles fósiles, los anuncios de Chevron oscurecieron el hecho de que los combustibles fósiles son la causa principal del aumento de las emisiones de gases de efecto invernadero y el principal impulsor del cambio climático.

154. Se adornaban mensajes engañosos sobre imágenes de estadounidenses promedio, como en el ejemplo que se destaca a continuación:



**Figura 10: Anuncio de Chevron "Will You Join Us?"**

155. En 2010, Chevron lanzó una campaña publicitaria titulada "We Agree". La campaña publicitaria impresa, en Internet y televisión se expandió por todo Estados Unidos e internacionalmente. Por ejemplo, el anuncio a continuación destacaba el supuesto compromiso de Chevron con el desarrollo de la energía renovable y decía en letras grandes junto a una fotografía de una niña: “Es hora de que las empresas petroleras apoyen el desarrollo de la energía renovable. Estamos de acuerdo". El anuncio enfatizaba: “No estamos solo detrás de las energías renovables. Estamos afrontando el desafío de hacerlas asequibles y fiables a gran escala”.



**Figura 11: Anuncio de Chevron "We Agree"**

156. La descripción que hizo Chevron de sí misma como líder en energías renovables fue falsa y engañosa. En realidad, solo el 0,2 % del gasto de capital de Chevron entre 2010 y 2018 se destinó a fuentes de energía bajas en carbono, y el 99,8 % se destinó a la exploración y el desarrollo continuos de combustibles fósiles, un marcado contraste con el mensaje comunicado a los consumidores a través de los anuncios de la empresa.[196]

157. La campaña "We Agree" de Chevron también incluyó anuncios televisivos engañosos. En un anuncio centrado en las energías renovables, un profesor dice: "Está bien, escuchen. Alguien tiene que ponerse serio. Necesitamos energía renovable". A lo que un empleado de operaciones ambientales de Chevron responde: "En Chevron estamos invirtiendo millones en tecnologías solares y de biocombustibles para que funcione". En realidad, Chevron continuó centrándose abrumadoramente en la extracción y el desarrollo de combustibles fósiles, y su inversión de "millones" en energías renovables es minúscula en comparación con su

[196] Raval & Hook, Oil and Gas Advertising Spree Signals Industry's Dilemma, supra note 192.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 77 de 91

inversión de miles de millones en combustibles fósiles. Un consumidor promedio que mirara los anuncios de "We Agree" creería falsamente que Chevron ha invertido de forma significativa en el desarrollo y despliegue de tecnologías limpias, mientras que casi todo el gasto de la empresa se dirige al desarrollo de petróleo y gas. El hecho de que Chevron no haya informado a los consumidores promedio que sus promocionadas inversiones en energía limpia representan solo un porcentaje minúsculo de sus gastos (y que pretende aumentar la producción y las ventas de combustibles fósiles en el futuro) hace que estos anuncios sean materialmente engañosos.

**E. Las campañas de ecoblanqueo engañosas de ConocoPhillips**

158. En 2012, ConocoPhillips publicó un Informe sobre Desarrollo Sostenible en el que "reconocía que la actividad humana, incluida la quema de combustibles fósiles, está contribuyendo al aumento de las concentraciones de gases de efecto invernadero (GEI) en la atmósfera, que pueden provocar cambios adversos en las condiciones climáticas globales"[197]. Los objetivos del Informe incluían "[e]ntender nuestra huella de GEI", "[r]educir nuestras emisiones de GEI" y "evaluar y desarrollar tecnologías para la energía renovable"[198].

159. Este informe contrasta marcadamente con la presentación 10-K de 2012 de ConocoPhillips ante la SEC, que revela el enfoque exclusivo de la empresa en producir combustibles fósiles para su distribución global: "Como empresa independiente de exploración y producción, nos centramos únicamente en nuestro negocio principal de exploración, desarrollo y producción de petróleo crudo y gas natural a nivel mundial". La presentación destacó además los "crecientes negocios de arenas bituminosas y esquisto en América del Norte" de la empresa. . . y

[197] ConocoPhillips, Sustainable Development; Climate Change Position 17 (2012), http://static.conocophillips.com/files/resources/2012-sd-report.pdf.
[198] Id. at 17, 20.

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 106 of 119

un programa de exploración global"[199], con lo que dejó en claro que no tenía intención de cumplir con los compromisos contenidos en su Informe sobre Desarrollo Sostenible.

160. De hecho, en 2019, ConocoPhillips produjo más de 700.000 barriles de petróleo crudo por día y más de 2,8 millones de pies cúbicos de gas natural por día[200]. El hecho de que ConocoPhillips no informe a los consumidores comunes que sus pregonadas inversiones en energía limpia representan solo un porcentaje minúsculo de sus gastos (y que pretende aumentar la producción y las ventas de combustibles fósiles en el futuro) hace que sus pregonados objetivos de sostenibilidad sean materialmente engañosos.

## VII. Los Demandados también hicieron afirmaciones engañosas sobre productos de combustibles fósiles "ecológicos" o "menos contaminantes" específicos.

161. Los Demandados también han participado en esfuerzos de marketing extensos y altamente engañosos destinados a promover ciertos de sus productos de combustibles fósiles como "ecológicos" y beneficiosos para el medio ambiente.

162. Los materiales publicitarios y promocionales de los Demandados no revelan el riesgo extremo de seguridad asociado con el uso de productos de combustibles fósiles, que están causando un cambio climático "catastrófico", como lo entendieron los Demandados durante décadas. Los Demandados continúan omitiendo esa importante información hasta el día de hoy, en consonancia con su objetivo de mantener la demanda de los consumidores de sus productos de combustibles fósiles a pesar de los riesgos que representan para el planeta y sus habitantes.

163. Los Demandados declaran engañosamente que el uso de ciertos productos de combustibles fósiles por parte del consumidor en realidad ayuda a los clientes a reducir las emisiones y obtener una mayor economía de combustible. No obstante, enfatizar los beneficios

---

199 ConocoPhillips, Annual Report (Form 10-K) 32 (Dec. 31, 2012), https://www.sec.gov/Archives/edgar/data/1163165/000119312513065426/d452384d10k.htm.

200 ConocoPhillips, 2019 Annual Report 168 (2019), https://static.conocophillips.com/files/resources/2019-conocophillips-annual-report-19-0895.pdf.

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 107 of 119

climáticos y "ecológicos" relativos mientras se ocultan los efectos peligrosos de las altas tasas continuas de uso de combustibles fósiles crea una imagen general engañosa que oculta los terribles impactos climáticos resultantes del uso normal por parte de los consumidores de los productos de combustibles fósiles de los Demandados. Contrariamente a las afirmaciones "ecológicas" de los Demandados, el desarrollo, la producción, la refinación y el uso por parte del consumidor de los productos de combustibles fósiles de los Demandados (incluso productos que pueden producir un rendimiento de motor relativamente más eficiente) aumentan las emisiones de gases de efecto invernadero en detrimento de la salud pública y el bienestar de los consumidores. No importa qué químicos se agreguen a la mezcla de combustible, la quema de gasolina siempre emite gases de efecto invernadero, que contribuye al cambio climático y sus impactos asociados. El marketing aditivo de los Demandados encubre sus productos de gasolina con una apariencia respetuosa con el medio ambiente y al mismo tiempo oculta de manera engañosa los peligrosos efectos climáticos de la quema de combustibles fósiles.

164. Además, mientras los Demandados promocionaban activamente sus productos de gasolina "menos contaminantes" en las gasolineras de Puerto Rico y en los sitios web de sus empresas, expandieron masivamente la producción de combustibles fósiles y aumentaron las emisiones. Si los consumidores hubieran entendido el grado total en el que los productos de los Demandados contribuyeron al cambio climático y que los Demandados de hecho no habían invertido materialmente en fuentes de energía alternativas o fueron de otro modo cautelosos con el medio ambiente, probablemente habrían actuado de manera diferente, *por ejemplo*, no comprando los productos de los Demandados o comprando menos de ellos.

165. En la promoción de estos y otros productos de combustibles fósiles, incluso en sus gasolineras de marca en Puerto Rico, los Demandados no revelan el hecho de que los

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 108 of 119

combustibles fósiles son una de las principales causas del cambio climático y que los niveles actuales de uso de combustibles fósiles (incluso los supuestamente “menos contaminantes”) ”o productos más eficientes, representan una amenaza directa para los puertorriqueños y el medio ambiente. Las omisiones de los Demandados a este respecto son consistentes con su objetivo de influir en la demanda de los consumidores de sus productos de combustibles fósiles a través del ecoblanqueo. Los Demandados tampoco exigen a sus proveedores y puntos de venta minoristas externos que revelen hechos relacionados con el impacto que tienen el consumo de combustibles fósiles y sus alternativas "menos contaminantes" en el cambio climático al vender los productos de los Demandados.

166. La comercialización que hacen los Demandados de estos productos de combustibles fósiles a los consumidores de Puerto Rico como “seguros”, “no contaminantes”, “reductores de emisiones” e implícitamente beneficiosos para el clima (cuando la producción y el uso de dichos productos es la principal causa del cambio climático) recuerda el esfuerzo de la industria tabacalera por promover los cigarrillos “bajos en alquitrán” y “suaves” como alternativa a dejar de fumar después de que el público tomó conciencia de los daños a la salud potencialmente mortales asociados con el tabaquismo[201].

167. Las promociones de productos de los Demandados están posicionadas para asegurar a los consumidores que la compra y el uso de sus productos son beneficiosos para abordar el cambio climático, cuando en realidad, el uso continuo de dichos combustibles fósiles es extremadamente dañino, del mismo modo que las empresas tabacaleras promovían engañosamente "bajo en alquitrán" y los cigarrillos “suaves” como una opción más saludable y

---

[201] See American Cancer Society Cancer Action Network, “23 Year History of the Racketeering Lawsuit Against the Tobacco Industry: Guilty of Deceiving the American Public” (June 29, 2023), https://www.fightcancer.org/sites/default/files/history_of_doj_rico_lawsuit_fact_sheet_final_6.29.23.pdf, at pp. 1, 5; see also Tobacco Control Legal Consortium, The Verdict Is In: Findings from United States v. Philip Morris, Section on Light Cigarettes pp. 1–9, https://www.publichealthlawcenter.org/sites/default/files/resources/tclc-verdict-is-in.pdf

menos dañina, cuando las empresas tabacaleras sabían que cualquier uso de cigarrillos era perjudicial.

168.    Al igual que con el uso engañoso de términos científicos y de ingeniería por parte de las empresas tabacaleras en la publicidad para mejorar la credibilidad de sus declaraciones, los materiales promocionales de los Demandados para sus productos de combustibles fósiles también invocan engañosamente terminología similar para transmitir falsamente a los consumidores de Puerto Rico que el uso de estos productos beneficia el medio ambiente.

169.    Por ejemplo, Exxon anuncia que su combustible Synergy Diesel Efficient permitirá a los vehículos "reducir las emisiones y quemar de manera más limpia"[202]. Exxon también publica contenido en línea bajo el lema "Energy Factor", en el que Exxon afirma que "ofrece una gama de productos, incluidos materiales livianos y lubricantes y combustibles avanzados, que mejoran el rendimiento, la durabilidad y la eficiencia para reducir las emisiones". Con esta "cartera de soluciones", afirma Exxon, está llevando a cabo "la tarea vital de reducir las emisiones de gases de efecto invernadero en todo el sector del transporte"[203].

170.    De manera similar, Shell anuncia que el uso de su gasolina "produce menos emisiones"[204].

171.    BP comercializa su gasolina Invigorate como un "aditivo detergente patentado" que "ayuda a que los automóviles se conviertan en máquinas no contaminantes y eficientes", y su bp Diesel como combustible que "puede reducir las emisiones con un combustible potente,

---

[202]    Exxon, Synergy Diesel Efficient Fuels For Fleets, Light-Duty Trucks, and Passenger Vehicles, https://www.exxon.com/en/synergy-diesel-efficient#:~:text=Synergy%20Diesel%20Efficient%20fuel%20is,means%20less%20maintenance%20and%20downtime (last visited Feb. 5, 2024).
[203]    Exxon, Transforming Transportation, https://corporate.exxonmobil.com/what-we-do/lower-emission-transportation#Transportationsectors (last visited Feb. 5, 2024).
[204]    See, e.g., Shell, Shell Nitrogen Enriched Gasolines, https://www.shell.us/motorist/shell-fuels/shell-nitrogen-enriched-gasolines.html (last visited Oct. 14, 2022).

confiable y energéticamente eficiente elaborado con contenido bajo en azufre y aditivos”[205]. El sitio web de BP también anuncia que su selección de combustibles "incluye un número creciente de productos con bajas emisiones de carbono y neutrales en carbono"[206].

172. Chevron anuncia su combustible Techron con afirmaciones que enfatizan sus supuestas cualidades ambientales positivas, tales como: “menos es más”, “minimizar las emisiones” y “hasta un 50 % menos contaminante”[207]. En una sesión de preguntas y respuestas en el sitio web de Chevron, una pregunta dice: “Me preocupa el medio ambiente. ¿Techron afecta las emisiones de mi automóvil? Chevron responde que las “[g]asolinas con Techron” limpian los carburadores, los inyectores de combustible y las válvulas de admisión, “lo cual reduce las emisiones”[208].

173. Estas tergiversaciones, que pretendían llegar e influir en los consumidores de Puerto Rico, eran engañosas porque enfatizan las cualidades supuestamente beneficiosas para el medio ambiente de los combustibles sin revelar el papel clave que desempeñan los combustibles fósiles en la causa del cambio climático.

174. Al igual que con el uso de términos científicos por parte de las empresas tabacaleras para promover los cigarrillos “suaves”, la afirmación de los Demandados de que sus nuevos productos de combustibles fósiles supuestamente de alta tecnología ayudan a los consumidores a reducir las emisiones hace que sus materiales promocionales sean engañosos, porque buscan transmitir, con el imprimátur de credibilidad científica: un mensaje general que es

[205] See, e.g., BP, Our Fuels, https://www.bp.com/en_us/united-states/home/products-and-services/fuels.html (last visited 14, 2022).
[206] BP, Advanced Fuels and Lubricants, https://www.bp.com/en_us/united-states/home/what-we-do/advanced-fuels-and-lubricants.html (last visited, Feb. 5, 2022).
[207] See, e.g., Chevron, Techron, https://www.techron.com (last visited Oct. 14, 2022).
[208] Id.

falso y que se contradice con el conocimiento interno de décadas de los propios Demandados sobre los peligros del uso de combustibles fósiles.

**VIII.  Los Demandados pretendían que los consumidores confíen en sus ocultamientos y omisiones con respecto a los peligros de sus productos de combustibles fósiles.**

175.    El uso de productos de combustibles fósiles por parte de los consumidores, particularmente al conducir automóviles y otros vehículos propulsados por gasolina, contribuye significativamente al cambio climático. Sin embargo, como resultado de la sostenida y generalizada campaña de desinformación de los Demandados, muchos consumidores de Puerto Rico no tomaron conciencia sobre la magnitud de la amenaza que representa el uso de combustibles fósiles, o de la relación entre su comportamiento de compra y el cambio climático.

176.    Los Demandados han sido conscientes durante décadas de que la energía limpia presenta una alternativa viable a sus productos de combustibles fósiles. En 1980, Exxon pronosticó que, si se buscaban fuentes de energía no fósiles, podrían penetrar la mitad de un mercado energético competitivo en aproximadamente 50 años[209]. Esta estimación interna se basó en una extensa modelización dentro de la comunidad académica, incluida una investigación realizada por David Rose del MIT que concluyó que se podría lograr una transición a la energía no fósil en unos 50 años. Exxon hizo circular un memorando interno mediante el que aprobó las conclusiones de Rose y afirmó que se "basaban en suposiciones razonables"[210]. Pero en lugar de buscar una transición hacia una energía limpia o advertir al público sobre los peligros de quemar combustibles fósiles, los Demandados optaron por engañar a los consumidores para preservar sus ganancias y activos.

---

[209] H. Shaw and P. P. McCall, Exxon Research and Engineering Company's Technological Forecast: CO2 Greenhouse Effect 5 (Dec. 18, 1980).

[210] CO2 Greenhouse Effect: A Technical Review, Coordination and Planning Division, Exxon Research and Engineering Company 18 (April 1, 1982).

177.    Al engañar a los consumidores de Puerto Rico sobre los impactos climáticos del uso de productos de combustibles fósiles, incluso hasta el punto de afirmar que algunos de sus productos pueden beneficiar al medio ambiente, y al no revelar a los consumidores los riesgos climáticos asociados con la compra y el uso de esos productos, los Demandados privaron y siguen privando a los consumidores de información sobre las consecuencias de sus decisiones de compra.

178.    Los Demandados pretendían que los consumidores de Puerto Rico confiaran en sus omisiones y ocultamientos y continuaran comprando productos de combustibles fósiles de los Demandados sin tener en cuenta el daño que tales productos causaban.

179.    El conocimiento de los riesgos asociados con el uso rutinario de productos de combustibles fósiles es fundamental para las decisiones de los consumidores de Puerto Rico de comprar y utilizar esos productos. Al igual que con los cigarrillos, la historia demuestra que cuando los consumidores son conscientes de los efectos nocivos o las cualidades de los productos que compran, a menudo optan por dejar de comprarlos, reducir sus compras o tomar decisiones de compra diferentes. Este fenómeno es especialmente cierto cuando se demuestra que los productos dañan la salud pública o el medio ambiente. Por ejemplo, la mayor conciencia de los consumidores sobre el papel de los pesticidas en el daño a la salud humana, la salud de los trabajadores y el medio ambiente ha estimulado un mercado creciente de alimentos cultivados orgánicamente y sin el uso de pesticidas. Al tener acceso a información sobre cómo se cultivan sus alimentos, los consumidores han exigido opciones más saludables y el mercado ha respondido.

180.    De manera similar, un consumidor que recibió información precisa de que el uso de combustibles fósiles era uno de los principales impulsores del cambio climático y los peligros

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 85 de 91

resultantes para el medio ambiente y las personas podría comprar menos productos de combustibles fósiles o decidir no comprar ninguno. Los consumidores pueden optar por evitar ocombinar viajes en automóvil, compartir vehículo, cambiar a vehículos de menor consumo de combustible, vehículos híbridos o vehículos eléctricos, utilizar un servicio de vehículo compartido; buscar alternativas de transporte de forma total o parcial, si están disponibles (por ejemplo, transporte público, andar en bicicleta o caminar). o adoptar cualquier combinación de estas opciones. Además, los consumidores informados contribuyen a resolver los problemas ambientales mediante el apoyo a las empresas que perciben que están desarrollando productos "ecológicos" o más respetuosos con el medio ambiente.

181. Al ocultar y tergiversar afirmativamente los efectos climáticos catastróficos del consumo de combustibles fósiles, los Demandados privaron a los consumidores de los hechos necesarios para tomar decisiones informadas sobre cómo y dónde comprar energía. Si los consumidores hubieran conocido de forma completa y precisa los riesgos para la salud pública de la quema de combustibles fósiles podrían haber formado una base de clientes receptiva a las alternativas de energía limpia décadas antes de que tal demanda se desarrollara. El retraso en la aparición de un mercado escalable para la energía de combustibles no fósiles es atribuible a la ignorancia de los consumidores, inducida por la industria, de la realidad y la gravedad de las consecuencias climáticas asociadas con el uso normal de combustibles fósiles. La transición social a una economía baja en carbono habría sido mucho más barata y eficiente si los Demandados hubieran reconocido públicamente las conclusiones a las que llegaron sus propios científicos y la comunidad científica en general. Como resultado de este retraso, se han liberado a la atmósfera enormes cantidades de emisiones evitables de gases de efecto invernadero, lo que

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 86 de 91

ha provocado mayores emisiones totales, picos de emisiones más elevados y todos los efectos climáticos asociados.

**IX. El engaño de los Demandados salió a la luz recientemente y su conducta negligente continúa.**

182. El hecho de que los Demandados y sus apoderados proporcionaron a sabiendas información incompleta y engañosa al público, incluidos los consumidores de Puerto Rico, se reveló recientemente, entre otras cosas, debido a:

a. la campaña de engaño de los Demandados antes descrita, que continúa hasta el día de hoy;

b. los esfuerzos de los Demandados por desacreditar la ciencia del cambio climático y crear la apariencia de que dicha ciencia es incierta;

c. el ocultamiento y las tergiversaciones de los Demandados sobre el hecho de que sus productos causan daños catastróficos; y

d. el hecho de que los Demandados utilizaron grupos fachada como el API, la Coalición Global por el Clima y la Asociación Nacional de Minería para ocultar su participación en estas acciones, lo que desvió al Estado Libre Asociado de la investigación.

183. Además, la conducta negligente e ilícita de los Demandados, en forma de tergiversaciones, omisiones y engaños, comenzó hace décadas y continúa hasta el día de hoy. Como se describió anteriormente, los Demandados, directamente y/o a través de membresía en otras organizaciones, continúan tergiversando sus propias actividades, el hecho de que sus productos causan el cambio climático y el peligro que representa el cambio climático. A continuación, se presentan ejemplos de las continuas tergiversaciones, omisiones y engaños de los Demandados.

184.    En junio de 2018, una publicación en el blog oficial de Shell decía: "El alcance potencial del cambio climático podría eliminarse ahora. En otras palabras, la perspectiva de un cambio climático galopante podría haber pasado"[211]. Sin embargo, esta afirmación no está respaldada por investigaciones científicas válidas y fue y es contradicha por estudios acreditados[212].

185.    En marzo de 2018, Chevron publicó un informe titulado "Resiliencia al cambio climático: un marco para la toma de decisiones", que afirmaba engañosamente que "[e]l Quinto Informe de Evaluación del IPCC concluye que existe un calentamiento del sistema climático y que el calentamiento se debe en parte a la actividad humana"[213]. En realidad, el quinto informe de evaluación concluyó que "[e]s extremadamente probable [definido como una probabilidad del 95 % al 100 %] que la influencia humana haya sido la causa dominante del calentamiento observado desde mediados del siglo XX"[214].

186.    A pesar de este hecho, en abril de 2017, el director ejecutivo y presidente de la Junta Directiva de Chevron, John Watson, dijo en un podcast: "No hay duda de que ha habido cierto calentamiento; se pueden mirar los datos de temperaturas y verlo. La pregunta y el debate gira en torno a cuánto y en qué medida es causado por los humanos"[215].

---

[211] David Hone, Has Climate Change Run Its Course??, Shell Climate Change Blog (June 14, 2018), https://blogs.shell.com/2018/06/14/has-climate-change-run-its-course.

[212] See, e.g., Fiona Harvey, Carbon Emissions from Warming Soils Could Trigger Disastrous Feedback Loop, The Guardian (Oct. 5, 2017), https://www.theguardian.com/environment/2017/oct/05/carbon-emissions-warming-soils-higher-than-estimated-signalling-tipping-points; Jonathan Watts, Domino-Effect of Climate Events Could Move Earth into a 'Hothouse' State, The Guardian (Aug. 7, 2018), https://www.theguardian.com/environment/2018/aug/06/domino-effect-of-climate-events-could-push-earth-into-a-hothouse-state; Fiona Harvey, 'Tipping Points' Could Exacerbate Climate Crisis, Scientists Fear, The Guardian (Oct. 9, 2018), https://www.theguardian.com/environment/2018/oct/09/tipping-points-could-exacerbate-climate-crisis-scientists-fear.

[213] Chevron, Climate Change Resilience: A Framework for Decision Making 20 (Mar. 2018), https://www.chevron.com/-/media/shared-media/documents/climate-change-resilience.pdf.

[214] IPCC, Summary for Policymakers: Working Group I Contribution to the Fifth Assessment Report 17 (2013), https://www.ipcc.ch/site/assets/uploads/2018/02/WG1AR5_SPM_FINAL.pdf.

[215] Columbia Energy Exchange Podcast, John Watson, CEO, Chevron (Apr. 10, 2017), https://www.energypolicy.columbia.edu/us-energy-markets-policy.

Case 3:24-cv-01393-ADC Document 1-1 Filed 08/30/24 Page 116 of 119

187. De manera similar, la "Posición sobre el cambio climático" de ConocoPhillips, tal como apareció en el sitio web de la empresa hasta 2020, afirmaba que la actividad humana está "contribuyendo al" cambio climático y enfatiza las "incertidumbres", aunque la ciencia es clara: "ConocoPhillips reconoce que la actividad humana, incluida la quema de combustibles fósiles, está contribuyendo a mayores concentraciones de gases de efecto invernadero (GEI) en la atmósfera que pueden provocar cambios adversos en el clima global… Si bien persiste la incertidumbre, continuamos gestionando las emisiones de gases de efecto invernadero en nuestras operaciones e integrando actividades y objetivos relacionados con el cambio climático en nuestra planificación comercial"[216].

188. En 2015, el entonces director ejecutivo de Exxon Mobil, Rex Tillerson, argumentó que los modelos climáticos no eran lo suficientemente sólidos como para justificar un alejamiento de los combustibles fósiles, y dijo: "¿Qué sucede si en todo lo que hacemos resulta que nuestros modelos son pésimos y no obtenemos los efectos que predecimos? La humanidad tiene esta enorme capacidad para enfrentar la adversidad, y esas soluciones se presentarán a medida que esos desafíos se vuelvan claros"[217].

**X. El Estado Libre Asociado ha sufrido, está sufriendo y sufrirá daños por la conducta ilícita de los Demandados.**

189. Al sembrar dudas sobre las consecuencias futuras del consumo irrestricto de combustibles fósiles, las campañas de engaño de los Demandados han retrasado la transición a fuentes de energía alternativas, que los Demandados pronosticaron podrían penetrar la mitad de un mercado energético competitivo en 50 años si se les permitiera desarrollarse sin obstáculos.

---

[216] ConocoPhillips, Climate Change Position (Oct. 28, 2020), https://web.archive.org/web/20201028115814/https://www.conocophillips.com/sustainability/integrating-sustainability/sustainable-development-governance/policies-positions/climate-change-position/.

[217] Dallas Morning News, Exxon CEO: Let's Wait for Science to Improve Before Solving Problem of Climate Change (May 27, 2015), https://www.dallasnews.com/business/energy/2015/05/28/exxon-ceo-let-s-wait-for-science-to-improve-before-solving-problem-of-climate-change.

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 89 de 91

Esta demora provocó la emisión de enormes cantidades de gases de efecto invernadero que de otro modo se habrían evitado, asegurando así que el daño causado por el cambio climático a Puerto Rico será sustancialmente más severo que si los Demandados hubieran actuado honestamente, acorde con su conocimiento interno.

190. Como causa directa e inmediata de la conducta engañosa e ilegal de los Demandados, el Estado Libre Asociado de Puerto Rico, sus ciudadanos y sus recursos naturales han sufrido y seguirán sufriendo graves daños infligidos por el cambio climático en el futuro.[218] Por ejemplo:

a. Se prevé que el nivel del mar alrededor de Puerto Rico seguirá aumentando durante siglos. El aumento del nivel del mar amenaza con inundar las comunidades ubicadas en la zona costera (donde vive el 60 % de la población) y causar enormes daños a la infraestructura esencial, incluido el Puerto de San Juan, los principales aeropuertos, las plantas de energía, la infraestructura de agua y alcantarillado y cientos de kilómetros de carreteras.

b. Los puertorriqueños enfrentan importantes riesgos para la salud humana debido al cambio climático, incluidas olas de calor más frecuentes e intensas, tormentas extremas, incendios forestales y una mayor transmisión de patógenos. El Gobierno de Puerto Rico tendrá que gastar grandes sumas de dinero para adaptar la infraestructura médica, energética y de transporte del Estado Libre Asociado para abordar estos riesgos para la salud.

c. El cambio climático amenaza a muchos de los recursos naturales y ambientales de Puerto Rico. En particular, la acidificación de los océanos, las temperaturas más

---

[218] See Puerto Rico Climate Change Council, Puerto Rico's State of the Climate, 2014–2021: Assessing Puerto Rico's Social-Ecological Vulnerabilities in a Changing Climate (2022), https://www.drna.pr.gov/wp-content/uploads/2022/10/PR_StateOfTheClimate_2014-2021_PRCCC-09-2022.pdf

SJ2024CV06512 15/07/2024 07:55:16 am Entrada Núm. 1 Página 90 de 91

cálidas de los océanos y las tormentas extremas ya han provocado un importante blanqueamiento y destrucción de los arrecifes de coral alrededor de Puerto Rico. Además, es probable que el cambio climático provoque cambios en los ecosistemas de agua dulce, costeros y marinos en Puerto Rico, lo que afectará la capacidad de esos ecosistemas para proporcionar hábitats para la flora y la fauna que sustentan, incluidas especies comercialmente importantes y especies que son raras o exclusivas de Puerto Rico.

d. Se espera que la industria del turismo, un componente importante de la economía de Puerto Rico, sufra pérdidas significativas a medida que el aumento del nivel del mar erosione las playas e inunde los sitios culturales, las tormentas extremas y los incendios forestales dañen las atracciones turísticas, las temperaturas más cálidas aumenten el estrés térmico de los turistas y los arrecifes de coral se decoloren y queden destruidos.

e. Se prevé que la industria agrícola se verá afectada negativamente por la mayor intensidad de las precipitaciones, los períodos de sequía y el aumento del nivel del mar que introduce agua salada en los acuíferos de los que dependen las tierras agrícolas.

191. Estas consecuencias afectarán de manera desproporcionada a las comunidades de ancianos y de escasos recursos de Puerto Rico, a medida que el cambio climático exacerba los factores de estrés medioambientales y de salud pública asociados con las disparidades socioeconómicas y de edad.[219] Los puertorriqueños socialmente vulnerables, que ya sufren tasas más altas de efectos adversos para la salud como asma, cáncer y enfermedades respiratorias, a

[219] See Instituto de Estadísticas, Puerto Rico Community Survey 2015-2019 (2021), https://censo.estadisticas.pr/EncuestaComunidad (44.1% of Puerto Rican households live below the poverty level).

menudo están menos preparados para adaptarse a un mundo en calentamiento porque sus comunidades carecen de la infraestructura y los recursos necesarios para resistir las amenazas que plantea el cambio climático.[220, 221]

192.    En un estudio de 2018, la mayoría de los puertorriqueños que informaron haber sufrido inundaciones costeras durante tormentas y huracanes se encontraban entre la población con el rango de ingresos más bajo.[222]  El 46 % de las unidades de vivienda de Puerto Rico (unas 408.279 unidades) están ocupadas por hogares de ingresos bajos y moderados en áreas que podrían quedar permanentemente inundadas por un aumento de 0,9 metros en el nivel del mar.[223]

193.    Las consecuencias del cambio climático no se sentirán solo en las comunidades costeras de Puerto Rico. Por ejemplo, el cambio climático impacta negativamente la agricultura y la producción de alimentos en todo el Estado Libre Asociado: la sequía de 2014-2016 afectó al 64 % de Puerto Rico y causó $13,8 millones en pérdidas agrícolas.[224]  Además, se espera que el aumento del nivel del mar haga que los bosques de manglares de Puerto Rico migren tierra adentro, invadiendo el hábitat del bosque seco del que dependen muchas especies.[225]

---

[220] See Departamento de Recursos Naturales y Ambientales, Climate Change Risk and Resilience Public Perception Study (2018), http://drna.pr.gov/wp-content/uploads/2019/01/Informe-final-Estudio-de-percepcion-publica-sobre-cambio-climatico.pdf

[221] See P. Méndez-Lázaro et al., Climate change, heat, and mortality in the tropical urban area of San Juan, Puerto Rico, 62 Int'l J. of Biometeorology 699 (2018)

[222] Departamento de Recursos Naturales y Ambientales, Climate Change Risk and Resilience Public Perception Study

[223] Gobierno de Puerto Rico, State Consolidated Plan for Housing and Community Development Programs 2020–2024 & 2020 Annual Action Plan (2020), https://www.vivienda.pr.gov/wp-content/uploads/2021/03/STATE-CONSOLIDATED-PLAN-2020-24-2020-ANNUAL-ACTION-PLAN-PARTE-1.pdf.

[224] N.L. Álvarez-Berríos et al., Correlating drought conservation practices and drought vulnerability in a tropical agricultural system Renewable Agriculture and Food Systems, 33 Renewable Agriculture and Food Systems 279 (2018).

[225] See Puerto Rico Climate Change Council, State of the Climate.