# EXHIBIT 70

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| **ANNE ARUNDEL COUNTY, MARYLAND,** | **CASE NO.:** |
| **Plaintiff,** | **NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A., INC.** |
| **v.** | |
| **BP P.L.C.; BP AMERICA, INC.; BP PRODUCTS NORTH AMERICA INC.; CROWN CENTRAL LLC; CROWN CENTRAL NEW HOLDINGS LLC; ROSEMORE, INC.; CHEVRON CORP.; CHEVRON U.S.A. INC.; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; CITGO PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; MARATHON OIL COMPANY; MARATHON OIL CORPORATION; MARATHON PETROLEUM CORPORATION; SPEEDWAY LLC; HESS CORP.; CNX RESOURCES CORPORATION; CONSOL ENERGY INC.; CONSOL MARINE TERMINALS LLC; and AMERICAN PETROLEUM INSTITUTE,** | **[Removal from the Circuit Court for Anne Arundel County]**<br><br>**Action Filed:  April 26, 2021** |
| **Defendants.** | |

## AFFIDAVIT OF RICHARD TYLER PRIEST

1. My name is Richard Tyler Priest.  I am over eighteen (18) years of age.  I have personal knowledge of the facts set forth in this declaration and am competent to testify to them if necessary.

2. Since 2012, I have been Associate Professor of History and Geographical and Sustainability Sciences at the University of Iowa.  From 2004 to 2012, I was Clinical Professor and Director of Global Studies at the C.T. Bauer College of Business, University of Houston.  In 2010-2011, I served as Senior Policy Analyst with the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling.  My primary interests are in the fields of energy and environmental history.  I also work and teach in the related areas of global history, history of business and technology, and public history.

3. I am being compensated at the hourly rate of $400.00 for my work on this matter.

4. I received my Ph.D. in History from the University of Wisconsin-Madison in 1996.  My scholarly work investigates the history of oil and energy, and the main thrust of my research examines the history of offshore oil and gas.  My publications include the co-authored, *Offshore Pioneers: Brown & Root and the History of Offshore Oil and Gas* (Gulf Publishing, 1997), and the book, *The*

*Offshore Imperative: Shell Oil's Search for Petroleum in Postwar America* (Texas A&M Press).  My research on offshore petroleum evolved into a long-range effort to preserve, document, and analyze the history of the offshore industry in the Gulf Coast region.  I have served as chief historian on three interdisciplinary and collaborative research projects sponsored by the Department of Interior's Minerals Management Service (since 2011, the Bureau of Ocean Energy Management, or BOEM).

## Scope of Assignment

5. I have been retained by Chevron to conduct historical research and provide historical analysis on the role of the U.S. federal government in oil and gas exploration, development, and operations on the U.S. Outer Continental Shelf.

6. I and/or research assistants working at my direction have conducted research in public documents and public and/or business records normally relied on by experts in my field.  The materials consulted and/or cited in this declaration were obtained from various libraries, archives, and other repositories, including, but not limited to, the National Archives and Records Administration in College Park, Maryland; the Louisiana Research Collection, Tulane University; the Kansas Collection, University of Kansas Libraries; the American Heritage Center,

University of Wyoming; published government records; and other digitally accessible sources.  Collected and cited documents include primary source materials contemporaneous with government and industry actions and polices at issue here as well as secondary sources.  Should additional relevant information become available to me, I may revise and/or supplement this declaration.

**Findings Summary**

7.  The collection and analysis of the materials identified was conducted using an established historical methodology for inquiries of this type.  My findings are based on the body of information available to date.  My findings emphasize two main themes:

(1) For more than six decades, the U.S. federal Outer Continental Shelf (OCS) program[1] filled a national government need.  It procured the

---

[1] From 1954 to 1982, the Bureau of Land Management (BLM) and the U.S. Geological Survey's Conservation Division within the Department of the Interior were the lead agencies in the federal OCS program.  These agencies were combined in 1982 to form the Minerals Management Service (MMS). In 2010, the MMS was reorganized briefly into the Bureau of Ocean Energy Management, Regulation and Enforcement (BOEMRE).  In 2011, Interior split BOEMRE into three independent agencies that then reported to the Assistant Secretary for Land and Minerals Management: the Bureau of Ocean Energy Management (BOEM), which handles leasing and environmental assessment; the Bureau of Safety and

services of oil and gas firms to develop urgently needed energy resources on federal offshore lands that the federal government was unable to do on its own.  The federal OCS program created a secure, domestic source of oil and gas to help meet growing U.S. demand during many years of heightened and recurring geopolitical crises that made reliance on foreign sources precarious.  Oil and gas production during this period also generated substantial revenues for the federal treasury.  Between 1954 and 2016, the Department of the Interior held 173 auctions to lease federal lands on the U.S. OCS, the official designation for submerged federal lands located beyond three miles (in most places) of the coastline.  In these lease sale auctions, the government issued contracts for more than a total of 162 million acres, 89 percent of which were in the Gulf of Mexico.  Commercial production from offshore leases totaled more than 20 billion barrels of oil and nearly 175 trillion cubic feet of natural gas—most of it, again, from the

_____

Environmental Enforcement (BSEE), which regulates and inspects offshore operations, and the Office of Natural Resource Revenue (ONRR), which collects and manages mineral revenues.  In addition to the DOI offices, there are many others in the federal government that historically have had a hand in enforcing various laws that apply offshore.  These include the National Oceanographic and Atmospheric Administration (NOAA), the Coast Guard, the Federal Energy Regulatory Commission, the U.S. Department of Defense, Homeland Security, the Environmental Protection Agency, the Pipeline and Hazardous Materials Safety Administration, the Army Corps of Engineers, and the Fish and Wildlife Service.

Gulf.  The federal OCS program has also been a major source of revenue for the United States.  From 1954 to 2016, the federal government collected an estimated $80 billion in signature bonuses and $150 billion in royalties—not adjusted for inflation—from offshore oil and gas leases.[2]  In 2010, the industry created $44 billion in annual GDP, deposited $8–10 billion a year in the federal treasury, and directly supported 230,000 relatively high-paying jobs, one-third of which were outside the Gulf region.[3]  These numbers indicate not merely commercial transactions between the federal government and the oil companies.  They reflect the creation of a valuable national security asset for the United States over time.  As much as the extraction of oil from the ocean was the result of extraordinary technological innovation, it was also a political and policy-driven project to incorporate ocean space and the OCS into the nation's public lands and manage OCS resources in the long-term interest of U.S. energy security.

---

[2] U.S. Department of the Interior, Bureau of Ocean Energy Management, Production Information, https://www.data.boem.gov/Main/Production.aspx, and Outer Continental Shelf Lease Sale Statistics,  https://www.boem.gov/Outer-Continental-Shelf-Lease-Sale-Statistics/; Office of Natural Resource Revenue, Statistical Information, https://statistics.onrr.gov/ReportTool.aspx.

[3] IHS Global Insight and IHS CERA, "Restarting the 'Engine' – Securing American Jobs, Investment, Energy Security: The Importance to the U.S. Economy of Restarting the Offshore Oil and Gas Exploration and Development Industry" (August 2011), ES-1.

(2) The federal government directed operations on the OCS as more than merely a disinterested landowner and for purposes beyond monetary gain. The federal OCS program created an expanding market for offshore oil and gas and actively managed leases and operations to fulfill a critical national need for domestic energy. As Supreme Court Justice Hugo Black put it, the federal government's rights on the OCS transcended those of a "mere property owner" or rentier. In promoting the expansion of offshore oil and gas drilling, production, and transportation, the federal government supervised the OCS in a way that cultivated a special relationship with oil and gas firms, but which was not driven by the particular business interests of those firms. Federal OCS governance involved establishing rights to public resources, enforcing competition among private entrants to the public mineral estate, protecting high-cost offshore exploration from foreign competition, and collecting and allocating public revenues. In doing so, federal officials also exercised their responsibilities as public trustees toward non-producers of the resource and as guardians of national interests. The policies and plans of the federal OCS program did not always align with those of oil firms interested in drilling offshore. Federal officials viewed these firms as agents of a larger, more long-range energy strategy to increase

domestic oil and gas reserves.  Officials enlisted offshore oil operators as

partners in creating the leasing system, formulating regulations, developing

advanced technology, and cultivating the growth of a specialized offshore

services sector.  But the federal government dictated the terms, locations,

methods, and rates of hydrocarbon production on the OCS.  The ultimate

objective of federal officers was to conserve those resources in the economic

and security interests of the federal government, the resource owner and

lessor.


### The Legal and Administrative Foundation of the Federal OCS Program


8. At least until 1937, congressional and executive policy in the United

States assumed that individual states held property title out to three miles from the

coastline in the ocean, the limit of national jurisdiction recognized by most nations

under international law.  In the summer of 1937, Secretary of the Interior Harold

Ickes began to revise federal policy to challenge state claims to offshore

submerged lands.  During a period of depression and international crisis, this

challenge was driven by a nationalistic desire to appropriate revenues from

offshore leasing for the federal treasury, protect strategic petroleum resources from

predatory state policies and foreign suitors, and assert greater control over the oil

industry.  In 1933, President Franklin Roosevelt had appointed Ickes as "Oil

Administrator" under the National Recovery Administration (NRA).  Although the

Supreme Court declared the NRA unconstitutional in 1935, the Connelly Hot Oil

Act and creation of the Interstate Oil Compact Commission gave the federal

government a greater role in imposing production restrictions on American oil

wells.  Roosevelt and Ickes were determined to extend that control to oil

production under "submerged lands" offshore.  In May 1937, with war clouds

forming around the world, Roosevelt "raised the question [with Ickes] as to the

ownership of oil found under the ocean but within the three-mile limit."[4]  A year

later, Roosevelt suggested issuing an executive order to set up "naval oil reserves

on the coast beginning with the shoreline and extending halfway across the

oceans."[5]

 9. During the Second World War, Harold Ickes' tactical views on the

"tidelands" dispute with the states hardened from a willingness to await a legal or

legislative resolution to advocating for an executive pronouncement claiming

---

[4] Harold L. Ickes, *The Secret Diary of Harold L. Ickes: Volume II, The Inside Struggle, 1936-1939* (New York: Simon and Schuster, 1954), 127.

[5] Nathan R. Margold, Solicitor, Department of the Interior, Memorandum for the First Assistant Secretary, September 16, 1938, Admin-Submerged Lands, 1/26/37-12/23/38, General Land Office (GLO), Central Classified Files (CCF) 1937-53, Box 3278, Record Group (RG) 48, Records of the Office of the Secretary of the Interior, U.S. National Archives and Records Administration, College Park, MD.

national control over the continental shelf.  In May 1943, the Interior Department's General Land Office submitted a memorandum to the secretary, pointing out the wartime opportunity to eliminate "from our thinking and international law the shackles of the three-mile limit for territorial waters," and advising that the United States adopt a "line of 100 or 150 miles from our shores" extending U.S. territory "beyond the continental shelf and reserving this valuable asset for the United States."[6]

10. At the end of the war, President Harry Truman carried out Roosevelt's and Ickes' plan to assert federal power over the continental shelf.  On September 28, 1945, he issued Proclamation 2667, which stated that the "Government of the United States regards the natural resources of the subsoil and seabed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control." The same day, Truman signed Executive Order 9633 reserving and placing certain resources of the continental shelf under management of the secretary of the interior.[7]  Representing the boldest step so far in the construction of marine

---

[6] C.E. Jackson, F.W. Lee, I.D. Wolfsohn, General Land Office, Memorandum to Secretary of the Interior, May 28, 1943, General Land Office (GLO), Admin-Submerged Lands, Central Classified Files (CCF) 1937-53, RG 48.

[7] Harry S. Truman, "Presidential Proclamation No. 2667, Concerning the Policy of the United States with Respect to the Natural Resources and Subsoil and Sea-Bed of the Continental Shelf of 28 September 1945," 10 *Federal Register* (*Fed. Reg.*)

territory as national territory, Truman's proclamation and executive order were the culmination of federal efforts beginning in the late 1930s to establish government supremacy over resources in submerged lands off the U.S. coast for the protection of national defense and the national economy.[8]

11. Immediately after issuing the proclamation, Truman ordered Attorney General Tom Clark to file an original action against the State of California in the U.S. Supreme Court, challenging the state's right and title in submerged lands below the low-water mark. The Court ruled in the case on June 23, 1947. Considering the larger context at that moment in time is important to understanding the majority thinking in *U.S. v. California*. The world was in geopolitical and economic crisis. The Supreme Court justices' first conference took place five days after the dramatic "Truman Doctrine" speech to a joint session of Congress, in which the president pledged political, military, and economic assistance to all nations under the threat of communism, the *de facto* declaration of a global Cold War with the Soviet Union and China. The National Security Act,

---

193 (October 2, 1945), 12303; Harry S. Truman, Executive Order No. 9633, 10 *Fed. Reg*. 193 (October 2, 1945), 12035.

[8] Truman also issued a second proclamation that addressed fisheries, "Presidential Proclamation No. 2668, Concerning the Policy of the United States with Respect to Coastal Fisheries in the Certain Areas of the High Seas of 28 September 1945," 10 *Federal Register* (*Fed. Reg.*) 193 (October 2, 1945), 12304.

which restructured the government's military and intelligence agencies, was swiftly moving through Congress.  A swelling tide of cheap petroleum imports, furthermore, had undermined experimentation with synthetic fuels and threatened domestic oil production.  In 1947, the United States became a net importer of oil for the first time.  The Court's conference notes indicate that most of the justices leaned toward bolstering the power and privileges of the federal government during the crisis, not undercutting them.  According to Justice Hugo Black, "The federal government has complete power over the waters, the fish, sponges, oil, and all else that is there."[9]

12. In an opinion written by Justice Black, the Supreme Court ruled that the federal government had "paramount rights" in and over the submerged lands below the low water mark, out to and beyond the three-mile belt, off the coast of California.  Because the oil and property involved might be necessary for preserving national security and conducting international affairs, Black argued that the case should not be judged on the question of "bare legal title."  The United States had rights "transcending those of a mere property owner."[10]  Three years

---

[9] Conference of March 17, 1947 and March 29, 1947, *United States v. California*, 332 U.S. 19 (1947) in Del Dickson, ed., *The Supreme Court in Conference (1940-1985): The Private Discussions Behind Nearly 300 Supreme Court Decisions* (Oxford: Oxford University Press, 2001), 251, 249.

[10] Supreme Court of the United States, *United States v. California* 332 U.S. 19, June 23, 1947.

later, on June 5, 1950, the Court issued similar decisions against Texas and Louisiana (*U.S. v. Texas*, *U.S. v. Louisiana*).  "Protection and control of the area are indeed functions of national external sovereignty" and "the marginal sea is a national, not a state concern," wrote Justice William O. Douglas in the *United States v. Louisiana* majority opinion.[11]

13. After the Supreme Court's Tidelands' decisions, the issue moved to the political arena.  Coastal states, backed by many state attorneys general, pushed strongly for legislation to "quitclaim," or return to the states, the federal government's rights to the marginal sea and its seabed out to three nautical miles from the coast.  In 1952, Congress passed such a quitclaim bill, but Truman vetoed the legislation, explaining that he would not approve "a free gift of immensely valuable resources, which belong to the entire Nation, to the States which happen to be located nearest to them."[12]  In a speech to Americans for Democratic Action, Truman added, "They want us to turn the vast treasure over to a handful of states,

---

[11] Supreme Court of the United States, *United States v. Louisiana* 339 U.S. 699, June 5, 1950.

[12] Harry S. Truman, Veto of Bill Concerning Title to Offshore Lands, May 29, 1952, The American Presidency Project, https://www.presidency.ucsb.edu/documents/veto-bill-concerning-title-offshore-lands-0.

where the powerful private oil interests hope to exploit it to suit themselves."[13] Both the Supreme Court and the Truman Administration determined that the federal government was the ultimate authority over the marginal sea and continental shelf, and that federal officials had the responsibility to manage the resources in the greater national interest, not as a "mere property owner" engaged strictly in commercial transactions with oil firms.

14. The parties and candidates in the 1952 presidential election postured around the Tidelands issue – Republican Dwight Eisenhower favoring quitclaim and Democrat Adlai Stevenson supporting Truman's position. The increasing national security importance of developing domestic oil gave urgency to a speedy resolution of the Tidelands' controversy. In 1950, oil had replaced coal as the nation's leading source of energy. War on the Korean peninsula and postwar reconstruction in Europe and Japan placed pressure on global oil supplies, even as the great Middle Eastern oil fields came on stream, and crisis in Iran slowed exports from that nation to a trickle.

15. Upon Eisenhower's victory, coastal state delegations redoubled their drive for quitclaim the minute the 83rd Congress went into session. As in the past, the House was expected to pass the measure relatively easily, while the Senate

---

[13] United States Congress, *Congressional Record*, 82nd Congress, 2nd Session, Vol. 98, 1952, 625.

would provide stronger resistance, but would also likely pass the bill with a Republican majority.  Advocates of federal control did not surrender meekly.  An early indication of this was when, in one of his last acts as president, Truman issued an executive order declaring submerged lands to be a naval reserve.  The order was essentially nullified when Eisenhower's attorney general, Herbert Brownell, interpreted it very narrowly to mean the offshore deposits merely passed to the secretary of the navy as custodian, leaving the issue of title unaffected.[14] Nevertheless, the order demonstrated that President Truman, like Roosevelt before him, considered offshore oil and gas to be critical for national defense.

16. In May 1953, after the longest Senate filibuster in history up to that point, Congress passed and President Eisenhower signed the Submerged Lands Act, the first major piece of legislation to cross his desk. While the Act did not recognize specific state claims, it nevertheless quitclaimed to the states all lands permanently covered by tidal waters seaward three nautical miles from the coastline of each state as the boundary existed when the state became a member of the Union.[15]

---

[14] "States May Share in Oil Far at Sea," *New York Times* (March 1, 1953). The passage of the Outer Continental Shelf Lands Act formally revoked the executive order.

[15] Submerged Lands Act, May 22, 1953, 67 Stat. 29.

17. After returning the three-mile band to the states, Congress passed another bill that reinforced the power, privileges, and paramount rights of the federal government on the OCS beyond three miles.  In August, Congress and the President enacted the Outer Continental Shelf Lands Act (OCSLA), which provided that "the subsoil and seabed of the outer Continental Shelf [beyond three nautical miles] appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided by the Act."[16]  "In order to meet the urgent need for further exploration and development of the oil and gas deposits of the submerged lands of the outer Continental Shelf," OCSLA authorized the Department of the Interior to grant oil and gas leases and promulgate regulations for their development.[17]  OCSLA also assigned United States district courts "original jurisdiction of cases and controversies arising out of or in connection with any operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing or transporting by pipeline the natural resources, or involving rights to the natural resources of the subsoil and seabed of the outer Continental Shelf . . . ."[18]  The fact that Congress assigned federal courts jurisdiction in all matters relating to the OCS indicated a consensus among

_____

[16] Outer Continental Shelf Lands Act, August 7, 1953, P.L. 83-31, 67 Stat., 462.

[17] P.L. 83-31, 67 Stat., 468.

[18] P.L. 83-31, 67 Stat., 463.

policymakers that the nation and federal government had a special interest in the oil and gas resources underlying these federal lands.

## Evolution of the Federal OCS Program, 1954-1970

18. Using the same division of responsibilities in place for onshore federal lands, Interior delegated management of the OCS to the Bureau of Land Management and the Conservation Division of the U.S. Geological Survey.[19]  The BLM prepared the official leasing maps, issued leases and pipeline rights-of-way, and handled all title matter relating to leases.  The Conservation Division managed all operational matters, issuing permits for geophysical and geological explorations, collecting rentals and royalties, and policing the operations.  With the passage of the OCSLA, the two agencies extended their jurisdiction to mineral leasing offshore.  Interior officials, however, had to start from scratch to establish governance over an activity with which the federal government had no prior experience or expertise.  Therefore, they had little choice but to enlist the service of the oil firms who did.  In the spring of 1954, the directors of the BLM and

---

[19] Marion Clawson, *The Bureau of Land Management* (New York: Praeger Publishers, 1971), 139-141.

USGS, Edward Woozley and Dr. W. E. Wrather, conducted conversations with industry and held a series of government meetings and conferences to draw up the regulations.[20]

19. The initial Code of Federal Regulations (C.F.R.), finalized in May 1954, went well beyond those that governed the average federally regulated entity at that time and provided federal officers with the authority to direct lessees' operations. Lessees were required to "comply with the terms of the lease, with the written orders of the supervisor [a representative of the Secretary, under administrative direction of the Director of the U.S. Geological Survey], and, subject to the provisions of section 5 (a) of the act, with the regulations in this part and any amendments thereof."[21]   An OCS lease was a contractual obligation on the part of lessees to ensure that all operations "conform to sound conservation practice" (see below) and effect the "maximum economic recovery" of the natural resources on the OCS.[22]  "The lessee shall promptly drill and produce such other wells as the supervisor may reasonably require," according to the regulations, "in order that the

---

[20] Directors, BLM and USGS, to Secretary of the Interior, April 27, 1954, Box 513, CCF, 1954-1958, RG 48.

[21] Geological Survey, Department of the Interior, 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R. §250.30, 2657.

[22] 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R. §250.11, 2656.

lease may be properly and timely developed and produced in accordance with good operating practices."[23]

20. The OCS regulations gave the Department of the Interior additional powers to direct how oil and gas resources would be extracted and sold from the OCS. The department's regional supervisor could suspend "any operation or method of operation which endangers life or threatens immediate, serious, or irreparable damage to the leased deposit or other valuable mineral deposits."[24] The regulations required agency approval of drilling and development programs and all subsequent well operations. Lessees were required to submit all sales contracts to the supervisor, furnish all well logs within 30 days of completing a well, and produce a monthly report of operations. Other requirements included government specifications for "samples, tests, and surveys," the timing and procedures for well tests, and "well-spacing and well-casing programs."[25] The supervisor also had the final say over methods of measuring production and computing royalties, the latter of which was "the estimated reasonable value of the product as determined by the

---

[23] 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R. §250.33(b), 2657.

[24] 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R §250.12(b), 2656.

[25] 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R. §250.38, 2659; 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R §250.14, 2657; 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R. §250.17, 2657.

supervisor, with due consideration being given to the highest price paid for a part or for a majority of production of like quality in the same field or area, to the price received by the lessee, to posted prices, and to other relevant matters."[26]

21. An OCS lease was not simply a contract to explore for oil and gas, but an obligation by the lessee to produce them. In exchange for the "exclusive right and privilege to drill for, mine, extract, remove and dispose of all oil and gas deposits" in a described area, the lessee was required "to drill and produce such wells as are necessary to protect the lessor from loss by reason of production on other properties or, in lieu thereof, with the consent of the oil and gas supervisor, to pay a sum determined by the supervisor as adequate to compensate the lessor for failure to drill and produce any such well."[27] Primary lease terms were five years. If, at the end of five years, "no well is producing, or is capable of producing, oil and gas in paying quantities from the leased area," the Secretary of the Interior had the power to cancel the lease and force its surrender back to the government.[28] Many such non-producing leases were surrendered and often re-leased at subsequent lease auctions to other bidders.

---

[26] 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R. §250.64, 2659.

[27] 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R §250.33(a), 2657.

[28] 19 *Fed. Reg.* 90 (May 8, 1954), Lease Form 4-1255, 2666-2667.

22. The regional OCS supervisor of the Geological Survey's Conservation Division actively managed what became thousands of discretely different OCS leases and operations. OCS regulations were general requirements that rarely, if ever, could be uniformly applied, or complied with, on the OCS. Offshore exploration, drilling, and production were complex and dynamic operations. Each oilfield, each reservoir within each oilfield, and each well within each reservoir was unique. "Each oil well has its own personality, is completely different than the next and has its own problems," observed one offshore consulting geologist in 1970. "I have never seen two wells present identical problems."[29] Moreover, technology in the offshore industry changed rapidly. Operators and contractors continually introduced new equipment and techniques to meet the novel challenges of extracting oil and gas from progressively deeper waters in the ocean, from routine depths of thirty feet in 1954, to 100 feet in 1960, to 500 feet in 1970, to 1,000 feet by 1980. Different water depths, locations, and environmental conditions called for different kinds of platform designs, installations, and

---

[29] Neil R. Etson to President Nixon, March 18, 1970, U.S. Geological Survey, Central Classified Files, 1968-1974, Box 71, RG 57, Records of the U.S. Geological Survey, National Archives and Records Administration, College Park, MD.

operations.[30]  The regional OCS supervisor and his regulatory staff did not engage in perfunctory, run-of-the-mill permitting and inspection.  They constantly had to adapt what they called their "lease management" program to unique and changing circumstances in order to maximize public benefit from OCS hydrocarbon resources.

23. The C.F.R. left substantial discretion to the supervisor in implementing the regulations.  Lease operators were required to "exercise reasonable diligence in drilling and producing the wells," and "carry on all operations in accordance with approved methods and practices."  Operators were obliged to "take all reasonable precautions for keeping all wells under control at all times," and "take all reasonable precautions to prevent any well from blowing open, including the installation of storm chokes on all producible wells."  They were ordered to "take all reasonable precautions to prevent accidents and fires" and notify the supervisor and submit a full report on any that should occur.  In general, lessees were required to "carry on all operations and maintain the property at all times in a safe and workmanlike manner, having due regard for the preservation and conservation of the property and for the health and safety of employees," and "take reasonable

---

[30] Tyler Priest, *The Offshore Imperative: Shell Oil's Search for Petroleum in Postwar America* (College Station, TX: Texas A&M University Press, 2007), 54-201.

steps" to prevent fire hazards.  Regulations also stated that the "lessee shall not

pollute the waters of the high seas or damage the aquatic life of the sea or allow

extraneous matter to enter and damage any mineral- or water-bearing formation"

and "dispose of all useless liquid products of wells in a manner acceptable to the

supervisor."[31]  The language of "reasonable precaution," "approved methods and

practices," "safe and workmanlike manner," and "manner acceptable to the

supervisor" gave wide interpretative latitude to federal OCS officers in

determining how they supervised offshore operations.

24. The Geological Survey's Conservation Division periodically issued

"OCS orders," which were directions and clarifications to all operators on how to

meet the requirements in the C.F.R.  Between 1958 and 1960, the Conservation

Division issued five orders.  OCS Order No. 1 specified how wells, platforms, and

other fixed structures should be marked.  OCS Order No. 2 dictated the minimum

depth and methods for cementing well conductor casing in place.[32]  OCS Order No.

3 prescribed the minimum plugging and abandonment procedures for all wells

drilled "in order to prevent possible migration of oil, gas, or water between

---

[31] 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R §250, 2655-2661.

[32] U.S. Geological Survey, *Monthly Engineering Report*, Conservation Division,
Oil and Gas Leasing Branch, Gulf Coast Region, Volume 125 (January-March
1958), RG 57.

formations or to the surface."[33]  OCS Order No. 4 established the conditions under

which an OCS lease may be maintained beyond the primary term.  These

conditions required that at least one well be drilled on the lease and the

performance of mandatory "production tests," under witness of a representative of

the Geological Survey, to establish that wells met a minimum flow duration and

prove that the wells were capable of producing in "paying quantities."[34]  OCS

Order No. 5 required the installation of subsurface safety devices ("storm chokes")

on all OCS wells.[35]

    25. Even with the specific stipulations under the OCS orders, the regional

supervisor still had to make adaptive and discretionary decisions.   Among other

issues, these included considering unitization proposals, applications to

"commingle" production from different production points, requests for "production

relief" (see below), and requests for waivers to orders.  For example, early storm

---

[33] U.S. Geological Survey, *Monthly Engineering Report*, Conservation Division, Oil and Gas Leasing Branch, Gulf Coast Region, Volume 131 (July-September 1959), RG 57.

[34] U.S. Geological Survey, *Monthly Engineering Report*, Conservation Division, Oil and Gas Leasing Branch, Gulf Coast Region, Volume 132 (October-December 1959), RG 57.

[35] U.S. Geological Survey, *Monthly Engineering Report*, Conservation Division, Oil and Gas Leasing Branch, Gulf Coast Region, Volume 133 (January-March 1960), RG 57.

chokes required by OCS Order No. 5 were very costly and often did not work properly, so the Gulf Region supervisor frequently waived the requirement until the cost and reliability of the technology had improved to a point in the 1970s where Order No. 5 could be strictly enforced.[36]  Through the lease management program and the promulgation and revision of OCS orders, the Geological Survey's regional supervisor exercised active control on the federal OCS over the drilling of wells, the production of hydrocarbons, and the provision of safety.

26. The OCSLA charged the Interior Department with regulating another important realm of offshore activity in the interest of upholding federal rights. Interior retained authority to determine the rate of production from OCS wells.  "In order to provide for the prevention of waste, and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein," OCSLA authorized the department to write rules providing for the "unitization, pooling, drilling agreements, suspension of operations or production, reduction of rentals or royalties, compensatory royalty agreements, subsurface

---

[36] U.S. Geological Survey, *Monthly Engineering Report*, Conservation Division, Oil and Gas Leasing Branch, Gulf Coast Region, December 1958, RG 57; U.S. Geological Survey, *Monthly Engineering Report*, Conservation Division, Oil and Gas Leasing Branch, Gulf Coast Region, February 1960, RG 57; K.E. Arnold, P.S. Koszela and J.C. Viles, "Improving Safety of Production Operations in the U.S. OCS," OTC 6079, Paper Presented at the Twenty-First Annual OTC, Houston, TX, May 1-4, 1979.

storage of oil or gas in any of said submerged lands, and drilling or other easements necessary for operations or production."[37]

27. When applied to petroleum resources, the concept of "conservation" did not mean preserving those resources for the use of future generations.  It meant extracting the greatest amount of oil and gas that was technologically possible from a finite deposit, while preventing the "waste" of those resources and protecting the property rights, or "correlative rights,"[38] of those affected by petroleum production and its regulation.  On the OCS and other federal lands, the general public possessed correlative rights through the representation of the federal government.  Waste could take the form of "physical waste," which was the loss of ultimate oil production through inefficient methods of production,[39] or "economic

---

[37] P.L. 83-31, 67 Stat., 464.

[38] The "Correlative Rights Doctrine" in oil and gas is a doctrine applied by the U.S. Supreme Court starting in the early 20th century in upholding state statutes prohibiting excessive use and waste of oil and gas in a common pool.  The doctrine held that each owner of land that covers a common reservoir is entitled to his or her fair share of the recoverable oil or gas beneath his or her land.  A mineral owner's right to extract oil and gas is limited by the obligation to do so in a way that conserves the resource without waste or negligence.  Lewis M. Andrews, "The Correlative Rights Doctrine in the Law of Oil and Gas," *Southern California Law Review* 13, no. 2 (January 1940): 185-203.

[39] In the 1930s, petroleum engineers considered physical waste to be the result of the "duplication of wells," which invariably resulted in the smaller ultimate recovery of oil and gas; the "ineffectual and partial use of gas pressure," which depleted the "reservoir energy" to bring oil and gas to the surface;" the "flooding of oil sands by water;" and the "failure to extract gasoline from gas."  Harold C.

waste," which resulted when petroleum production exceeded market demand and thus drove prices below production costs.  In spreading the benefits of petroleum production, conservation did "not differentiate between present and future or between producer and consumer."[40]

28. Without the power of mandatory unitization (combining or merging leases that covered a single field into a single entity) provided by OCSLA to Interior, there was a chance that operators might withdraw oil so rapidly from a multiplicity of wells that they might deplete the reservoir's pressure or drive mechanism.  Production on one lease could "drain" oil and gas from beneath a separately owned adjacent lease or unleased tract, thus reducing the productivity of a reservoir and depriving the government of revenue from lost production over time.  Starting in the late 1950s, in addition to approving or requiring unitization, the BLM frequently held special "drainage sales" (as opposed to "general sales") where it leased OCS tracts that surrounded producing leases in order to protect deposits under those leases from being drained and their value diminished.  In 1960, Interior started rejecting bonus bids, even if they were above the minimum

Hanke, "The Need for Conservation of Oil and Gas," *St. Louis Law Review* 221 (1931): 225.

[40] Dan A. Bruce, "'Maximum Efficient Rate' – Its Use and Misuse in Production Regulation," *Natural Resources Lawyer* 9, no. 3 (1976): 453.

required bonus price per acre, if the BLM and Geological Survey regional supervisors determined that such bids were "either too low when compared to the bids offered for offsetting tracts, because of proximity to proven acreage or in an area believed to have greater productivity potential than indicated by the bid."[41] Officers at the Interior Department thus provided direction to lessees regarding when and where they drilled, and at what price, in order to protect the correlative rights of the federal government as the resource owner and trustee.

29. OCSLA also authorized Interior to "cooperate with the conservation agencies of adjacent states" in regulating hydrocarbon production rates from OCS wells.[42]  Under the interstate pro-rationing system coordinated through the Interstate Oil Compact Commission (formed in 1935), oil-producing states limited or "pro-rated" oil and gas production in their jurisdictions below the full "rated potential" of individual wells.  This was done in order to match petroleum output to estimated "market demand" and prevent the economic waste of oil and gas from competitive production.  The system was called "market-demand pro-rationing." Each state issued a maximum "allowable" rate of production for all wells, adjusted

---

[41] Oil and Gas Supervisor, Gulf Coast Region, to Chief, Conservation Division, Memorandum, April 21, 1961, CCF, 1959-1963, 1960 Sale – Bid Rejection, Box 284, RG 48.

[42] P.L. 83-31, 67 Stat., 464.

monthly for changing conditions of supply and demand.  The State of Louisiana

also issued well-spacing requirements and monthly "allowables" for wells in state

waters (within three miles).  Offshore allowables were usually higher than onshore

allowables, to compensate for higher fixed costs offshore, but were nevertheless set

below full capacity.  To ensure the uniform conservation of oil and gas reservoirs

that straddled the state-federal offshore boundary or that were within the disputed

OCS zones still under litigation (see "interim agreement" below), the OCS

supervisor under the Geological Survey directed leases in both the disputed and

undisputed zones to produce at allowable rates and under spacing requirements that

matched those set by Louisiana.[43]  Furthermore, a Supplemental U.S. Supreme

Court Decree of December 13, 1965, in the case of *United States v. Louisiana*,

required OCS lessees to produce in accordance with Louisiana's established

production allowables.[44]  The Department of the Interior thus exercised direct

---

[43] Dean A. McGee, "Economics of Offshore Drilling in the Gulf of Mexico," *Offshore Drilling* (February 1955): 16; Hollis Dole, Assistant Secretary of the Interior to Senator Edward Kennedy, April 1, 1971, CCF, 1969-1972, Federal Leasing Policy – 1971, Box 135, RG 48.  In 1960, Louisiana's allowable formula gave offshore wells an average bonus of 70 percent compared to onshore wells depending on "depth bracket," provided additional allowables for wells drilled on units of more than 40 acres, and required a minimum distance between the first two wells drilled in a new pool of 1,320 feet and minimum distance between wells and property lines of 600 feet.  U.S. Geological Survey, *Monthly Engineering Report*, Conservation Division, Oil and Gas Operations Branch, Gulf Coast Region, (November 1960), RG 57.

[44] 382 U.S. 288 (1965) 294-295.

control and supervision over the amount of oil and gas that lessees could produce on the OCS.

30. During the 1950s, national security considerations continued to shape the administration of oil and gas production on the OCS.  The BLM held three Gulf of Mexico lease auctions in 1954 and 1955 before the State of Louisiana obtained a court injunction against further sales.  Louisiana requested a more precise definition of its meandering "coastline" and an explicit determination of the state-federal boundary offshore, as well as a determination of the rights of "ownership," as distinct from "paramount rights," over offshore submerged lands.[45]  As leasing and drilling were postponed in the Gulf, a major disruption in international oil supply in 1956, caused by Egypt's nationalization of the Suez Canal, underscored the growing importance of oil supplies close to tidewater ports for U.S. oil security.  In other words, the Gulf of Mexico took on new strategic importance for both the United States and the major oil companies at the very moment that the renewed Tidelands conflict suspended leasing and development.[46]  Louisiana and

---

[45] Gregory Blaine Miller, "Louisiana's Tidelands Controversy: *The United States of America V. State of Louisiana* Maritime Boundary Cases," *Louisiana History* 38 (Spring 1997): 203-221.

[46] "Tidelands in Court . . . and in Conferences," *Oil & Gas Journal* (August 27, 1956): 64.

the federal government soon worked out a complicated "interim agreement" that

divided the Gulf into zones of overlapping jurisdiction for the purposes of dividing

and sharing public revenues from areas contested in court.  Offshore oil and gas

development, which was strongly desired by both parties, could not go forward

without at least a provisional territorial regime to guarantee the security of the

massive investments that such development would require.  The interim agreement

advanced the political and legal process to a point where conflicting claims to

submerged lands would no longer limit the pace and scope of offshore leasing.[47]

31. In the late 1950s, the outlook for continued oil extraction from the OCS

turned gloomy.  An economic recession, an oversupply of crude, a series of

hurricanes, and declining oil finds in deeper waters forced a slowdown in offshore

exploration.[48]  High-cost offshore oil, moreover, could not compete with massive

volumes of cheap Middle Eastern oil entering the global and U.S. markets.  In

order to protect higher-cost domestic oil from foreign competition, President

Dwight Eisenhower in 1959 imposed mandatory quotas, or limits, on oil that could

be sold in the United States from abroad.  By limiting crude oil imports to 12.2

---

[47] "Truce Loosens Offshore Straightjacket," *Oil & Gas Journal* (October 15, 1956): 84-86.

[48] R.O. Frederick, R. O. "Marine Drilling: The Future Remains Bright," *Drilling* (December 1959): 55-56; Jack Gremillion, *Louisiana Tidelands: A Comprehensive Study* (Baton Rouge: Office of the Attorney General, 1957).

percent of domestic production, the objective of the quota system was to promote enough of an increase in domestic oil reserves to shield the United States from future foreign supply disruptions.[49]  The expansion of oil extraction from the OCS was central to the national goal of displacing imported crude oil with domestically produced oil.

32. Still, even with the imposition of quotas, officials in the federal OCS program decided to give industry more incentives to take risks in exploring offshore.  In March 1962, the New Orleans BLM held an unprecedentedly large sale, offering 3.67 million acres for lease, more than all previous four sales combined.  Some Texas oil companies and congressmen, however, objected to holding such a large sale.  They worried about competition for onshore operations during a time of significant shut-in capacity.  In the early 1960s, oil supply in the U.S. market outstripped demand, which prompted state pro-rationing orders to restrict producing wells to an average of 30 percent of capacity.  Texas congressman Jim Wright feared that offshore oil development would force the postponement or cancellation of onshore operations.  He even went as far as to say

---

[49] Dwight D. Eisenhower, Statement by the President Upon Signing Proclamation Governing Petroleum Imports, March 10, 1959, The American Presidency Project, https://www.presidency.ucsb.edu/documents/statement-the-president-upon-signing-proclamation-governing-petroleum-imports; Proclamation 3279, "Adjusting Imports of Petroleum and Petroleum Products into the United States," 24 *Fed. Reg.* 49 (March 12, 1959), 1781.

that offshore oil development "at this time serves no national interest."[50]  But the

Department of the Interior insisted that it was "necessary to develop the technology

required to explore, drill, develop and produce oil from extreme water depths in the

outer Continental Shelf."  Interior explicitly defended the unusually large sale to

reticent Texans in terms of national interest.  "Unless some incentive is provided in

the form of acreage actually held under lease," Assistant Secretary John Kelly

wrote to Representative Wright, "it seems doubtful that the oil companies and

operators would undertake the expense and research necessary to perfect such

technology."  Kelly added that "It should be noted that the outer Continental Shelf

is part of the United States, and mineral development and production from the

shelf properly should be considered an integral part of our overall U.S.

production."[51]

33. At the March 1962 sale, oil companies acquired almost two million acres

of new leases, much of them in unprecedented water depths.[52]  As a result, total

offshore oil production from the Gulf of Mexico rose from 127.6 million barrels in

---

[50] Representative Jim Wright to Interior Secretary, Stewart Udall, March 2, 1962, CCF, 1959-1963, Box 284, RG 48.

[51] Assistant Secretary of the Interior, John Kelly, to Representative Jim Wright, March 9, 1962, CCF, 1959-1963, Box 284, RG 48.

[52] John W. Pittman, "It's A Boom!" *Offshore* 20, no. 3 (October: 9, 1963).

1962 (4.8 percent of total U.S. production) to 334.6 million barrels in 1968 (8.6 percent of the U.S. total), all but about 30 million barrels of this increase coming from federal areas.[53]

34. The value of the federal OCS program to U.S. energy security was further underscored in June 1967, when the Six-Day War between Israel and neighboring Arab states provoked the closure of the Suez Canal and an Arab oil embargo. Although a surge in U.S. oil output from an increase in pro-rationing allowables rendered the embargo ineffective, the curbing of crude exports from some Arab countries nevertheless alerted industry and government about the need to maintain U.S. production capacity in the event of future supply crises. The federal OCS was crucial to ensuring that capacity. "The impact of the OCS fossil fuel development on the national energy complex is becoming increasingly important," wrote J. Cordell Moore, Assistant Secretary for Mineral Resources, after the 1967 Arab oil embargo. Moore emphasized the tremendous resource potential of the OCS, not just off Louisiana and Texas, but also off California and Alaska. Particularly important going forward, Moore noted, was "the substitution of offshore sources for onshore and overseas supplies.[54] The Department of the

---

[53] U.S. Department of the Interior, "Petroleum and sulfur on the U.S. Continental Shelf," Internal Study, August 1968, CCF, 1969-1972, Box 134, RG 48.

[54] J. Cordell Moore, "Challenges and Opportunities on the OCS," *Our Public Lands* 18, no. 3 (Summer 1968): 18.

Interior could not have made clearer the value of the OCS to national energy strategy and security, well before the oil shocks of the 1970s.

35. At the same time, OCS officials faced pressure from White House officials to increase revenues from leasing to help plug holes in the federal budget created by expenditures on the Vietnam War.  Unlike onshore oil and gas leasing on federal lands, where each state was entitled to 37.5 percent of the revenue from resources extracted within its boundaries, one hundred percent of OCS proceeds were deposited in the federal treasury, under the heading, "miscellaneous receipts." After the 1967 Louisiana sale, President Lyndon Johnson instructed the Bureau of the Budget (forerunner to the Office of Management and Budget) "to make every attempt to produce additional revenues from Federal resources" and specifically pressed its director, Charles Schultze, about "what might be done to increase revenues from off-shore leasing."[55]

36. Congress also took renewed interest in the allocation of OCS revenues. In July 1968, President Johnson signed a bill sponsored by Washington Senator Henry "Scoop" Jackson to amend the Land and Water Conservation Fund (LWCF) Act of 1964 to double the Fund from $100 to $200 million per year and dedicate

_____

[55] Charles Schultze Memorandum for Stewart Udall, November 20, 1967, Tract Evaluation Folder, CCF, 1964-1968, Box 185, RG 48.

revenues from offshore leasing to cover the increase. Championed by Interior Secretary Udall, the LWCF had been created to assist States in acquiring and developing "outdoor recreation resources," such as public parks, and financing the acquisition of new federal lands, such as inholdings within existing national parks or wilderness areas. Henceforth, OCS revenues would become the primary source of funding for the LWCF, whose annual authorized limit steadily increased to $900 million by 1977.[56] Revenue from offshore oil development was important not just for the general treasury account, but also as a source of funding to protect and conserve other types of natural resources in the United States.

### The "Acceleration" of OCS Leasing and Development, 1970-1990

37. In October 1968, Under Secretary of the Interior David S. Black traveled to Jackson, Mississippi to give a major policy address to the Gulf Coast Association of Geological Societies, heavily populated by people working for offshore oil firms. After reflecting on the "significant milestones" in the past fifteen years of federal management over the OCS, Black asked a pointed question:

---

[56] Margaret Walls, "Federal Funding for Conservation and Recreation: The Land and Water Conservation Fund," Resources for the Future Backgrounder, January 2009.

"Are the resources being developed at the rate and in the manner that will yield maximum benefit to the total economy, to the regions affected, to national security, and to the public in its proprietary role?"[57]  He suggested that they were not. Going forward, Black announced, Interior would begin to undertake more systematic and independent efforts to ensure that the public was receiving more value for its resources.  He hinted that "private parties" might be asked to share their "cumulative knowledge" of OCS resources with the government.  He also asserted the federal government's right to impose its own production controls on the OCS, instead of following those set by the states.[58]

38. Three months after Black's address, in January 1969, a major blowout occurred on a platform in the Santa Barbara Channel, an event that prompted the first steps in overhauling the federal OCS program and better institutionalizing it as a key component of American energy policy.  The Geological Survey revised the OCS orders that had governed lease management, issuing more stringent

---

[57] Remarks of Under Secretary of the Interior David S. Black before 18th Annual Convention of Gulf Coast Association of Geological Societies, Jackson, Mississippi, October 24, 1968, "The Outer Continental Shelf – Its Promise and Its Problems," Professional File 1963-69 - OCS Leasing Policy: Required Transmittal of Data, Box 21, Vincent McKelvey Papers, American Heritage Center, University of Wyoming, Laramie, Wyoming.

[58] Ibid.

requirements for mandatory equipment, testing, and operating procedures.[59]  It

issued new orders prescribing the kind of equipment required for well completions

(Order No. 6), procedures for reporting oil spills and disposing of waste (Order No.

7), and design and operation criteria for platforms and structures (Order No. 8) and

oil and gas pipelines (Order No. 9).[60]  The Coast Guard and the Geological Survey

also assumed responsibility for enforcing new regulations issued by the

Occupational Health and Safety Administration (OSHA), created in 1970, that

established new standards for personnel safety on offshore drilling vessels and

facilities.[61]

39. The year 1970 was a major turning point for the OCS program.  As

federal officials refocused on improving safety, and environmental organizations

mobilized to halt offshore leasing and drilling off California, other constituencies

---

[59] Department of the Interior, "New Orders Will Regulate Oil, Gas and Sulphur Operations in the Gulf of Mexico," News Release, August 29, 1969, Folder: 1969 – Natural Resources Gas and Oil – Offshore Drilling Regulations, Box 852, T. Hale Boggs Papers, Louisiana Research Collection, Tulane University, New Orleans, LA.

[60] U.S. Department of the Interior, Geological Survey Conservation Division, Gulf of Mexico Area, *OCS Orders 1 thru 12 Governing Oil, Gas, And Sulphur Leases In the Outer Continental Shelf Gulf of Mexico Area.*

[61] Donald J. Solanas, Oil and Gas Supervisor, Pacific Region Memorandum to Chief, Branch of Oil and Gas Operations. U.S.G.S., September 16, 1971, Part 15, CCF 1969-72, Box 137, RG 48.

began to pressure the government to accelerate OCS leasing.  Heating oil supplies

ran low during the winter of 1969–1970, and electricity brownouts struck the East

Coast the following summer.  In August 1970, representatives from the public

utilities commissions of nine northeast states met with Secretary of the Interior

Walter Hickel to express their grave concerns about future natural gas supplies to

their region and suggest that Interior "revise its policies and practices with respect

to the petroleum leases" offered offshore.  They enumerated their suggestions as

follows: 1) "Schedule more frequent sales for potential gas acreage;" 2) "Require

accelerated exploration and development;" 3) Stretch out bonus bidding to "reduce

the capital barrier to entry" and "share the risk between the government and

company;" 4) "Prevent undue delays in production due to extension of leases;" 5)

"Require drilling on drainage leases [tracts adjacent to established production]

within 1 year;" 6) "Open new areas promising to gas development;" and 7)

"Require expeditious development of unitized leases."[62]

---

[62] Alan J. Roth, Executive Assistant to Joseph C. Swidler, Chairman, New York
State Public Service Commission to Hollis Dole, Assistant Secretary, Department
of the Interior, June 2, 1970, Federal OCS Leasing 1970 – Public Utilities, Natural
Gas, Central Classified Files, 1969-1972, Box 135, RG 48; "Suggest for Improving
the Supply of Natural Gas – A Basis for Discussion," Meeting with the Secretary
of the Interior, August 11, 1970, attachment to Representative Lowell P. Weicker,
Jr., to Walter J. Hickel, August 25, 1970, Federal OCS Leasing 1970 – Public
Utilities, Natural Gas, Central Classified Files, 1969-1972, Box 135, RG 48.  The
nine agencies consisted of the Connecticut Public Utilities Commission, Maine
Public Utilities Commission, Massachusetts Department of Public Utilities, New
Hampshire Public Utilities Commission, New Jersey Board of Public Utility

40. The adequacy of crude oil supplies also concerned public officials. Rapidly increasing demand outstripped available supply and shrank the spare capacity that state regulators and the Interstate Oil Compact Commission had maintained for nearly two decades.  In 1971, the United States could provide for just 75.8 percent of the petroleum liquids it needed.[63]  By the time Libya and other producing nations in the Middle East began renegotiating their concession agreements with major oil firms and moving to nationalize their reserves, the United States had grown strikingly vulnerable to even a small interruption of foreign oil imports.  The "specter of a shortage of energy" loomed on the horizon.[64] In response to possible shortages of both crude oil and natural gas, and addressing the concerns of northeast public utilities, President Richard Nixon directed his Interior Department on June 4, 1971 to rapidly expand industry access to OCS lands for exploration.  In what he called the first presidential message on energy ever sent to Congress, Nixon set out a wide-ranging plan, the most consequential

---

Commissioners, New York State Public Service Commission, Pennsylvania Public Utility Commission, Rhode Island Public Utilities Commission, and Vermont Public Service Board.

[63] Petroleum and Other Liquids Overview, 1949–2011, *Annual Energy Review 2011*, DOE/EA-0384 (Washington, DC: U.S. Energy Information Administration, September 2012).

[64] William D. Smith, "Shortages of Energy Continue," *New York Times* (January 10, 1971).

of which was its instruction to Secretary of the Interior Rogers C. B. Morton to launch an "accelerated program" of development on the OCS. Nixon ordered an increase in "the offerings of oil and gas leases," the expansion of leasing beyond the Gulf of Mexico to "other promising areas," and the issuance of a lease sale schedule for the following five years.[65]

41. The five-year lease schedule was a significant shift in OCS policy. It asserted greater federal power and control over the pace and location of development on the OCS. Whereas in the past, the BLM held general lease sales infrequently and only when officials believed there was enough industry interest, the establishment of a five-year schedule was intended to guarantee that national energy needs and priorities were met, above and beyond just those of industry. Eleven days after Nixon's message, Morton released an aggressive five-year schedule that called for twelve lease sales to be held by the end of 1975. In the Gulf of Mexico, two annual lease sales would replace the infrequent and sporadic general sales during the 1960s. Morton also directed the Bureau of Land

---

[65] Richard M. Nixon, "Special Message to the Congress on Energy Resources, June 4, 1971," in *Public Papers of the Presidents of the United States: Richard M. Nixon, 1971*, 709.

Management to convene public hearings on the possibility of auctioning tracts—for the first time—off the Atlantic and in the Gulf of Alaska.[66]

42. While the federal OCS program sought to expand lease sales and oil and gas output across the OCS, officials also reasserted federal control over the management of oil and gas production on wells in the undisputed areas of the federal OCS. On December 5, 1970, President Nixon and the Secretary of the Interior ordered the establishment of "the conservation jurisdiction of the Secretary over all lease operations of every kind including rates of production, on oil and gas leases in these areas."[67] As Under Secretary David Black had warned in 1968, Interior was now claiming independent control over oil and gas production rates on the OCS, rather than coordinating production restrictions with state conservation agencies as it had in the past. Previous directives requiring lessees to comply with conservation rules and regulations of state agencies were rescinded. In place of these, Interior issued OCS Order No. 11 (effective December 5, 1970), which specified, in the ongoing interest of conservation, standards for establishing a

---

[66] Attachment A, "Tentative Schedule—OCS Leasing, June 1971," in *Final Environmental Statement, Proposed 1972 Outer Continental Shelf Oil and Gas General Lease Sale Offshore Eastern Louisiana* (Washington, DC: Department of the Interior, Bureau of Land Management, June 16, 1972), 346.

[67] Department of the Interior, "Outer Continental Shelf – Conservation Jurisdiction in Undisputed Areas," 35 *Fed. Reg.* 236 (December 5, 1970), 18559.

government-approved ceiling on the rate of production from OCS oil and gas reservoirs. With state-regulated, market-demand pro-rationing coming to an end, as domestic demand began to outrun domestic production capacity, the regulatory emphasis in conservation at both the state and federal levels shifted away from preventing economic waste to minimizing physical waste.

43. OCS Order No. 11 rested on two standards for guiding the conservation of OCS petroleum resources: 1) the "Maximum Efficient Rate" (MER) of production for individual reservoirs; and 2) the "Maximum Production Rate" (MPR) for each well within a given reservoir. The MER was defined as "the maximum sustainable daily oil or gas withdrawal rate from a reservoir which will permit economic development and depletion of that reservoir without detriment to ultimate recovery."[68] In other words, MER was a maximum rate of production for a reservoir that was less than what a reservoir could produce if wells were allowed to flow at their full, naturally driven rate. The use of MER as a regulatory tool went back to World War II, when the Petroleum Administrator for War and state regulatory agencies coordinated conservation measures that included MER.[69] The

---

[68] U.S. Department of the Interior, Geological Survey Conservation Division, Gulf of Mexico Area, *OCS Orders 1 thru 12 Governing Oil, Gas, And Sulphur Leases In the Outer Continental Shelf Gulf of Mexico Area*, January 1975, 11-1-2.

[69] Bruce, "'Maximum Efficient Rate'," 441-442.

MPR, by contrast, was the "maximum daily rate at which oil may be produced" from an oil or gas well "completion" (the actions of bringing a well into commercial production).[70]  Even prior to OCS Order No. 11, operators were required to submit MPRs for individual wells on the OCS for approval by the supervisor.  MER and MPR were related in the sense that "the withdrawal rate from a reservoir shall not exceed the approved MER and may be produced from any combination of well completions subject to any limitations imposed by the MPR established for each well completion."[71]

44. The newly required MER was a calculated production ceiling that would theoretically enable the largest recovery of oil and gas over the life of the producing formation.  OCS Order No. 11 stated that "all producible oil and gas wells and reservoirs may be produced at daily rates not to exceed the Maximum Efficient Rate (MER)," except under specifically approved and temporary circumstances, in order to "provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein."[72]  Operators were required to submit a proposed MER

---

[70] OCS Order No. 11, 11-2.

[71] Ibid., 11-6.

[72] Ibid., 11-1.

from each producing reservoir to the supervisor for approval, as well as test and review the MER annually.  The supervisor would then approve any needed adjustments.[73]  Operators submitted the first complete set of MERs for the OCS to the Geological Survey regional supervisor for approval in July 1974.[74]

45. MER was a dynamic and imprecise concept that left wide discretion to the supervisor for employing it as a regulatory tool to restrict production from OCS wells.  A MER's value depended upon many factors, both engineering and economic, that changed as oil and gas were extracted from a reservoir over time. The key engineering factors were the character of the reservoir and natural drive mechanisms that brought oil and gas to the surface.  Mathematical equations and reservoir simulation computer models predicted how a given reservoir would perform over time.  Other engineering factors included well performance characteristics, the number and spacing of wells, platform and pipeline capacities, and maintenance requirements.  Economic factors were numerous and subjective: hydrocarbon price; ultimate recoverable reserves (which depended on price); cost of drilling, completion, and production; and other kinds of development decisions.[75]  Application of the MER concept often required the curtailment of

---

[73] Ibid., 11-3-11-4.

[74] Bruce, "'Maximum Efficient Rate'," 448-449.

[75] Ibid., 449-450.

production rates "when excessive water or gas is produced with the oil so that reservoir energy is conserved."[76]  In other cases, with the regulatory shift from pro-rated allowables to MER, as Robert Evans, U.S.G.S. Gulf coast regional supervisor, observed in 1971, "We expect some increase in production from certain wells and reservoirs, which were prorated below their maximum efficient rate."[77] MER added another critical dimension to the lease management responsibilities of the federal OCS regional supervisor.

46. OCS Order No. 11 gave the supervisor a significant degree of discretion in enforcing the new conservation rule.  The supervisor could approve the MER for a reservoir from "any combination of well completions subject to any limitations imposed by the MPR established for each well completion," to allow for "excess production" due to "normal variations and fluctuations" in well output, and to give a producer time to bring a reservoir that produced in excess of the MER into "balance."  Operators were required, however, to bring all overproduction into balance "during the next succeeding month."  The order stipulated that an operator with a reservoir "in an overproduction status for two successive quarters which has

---

[76] Hollis Dole, Assistant Secretary – Mineral Resources, Memorandum for John C. Whitaker, Enclosure, January 26, 1971, Federal Leasing Policy – 1971, CCF, 1969-1972, Box 135, RG 48.

[77] Cited in Bruce, "'Maximum Efficient Rate'," 450.

not been brought into balance within the balancing period shall be shut in from that reservoir until the actual production equals that which would have occurred under the approved MER."  The supervisor also had latitude to allow operators to make up for production ("production relief") that was lower than the MER: "If, as the result of storm, hurricanes, emergencies, or other conditions peculiar to offshore operations, an operator is forced to curtail or shut in production from a reservoir, the Supervisor may, on request, approve the makeup of all or part of this production loss."[78]

47. To minimize the waste of resources, OCS Order No. 11 also prohibited the flaring or venting of oil and gas from wells on the OCS.  The supervisor, however, also had discretion to approve the flaring or venting of a "small volume" or for a "short term" under certain exceptional conditions.[79]  These included the release of gas vapors from storage or low-pressure production vessels "if such gas vapors cannot be economically recovered or retained;" the "relief of abnormal pressure systems" during temporary emergency situations; and flaring or venting during the "unloading or cleaning up of a well and during drillstem, producing, or

---

[78] Ibid. 11-6-11-7.  The supervisor also had the authority to grant production relief under federal-state pro-rationing on the OCS in the event of similar interruptions in production.

[79] Ibid., 11-9.

other well evaluation tests not exceeding a period of 24 hours."  The supervisor also had discretion to approve flaring or venting "during routine and special well tests" other than those previously described.  Finally, the supervisor was allowed to approve applications for flaring or venting of "oil-well gas" [small amounts of gas produced in association with oil] for a period not exceeding one year if "(1) the operator has initiated positive action which will eliminate flaring or venting, or (2) the operator has submitted an evaluation supported by engineering, geologic, and economic data indicating that rejection of an application to flare or vent gas will result in an ultimate greater loss or equivalent total energy than could be recovered for beneficial use from the lease if flaring or venting were allowed."[80]

48. Shortly after the issuing of OCS Order No. 11, an inquiry by the Office of Management and Budget asked if, under the current oil and gas supply crisis, Interior should allow for the "total decontrol of Federal OCS Production levels." Interior responded emphatically that federal decontrol would be against national interests in conserving oil and gas resources: "Allowing wells to flow at their maximum capacity regardless of MER would generally yield a loss of some of the resource, if the companies did not themselves move to regulate production in order to protect their investments.  An intentional loss of substantial resource would be

---

[80] Ibid.

contrary to orderly resource development.  Under no circumstances should there be

total decontrol of Federal OCS production levels, if acceptable standards are to be

maintained."[81]  In these ways, Interior supervised, directed, and controlled the rate

of oil and gas production from reservoirs on the OCS and enforced the federal

government's responsibilities as a resource owner and trustee.[82]

49. Although environmental resistance to expanded OCS leasing emerged on

the East and West Coasts (animated by concerns that followed the Santa Barbara

blowout), Morton pushed ahead with lease sales in the Gulf and public hearings

elsewhere.  The energy situation deteriorated over 1972 and into 1973.  President

Nixon's advisors warned him in January that the energy crisis was "much deeper,

much broader, much more severe" than anybody realized.[83]  In April, Nixon

submitted a second major energy message to Congress, in which he announced an

end to the mandatory quota system and called again for boosting oil and gas

extraction from the OCS.  "Approximately half of the oil and gas resources in this

---

[81] Dole, Assistant Secretary – Mineral Resources, Memorandum for John C. Whitaker, Enclosure.

[82] The MER order for the OCS remained the same until 1988, when the MMS revised it to require MERs only on "sensitive" reservoirs, initially defined as "oil reservoirs with associated gas caps."  53 *Fed. Reg*. No. 63, 10761.

[83] John Connally, Oval Office conversation with President Richard Nixon, January 31, 1973, 4:52 pm, in Douglas Brinkley and Luke A. Nichter, *The Nixon Tapes 1973* (New York: Mariner Books, 2016).

country are located on public lands, primarily on the Outer Continental Shelf," the statement pointed out. Nixon then ordered a second acceleration of offshore oil and gas leasing, directing Rogers Morton to "triple" the acreage leased each year to reach three million acres annually by 1979, starting with expanded sales in 1974.[84] In July, the BLM revised its five-year leasing schedule, increasing the total number of offerings from twelve to fifteen and expanding the leasing map to encompass sales in Alaska's Lower Cook Inlet and the Bering Sea Strait for the first time.[85]

50. The specter of an oil shortage became reality in October 1973 when the Organization of Arab Petroleum Exporting Countries (OAPEC) embargoed oil shipments to the United States as punishment for U.S. support of Israel in the Arab-Israeli War. In two November prime-time Oval Office addresses, Nixon called for a national effort—on the scale of the Manhattan Project or the Apollo moon missions—to develop the "potential to meet our own energy needs without depending on any foreign energy sources" by 1980.[86] The specifics behind what

---

[84] Richard M. Nixon, "Special Message to the Congress on Energy Policy, April 18, 1973," in *Public Papers of the Presidents of the United States: Richard M. Nixon, 1973*: 306.

[85] "Provisional Outer Continental Shelf Leasing; Provisional Schedule," 38 *Fed. Reg.* 132 (July 11, 1973), 18473.

[86] Richard M. Nixon, "Address to the Nation About Policies to Deal with the Energy Shortages, November 7, 1973," in *Public Papers of the Presidents of the United States: Richard M. Nixon, 1973*: 920.

Nixon termed "Project Independence" remained unclear until January 23, 1974, when the president sent yet another energy message to Congress. His plan outlined a long list of administrative actions, legislative proposals, and research and development goals similar in substance to what he had first proposed in 1971. The most immediate action Nixon could promise was to further accelerate the production of domestic crude oil. Once again, the federal OCS program was the centerpiece of this effort. The president directed Secretary Morton to "increase the acreage leased on the Outer Continental Shelf to ten million acres beginning in 1975, again more than tripling what had previously been planned."[87] The Federal Energy Administration-sponsored *Project Independence Report*, published in November 1974, underscored the importance of the OCS by forecasting that a large percentage of unproven reserves of oil and gas would likely come from accelerated leasing in the OCS frontier areas off the Atlantic, Pacific, and Alaska, and the military exclusion zone in the eastern Gulf of Mexico.[88]

51. Nixon's ten-million-acre announcement was impractically optimistic, and critics raised questions about the OCS program's capabilities to ensure safety

---

[87] Richard M. Nixon, "Special Message to the Congress on the Energy Crisis, January 23, 1974," in *Public Papers of the Presidents of the United States: Richard M. Nixon, 1974*, 29.

[88] Federal Energy Administration, *Project Independence Report* (Washington, DC: Government Printing Office, November 1974).

and environmental protection under such an aggressive mandate.  The passage of major environmental statutes, such as the National Environmental Policy Act (NEPA) of 1969, had transformed the federal role in governing activities that impacted air, water, and land or extracted resources from federal public lands, including, principally, offshore oil and gas.  Prior to the OAPEC oil embargo, many bills introduced in Congress went as far as restricting or banning oil and gas extraction on the OCS for environmental reasons.[89]  After the embargo, however, the drive for greater national self-sufficiency in energy overtook the political impulse to restrict offshore drilling.

52. Compromise efforts to revise OCSLA proceeded in Congress. Legislators introduced numerous bills in the 93rd Congress (1973-1975) to overhaul OCSLA.  Many aimed essentially to overturn the Tidelands decisions.  A proposal from Senator William Hathaway (D-ME) would have redirected 60 percent of the federal take to the adjacent coastal state and given each coastal governor an effective veto on opening its attendant OCS area to oil and gas leasing.  Senator Scoop Jackson's Energy Supply Act, the most comprehensive bill of the lot, sought to make OCS oil and gas "available as rapidly as possible," provided it was done with an eye to environmental protection and the return of "fair market value" to the

---

[89] "Heavy Backlog of Ocean-Related Bills Stacks up in Congressional Hoppers," *Offshore* (March 1972): 40, 43.

government.  Jackson's proposal required permittee disclosure of proprietary geological and geophysical data and directed the Secretary of the Interior to undertake a "survey program" of offshore resources by conducting or contracting out stratigraphic drilling.[90]  In January 1975, South Carolina Senator Fritz Hollings introduced a bill that would have further advanced a "federal exploration program" on the OCS.  In essence, Hollings called for the creation of a national oil company that would "conduct this program by using the same drilling and exploration firms that are usually hired by oil companies."[91]

53. Around the same time, in April 1974, separate hearings took place in the Senate Committee on Commerce on a bill that would have formally established a "Federal Oil and Gas Corporation."  "Fogco" was to be "owned by the federal government" and "in case of any shortage of natural gas or oil and serious public hardship, could itself engage in production on Federal lands in sufficient quantities to mitigate such shortage and hardship."  Fogco would have been allowed to request the right to develop oil and gas on the Outer Continental Shelf, provided it

---

[90] S.2922 and S.3211 in U.S. Senate, "Outer Continental Shelf Oil and Gas Development," *Hearings before the Senate Subcommittee on Minerals, Materials and Fuels, Committee on Interior and Insular Affairs*, 93rd Cong., 2nd sess. (May 6, 1974), 3-111.

[91] United States Congress, *Congressional Record—Senate,* 94th Congress, 1st Session, January 27, 1975, S903-911.

not be granted more than 20 percent of such rights offered for sale or lease.  It would have been equipped to employ the "best available geological and geophysical technology" to engage in exploration and also been permitted to store oil and gas in "strategic reserves" for use during an emergency.[92]  Some economists at the time believed that this might be the best way to encourage the exploration and development of new reserves.[93]  In the end, the Fogco proposal met strong opposition from various quarters of the private sector, but some of the principles that motivated it and other proposed OCSLA reforms found their way into policy.

54. One was a requirement that OCS lessees share geographical and geophysical (G&G) information with the BLM and Geological Survey.  Federal officials had long regarded Interior's lack of such information as the "most serious weakness" of its pre-lease-sale procedures.[94]  G&G data was deemed necessary for Interior to evaluate the resource potential of unleased areas of the OCS to be better assured of receiving fair market value for leases sold at auction.  Interior did not

---

[92] U.S. Senate, "Consumer Energy Act of 1974," *Hearings Before the Committee on Commerce*, 93rd Cong., 2nd sess. (April 22, 1974), 46-61.

[93] Robert S. Pindyck, "Should the Federal Government Enter the Oil Business?" *Challenge* 19, no. 2 (May/June 1976): 48-51.

[94] Draft – Outer Continental Shelf Leasing Policy Study, November 20, 1968, Professional File – OCS Leasing Study Draft, Box 21, McKelvey Papers.

have the funds to finance its own collection of G&G data or purchase such data from contractors.  In June 1976, after many years of study and comment, Interior issued a rule that required operators to submit most of their G&G data and interpretations to the OCS supervisor.  In order to protect companies' proprietary interests, most of that data would not be made publicly available until ten years after the issuance of the permit, or as long as the lease remained in effect, whichever was shorter, "unless the Supervisor with the approval of the Director determines that earlier releases of such information is necessary for the proper development of the field or area."[95]  The G&G rule was an important step in directing OCS permittees to assist the federal government in assessing the kind, location, and extent of the nation's resources on the OCS.

55. Congressional deliberations to reform OCSLA ruled out giving the government a direct role in exploring for oil and gas on the OCS, but they still reinforced the independent power and authority of Interior over the OCS.  A compromise bill finally emerged in the form of the OCSLA Amendments of 1978 (OCSLAA), which was wide-ranging in scope and approved by substantial

---

[95] Geological Survey, Department of the Interior, 41 Fed. Reg. 122 (June 23, 1976), C.F.R. §250.97, 25893.  Exceptions to the rule specified that "information identifying hydrocarbon shows or environmental hazards will be released immediately and information obtained from a deep stratigraphic test would be released five years after completion of the well and, in certain instances, earlier." 41 Fed. Reg. 122 (June 23, 1976), C.F.R. §250.97, 25892.

bipartisan margins in both houses of Congress.[96]  Most broadly conceived, the

OCSLAA sought to achieve "a proper balance between the potential for

environmental damage, the potential for the discovery of oil and gas, and the

potential for adverse impact on the coastal zone" when making leasing decisions.[97]

Even so, there was no mistaking which of the OCSLAA's aims was first among

equals.  Its primary aim was to "result in [the] expedited exploration and

development of the Outer Continental Shelf in order to achieve national economic

and energy policy goals, assure national security, reduce dependence on foreign

sources, and maintain a favorable balance of payments in world trade."[98] The law's

seemingly more restrictive provisions were put in place to help encourage broad

acceptance of this goal.  Legislators in the House explained that the stiffening of

safety and environmental requirements was a means of reducing red tape,

minimizing delays, and providing offshore operators with "greater certainty about

the political environment in which they are operating."[99]  Provisions for state and

---

[96] The Senate voted to approve the conference report 82–7; the House, 338–18, https://www.govtrack.us/congress/votes/95-1978/s987 and https://www.govtrack.us/congress/votes/95-1978/h1340.

[97] Outer Continental Shelf Lands Act Amendments of 1978, P. L. No. 95-372 (1978), 92 Stat. 655, 92 Stat. 650.

[98] P.L. 95-372, 92 Stat. 631.

[99] House of Representatives, *Report on the Outer Continental Shelf Lands Act Amendments of 1977*, 95th Cong., 1st sess., H.R. Rep. No. 95-590, at 48 (1977).

local involvement in federal decision-making were crafted in large part to "limit frivolous lawsuits and expedite all court actions" brought against the Interior Department for resolution.[100]

56. Central to achieving this goal was the OCSLAA's requirement that the Interior Department set, "as precisely as possible, the size, timing, and location of leasing activity" for a five-year period, in order to "best meet national energy needs."[101]  The requirement of a five-year leasing schedule provided regularity to the offshore program and demonstrated to the industry that the federal government was committed to providing predictable and stable access to the OCS, in order to promote the growth of offshore operations.  As noted above, the idea of a five-year plan had first come about in response to the energy crunch in 1971 to assure that national energy needs and priorities were met.  The OCSLAA enshrined this principle into law.

57. The OCSLAA transformed the federal OCS program by adding new provisions that aimed to speed up oil and gas development.  The new language regarding a lessee's submission of exploration plans required the Secretary to

---

[100] Ibid, 50.

[101] 92 Stat 649, 43 U.S.C. § 1344.

approve or reject a proposed plan within 30 days of submission.[102]  The

amendments required the submission of "development production plans" once oil

or gas was discovered on a lease for most areas of the OCS, except for the "Gulf of

Mexico," where most offshore activity took place, under the rationale that the oil

and gas industry in the Gulf of Mexico was mature, and therefore environmental

risks were better known than they were in "frontier" regions.[103]  Both of these

provisions compressed the process of regulatory review in the Gulf in order to

shorten the time from lease acquisition to first oil and gas production in the event

of a discovery.

    58.  The OCSLAA gave the Secretary of the Interior other kinds of decision-

making power to meet the national energy goal of accelerating production from the

OCS.  Although the Act required "the use of the best available and safest

technologies which the Secretary determines to be economically feasible, wherever

failure of equipment would have a significant effect on safety, health, or the

environment," it also gave the Secretary the authority to make exceptions, when

"the incremental benefits are clearly insufficient to justify the incremental costs of

utilizing such technologies."[104]  In addition to empowering the Secretary with

---

[102] 92 Stat 649, 43 U.S.C. § 1340 (c) (1).

[103] 92 Stat 649, 43 U.S.C. § 1351 (a).

[104] 92 Stat. 655, 43 U.S.C. § 1347 (b).

traditional enforcement actions, such as lease cancellation and criminal and civil penalties,[105] the OCSLAA permitted Interior to prohibit the submission of lease bids "if the Secretary finds, after notice and hearing, that the bidder is not meeting due diligence requirements on other leases."[106]  In other words, if found to be withholding oil and gas from the market by not meeting the obligation to produce from a lease, an operator could be disqualified from bidding in future lease sales. "It seems that in exercising control over public resources, the federal government must be given at least some of the powers of a private landowner to increase revenues and manage effectively," wrote legal analysts about this provision in the amendments.[107]

59. Yet other provisions in the OCSLAA were also designed to increase domestic energy supply.  A prohibition on joint bidding ventures between majors, first put into statute by the Energy Policy and Conservation Act (EPCA) of 1975, was reaffirmed in the OCSLAA.  The amendments further required the Secretary of the Interior to offer between 20 and 60 percent of OCS acreage in the five years

---

[105] 92 Stat. 655, 43 U.S.C. § 1334 (a).

[106] 92 Stat. 655, 43 U.S.C. § 1351 (d).

[107] Robert B. Krueger and Louis H. Singer, "An Analysis of the Outer Continental Shelf Lands Act Amendments of 1978," *Natural Resources Journal* 19, no. 4 (1979): 921.

after enactment under a bidding system alternative to the traditional variable-bonus, fixed-royalty method, "unless the Secretary determines that the requirements set for . . . are inconsistent with the purposes and policies of this Act."[108]  While both the joint bidding ban and alternative leasing methods were in part aimed at ensuring the government received fair market value for its resources, their primary goal was to support the continued survival of small and independent operators on the OCS, whose diminished competitiveness in offshore lease sales in the 1970s raised the fears that they would be driven out of the basin, reducing overall drilling and development activity, and thus undercutting domestic oil and gas production.

60. The OCSLAA also reaffirmed Interior's right to take royalties paid by lessees "in-kind" and authority to offer this royalty oil to "small or independent oil refiners," again as a way of ensuring competitiveness throughout the larger oil and gas industry.  During 1976-1982, Interior collected more than 237 million barrels of crude oil through the Royalty-In-Kind Program and sold it to small refiners who often had difficulty obtaining steady supplies of oil at affordable prices under the system of price regulation in place during that time.[109]  The federal government

---

[108] 92 Stat. 642.

[109] "Interior Sells Offshore Crude to Small Refiners," Minerals Management Service Press Release, October 7, 1983, MMS Press Releases –1980-1983, Box 1,

thus played an active role in directing the allocation of crude oil produced on the OCS during the post-embargo energy crises.

61. In the meantime, the Energy Policy and Conservation Act of 1975 shaped the administration of the OCS in other ways as a vehicle for national energy security.  In addition to introducing landmark conservation measures, EPCA banned crude oil and natural gas exports from the United States. Thereafter, until December 2015, when the ban was finally lifted, all oil and gas production in the United States (with certain exemptions), including that from the OCS, had to be destined for the U.S. market.[110]  EPCA also established the Strategic Petroleum Reserve for storing up to one billion barrels of petroleum in order to shield the United States from "near-term disruptions in supplies of petroleum products or to carry out obligations of the United States under the international energy program" – an idea that had been part of the Fogco proposal.[111]  During the 1990s and 2000s, the federal government frequently used OCS royalties-in-kind to replenish the SPR.

62. The federal OCS program's importance to achieving national energy

---

Public Relations Records, Records of the Minerals Management Service, RG 473, U.S. National Archives and Records Administration, College Park, MD.

[110] Public Law 94-163, 89 Stat. 877-878.

[111] Public Law 94-163, 89 Stat. 881.

independence was elevated once again during the renewed energy crisis that

engulfed the presidential administration of Jimmy Carter.  Mass demonstrations by

Islamic forces loyal to the Ayatollah Khomeini in Iran that had driven the Shah of

Iran from power in January 1979 resulted in a dramatic reduction in oil exports

from that nation.  In March 1979, a partial meltdown of a reactor at the Three Mile

Island nuclear facility in Pennsylvania reinforced anxiety about energy policy and

availability.  On April 5, 1979, in his second energy address to the nation from the

Oval Office, Carter vowed to "step up exploration and production on Federal

lands."[112]  Shortly thereafter, Secretary of the Interior, Cecil Andrus, issued a

memorandum to the leaders in his department, explaining that the president "has

directed me to propose additional acreage to that in the new 5-year OCS leasing

schedule . . . .  I believe that what the president expects is for us to increase the

chances of producing more OCS oil and gas in order to reduce reliance on insecure

and expensive imports . . . .  I want to be certain that we make the best effort we

can to move quickly into frontier areas where the potential for hydrocarbon

discovery is highest."[113]

---

[112] President Jimmy Carter, "Energy Address to the Nation," April 5, 1979, Online by Gerhard Peters and John T. Woolley, The American Presidency Project https://www.presidency.ucsb.edu/node/249678.

[113] Secretary of the Interior, Memorandum to Solicitor; Assistant Secretary, Land and Water Resources; Assistant Secretary, Energy and Minerals; Assistant Secretary for Fish and Wildlife and Parks; Assistant Secretary, Policy, Budget, and

63. As Carter initiated a phased deregulation of oil prices, American motorists dashed to top off their tanks.  Long lines reappeared at gas stations, as they had in 1973, and some states imposed odd-even-day gas rationing.  On July 15, 1979, Carter addressed the nation in his "Crisis of Confidence" speech (sometimes referred to as the "malaise" speech), outlining plans to cut oil imports in half by the end of the 1980s and to promote energy efficiency.  He also asked Congress to give him the authority to "cut through the red tape, the delays, and the endless roadblocks to completing key energy projects."[114]  These projects included oil and gas extraction on the OCS.  In June 1980, Secretary Andrus approved the first Five-Year OCS Plan under OCSLAA, for the years 1980-1985, which called for 36 lease sales and an acceleration of leasing in "frontier" areas.  This amounted to more than seven sales per year, totaling 55 million acres, much more than ever offered before.[115]  "The Outer Continental Shelf of the United States represents one

---

Administration, Director, Bureau of Land Management; Director, Geological Survey; Director, Fish and Wildlife Service, Subject: President's Energy Message – Enhance Production from the OCS, April 12, 1979, in U.S. Senate, "OCS Oversight of 1978 Amendments—Part 1," *Hearings Before the Select Committee on the Outer Continental Shelf*, 96th Cong. 1st sess. (May 7, 1979), 629.

[114] Jimmy Carter, Energy and the National Goals – A Crisis of Confidence, July 15, 1979, American Rhetoric, Top 100 Speeches, https://www.americanrhetoric.com/speeches/jimmycartercrisisofconfidence.htm.

[115] U.S. Bureau of Land Management, *Final Environmental Statement, Proposed Five-Year OCS Oil and Gas Lease Sale Schedule, March 1980-February 1985*, (Washington: Department of the Interior, Bureau of Land Management, 1980).

of the keys to eliminating the energy dependence which has made us so vulnerable," said Under Secretary of the Interior James Joseph, before the first meeting of the OCS Advisory Board on December 6, 1979.  "Of all our present and potential energy sources oil and gas remain our cheapest, cleanest, most flexible and transportable resource.  In this context then the Outer Continental Shelf oil and gas program of the Department of the Interior is important not just to the department, not simply to the President, not simply to the industry, but it is important to the American people."[116]

64. The push to expand and accelerate leasing and exploration of the OCS received new impetus yet again under the Presidential Administration of Ronald Reagan, who took office in January 1981.  Reagan's secretary of the interior, James Watt, immediately implemented a thorough reorganization of the federal OCS program and its leasing system.  In 1982, he merged the OCS offices of the BLM and Geological Survey's Conservation Division into a newly created Minerals Management Service (MMS), in order to assure greater fiscal

_____

During 1954-1969, the DOI had held 1.3 sales per year, increasing to 3.1 sales per year during 1970-1979.

[116] U.S. Department of the Interior, Outer Continental Shelf Advisory Board, Transcript of Proceedings of the Plenary Session of the OCS Advisory Board Meeting, December 6, 1979, Norfolk, VA, 20, Committee and Conference Records, Box 1, RG 473.

accountability for royalty collection and to act as a single, coordinated "policy implementing apparatus" for the Outer Continental Shelf and federal lands at large.[117]  He also introduced a new system of "area-wide leasing," which opened entire regional "planning areas" for lease at each sale, as opposed to the rationing of a selected number of industry-nominated tracts in previous sales.  "The imperative need for an accelerated OCS leasing schedule is the result of too much dependence on imported energy," testified Interior Assistant Secretary for Policy, Budget, and Administration J. Robinson West.[118]  Top officials at Interior expected that area-wide sales would lead to a vibrant rebound of domestic U.S. oil output.

65. Watt's five-year leasing program (1982-1987) dramatically increased the scale, scope, and pace of the offshore leasing program in an unprecedented way. Whereas the schedule approved by Cecil Andrus in 1980 planned to offer 55 million acres for sale over the course of five years, Watt's new schedule, which superseded Andrus's, set out to offer 890 million acres.  Interior justified the

---

[117] Don E. Kash, "Lease Management Activities in the Geological Survey," Commission on Fiscal Accountability of the Nation's Energy Resources. National Archives and Records Administration. U.S. Department of the Interior, Technical Reports, 1981–1982, File 239, Box 10, RG 48.

[118] J. Robinson West Testimony, U.S. Congress, House, 97th Cong., 1st sess., OCS Oversight – Part 2, on OCS Oversight and Related Issues, *Hearings Before the Subcommittee on the Panama Canal/Outer Continental Shelf of the Merchant Marine and Fisheries*, June 2, September 22, and October 28, 1981, 101.

scheduling of such large sales in nearly every OCS planning area in two ways. First, the new system was necessary for the United States to compete for capital investments in offshore development. Even though offshore production had been pioneered in the Gulf of Mexico, by the end of the 1970s the basin was locked in fierce competition with several offshore markets around the world for exploration and production investment dollars. The United Kingdom and Norway had opened up very large portions of their continental shelves for lease under policies similar to area-wide leasing. Brazil and West African countries also aggressively promoted drilling off their coasts and offered lease blocks much larger than the United States.[119] Flows of firms and capital soon followed suit. By the mid-1970s, roughly 75 percent of the globe's offshore drilling rigs were located outside of the United States.[120] The large amount of acreage offered for sale under area-wide leasing drove down the average auction price of bonus bids so that offshore operators could afford to acquire larger lease positions (comparable to those in other countries), in more expensive water depths and locations, and invest the savings in advancing offshore technology.

---

[119] Harry Wassall, "Government Indifferent to Need for Offshore Oil Exploration," *Oil & Gas Journal* (May 5, 1980), 221.

[120] "All Offshore Areas of the World Show Gains and Development," *Offshore* (December 1974): 51.

66. Second, Secretary Watt pointed out that only a very small percentage of promising areas of the U.S. OCS had ever been explored for oil and gas, and thus the nation needed to encourage greater exploration on the OCS in order to "inventory" its offshore resources.[121]  In 1981, the USGS, the Rand Corporation, the American Association of Petroleum Geologists, and the National Petroleum Council all submitted estimates of "undiscovered recoverable petroleum resources" to the new administration, and all pointed to areas on the federal OCS as holding the most promise.[122]  "Here we face the decade of the 1980s," Watt testified before Congress in June 1981, but we "do not know the extent of our mineral potential within the continental United States."  Watt added, "The President is vitally interested in the development of national energy self-sufficiency, and views acceleration in offshore leasing as an integral part of his economic recovery program."[123]  The recruitment of oil and gas firms in helping to inventory the OCS

---

[121] James Watt Testimony, U.S. Congress, House, 97th Cong., 1st sess., OCS Oversight – Part 2, on OCS Oversight and Related Issues, *Hearings Before the Subcommittee on the Panama Canal/Outer Continental Shelf of the Merchant Marine and Fisheries*, June 2, September 22, and October 28, 1981, 49.

[122] American Association of Petroleum Geologists, Select Committee on the OCS, Report on Expediting the Development of Petroleum Resources on the U.S. Federal Offshore, Submitted to the Honorable James G. Watt, Secretary of the Interior, May 26, 1981, RH MS 546, Box 47:2, Hollis Hedberg Papers, Kansas Collection, University of Kansas Libraries, Lawrence, KS.

[123] Watt Testimony, OCS Oversight – Part 2, on OCS Oversight and Related Issues, 49.

thus had both larger security and economic objectives.

67. The other notable policy shift under Reagan that enabled the expansion of offshore drilling was the extension of U.S. sovereign claims over larger marine territory.  In March 1983, two months before the first area-wide lease sale in the Gulf of Mexico, President Reagan provided a more secure legal and political foundation for the new system.  Presidential Proclamation 5030 declared a 200-mile "Exclusive Economic Zone" (EEZ) along the entirety of the U.S. continental margin.[124]  Reagan based his authority for this proclamation on the newly codified Law of the Sea convention.  Completed in 1982, the third United Nations Law of the Sea Conference had produced a convention that allowed coastal nations to claim a legal continental shelf out to 200 nautical miles, even if the geologic continental shelf did not extend that far, and it created a process by which states could extend their continental shelf beyond 200 miles based on certain geographic and geologic criteria.  Member nations could assert an "exclusive economic zone" over their continental shelf, where they retained "sovereign rights for the purpose of exploration and exploiting, conserving and managing the natural resources,

---

[124] "Proclamation 5030—Exclusive Economic Zone of the United States of America," 48 *Fed. Reg*. 48 (March 10, 1983), 10605.

whether living or non-living."[125]  The new U.S. EEZ formally expanded U.S. rights

beyond the edge of the continental shelf, where the U.S. government was pushing

oil companies to explore for new reserves.  Although the United States had played

an instrumental role in shepherding the Law of the Sea Convention to passage in

the United Nations, Reagan did not sign it, largely because of strong objections to

its provisions for the global sharing of deep sea-bed minerals located beyond the

EEZs.[126]  Nevertheless, Reagan's declaration of the EEZ certified the territorial

integrity under international law that oil and gas firms needed before committing to

billion-dollar investments in deeper waters.

68. The U.S. policy of area-wide leasing under the new EEZ framework

transformed U.S. offshore energy development in two ways.  First, it made it

possible for oil companies to invest in more expensive, deeper waters to search for

oil and gas.  Not until companies possessed such extensive acreage did they have

the incentive to develop and refine advanced technologies that they had on their

drawing boards.  Without such lease inventories, boards of directors would not

have approved the large capital outlays needed to test new concepts for deepwater

---

[125] United Nations Convention on the Law of the Sea, December 10, 1982, 1833 U.N.T.S., 418.

[126] George D. Haimbaugh, Jr., "Impact of the Reagan Administration on the Law of the Sea," *Washington & Lee Law Review* 151 (Winter 1989), https://scholarlycommons.law.wlu.edu/wlulr/vol46/iss1/6.

drilling and production.  After the oil price collapse of 1985-1986, the MMS gave

further impetus to deepwater exploration by lowering the minimum bonus bid for

all leases in water depths past 400 meters from $150/acre to $25/acre.[127]  The

softening of demand for crude and a series of lackluster sales between 1986 and

1987 convinced officials that the higher minimum bid level was an "undue

constraint" on the industry.[128]  Interior's administration of the area-wide leasing

system enabled firms with novel strategies for seismic exploration and deepwater

production to thrive in the economically challenging low-oil-price climate of the

mid-1980s and 1990s.

69. The reform of the leasing system led to major discoveries in the

deepwater Gulf (deeper than 400 meters or 1,300 feet of water) by the late 1980s,

the development of which reinvigorated the entire oil and gas complex from

Brownsville, Texas to Pascagoula, Mississippi in the 1990s.  Once derided as the

"Dead Sea" after a twenty-year decline in production, the Gulf of Mexico emerged

in the 1990s as one of the hottest plays in the world.[129]  The area-wide leasing

---

[127] Minerals Management Service, Outer Continental Shelf Oil & Gas, *5-Year Leasing Program Mid-1987 to Mid-1992*, Proposed Final, April 1987, 16.

[128] "More Incentives Are Needed to Bring Forth Frontier Oil," *Offshore* (March 1986).

[129] Priest, *The Offshore* Imperative, 180-226.

reform of the early 1980s accomplished what its designers had intended, which was to stimulate a vibrant market for leases, spur investment, and enlarge domestic sources of oil and gas.

70. The second transformation spurred on by area-wide leasing was an onslaught of litigation that challenged the expansion of offshore leasing as a threat to the environmental and recreational health of American coastlines.  As coastal states outside the Gulf of Mexico and environmental organizations lost major legal challenges to the Andrus and Watt five-year plans in federal court, they turned to legislative fixes to inhibit or prevent the expansion of offshore drilling beyond the Gulf of Mexico.  Starting in Fiscal Year 1982, coastal-state congressional representatives began attaching riders or limitation clauses on annual appropriations bills that emerged from the House, restricting Interior's activity along parts of the OCS.  Congress progressively expanded its "moratoria," withdrawing increasingly large portions of OCS acreage every year until 1990, at which point virtually the entire Atlantic and Pacific coasts were off-limits to development.  Acreage withdrawals were put in place over most of the eastern Gulf of Mexico in 1984, and smaller amounts taken off the table over Alaskan waters starting in 1989.  In 1990, President George H.W. Bush issued an executive withdrawal of OCS lands off both coasts until 2000, under the authority of the Antiquities Act.  President Bush also delayed and canceled several lease sales

planned for 1989 and 1990 off California and Florida and initiated the buy-back of leases in the eastern Gulf of Mexico.  In 1998, President Clinton extended the Bush moratorium through 2012.

71. During the 1970s and 1980s, the vast majority of organized opposition to offshore drilling in the United States did not focus on climate change.  Rather, opposition centered on concerns about the threat of oil spills to coastlines, marine life, and the communities that depended upon them.  After James Hansen, chief scientist at NASA's Goddard Institute for Space Studies, testified before the Senate in June 1988 on the subject of climate change, the Department of the Interior immediately formed a high-level working group to examine how action to address the issue might impact the department's resource management and responsibilities. MMS director, William Bettenberg, informed the deputy assistant secretary for land and minerals management in Interior that action to address climate change would most likely shift energy use from coal to cleaner-burning oil and gas, and therefore result in greater demand for hydrocarbons from the OCS.[130]

---

[130] Deputy Assistant Secretary for Land and Minerals Management (Griles) to Directors of MMS, BLM, OSMRE, July 28, 1988, Request for Assistance on Climate Change Issue; and Director, MMS (Bettenberg) to Deputy Assistant Secretary – Land and Minerals Management, August 22, 1988, ENV 4 – Environmental and Ecological Data Collection, FY 1988, Box 1, Mission Subject Files 1987-1988, UD-10W7, Records of the Minerals Management Service, RG 473.

## The Renewal of the OCS, 1990-2015

72. As large sections of the U.S. OCS were closed off to leasing and drilling, the federal OCS program in the early 1990s focused on the one proven OCS province that was still open -- the central and western Gulf of Mexico -- as the most likely place to expand U.S. domestic oil and gas reserves. By this time, the offshore oil industry was suffering under low crude oil prices. Production of oil and natural gas from the Gulf of Mexico was in decline, and proven reserves in the United States as a whole were also trending downwards. Unemployment in the petroleum-rich regions of Louisiana had reached 20 percent after the price crash in 1986. Industry supporters in Congress and the MMS searched for ways to provide incentives to companies that had discovered deepwater hydrocarbon deposits, thanks in part to the area-wide leasing reform, but which could not afford the massive capital investments needed to develop those discoveries. In August 1992, Louisiana Senator Bennett Johnston introduced the "Outer Continental Shelf Deep Water Production Incentives Act," which amended Section 8 of the OCSLAA to allow the Secretary of the Interior to exempt royalty payments on oil and gas production from deepwater leases (200 meters or greater) "until the capital

investment costs related to such production have been recovered by the lessee out of proceeds from such lease."[131]

73. Minerals Management Service director, Scott Sewell, testified before Johnston's committee in 1992 that he had grave concerns about the viability of continued oil and gas growth in the Gulf of Mexico. Recent lease sales—still held under the area-wide approach—had deeply disappointed those in the agency, as bonus bid revenues fell to near-historic lows. Sewell explained, "I do not think anybody expected really how far things have fallen and how bad the situation has gotten . . . particularly in the Gulf of Mexico, which is really the bread and butter of the entire OCS program."[132] Sewell estimated that as much as 50 percent of deepwater discoveries not already producing could become newly economical if given an additional financial incentive.[133] Sewell also expressed one concern that added another dimension to the debate: he feared that a sustained slump in the deepwater exploration and production market could gut the entire offshore industry

---

[131] U.S. Congress, Senate, "Outer Continental Shelf Deep Water Production Incentives Act," S. 3127. *Hearings Before the Committee on Energy and Natural Resources*, 102nd Cong., 2nd sess., August 11, 1992.

[132] Testimony of Scott Sewell, U.S. Congress, Senate, Outer Continental Shelf Deep Water Production Incentives Act, *Hearings Before the Committee on Energy and Natural Resources*, 102nd Cong., 2nd sess., August 11, 1992, 20.

[133] Ibid., 23.

in the United States.  Such an occurrence would be detrimental to domestic energy and national security alike.  Speaking to the job losses suffered in the Gulf of Mexico since the mid-1980s, Sewell said, "A decline of this magnitude poses long-term dangers to the industry and its ability to recover.  Even if the operating outlook of the industry were to improve dramatically, it would take many years to reacquire the specialized scientific, engineering, and technical skills of the people that have moved out of the industry over the last decade."[134]  Even though crude oil supplies appeared abundant and prices low, the MMS and Interior Department were concerned about the ability of the oil industry to maintain the technological capacity to ensure adequate domestic petroleum supplies in the future.

74. After several years of congressional and executive deliberation, President Bill Clinton in November 1995 signed the Deep Water Royalty Relief Act (DWRRA) into law.[135]  The DWRRA amended Section 8(a) of the OCSLA to authorize the Secretary of the Interior to offer royalty suspensions up to a certain production volume on "producing or non-producing" leases as well as new leases in 200 meter water depths or greater in the Western and Central Planning Areas of the Gulf of Mexico.  The Act gave the Secretary the sole power to "determine"

---

[134] Ibid., 17.

[135] Title III of P.L. 104-58, 109 Stat. 557.

whether new production from existing leases "would be economic in the absence of the relief from the requirement to pay royalties."[136] The application of royalty suspensions to existing leases was another indication that the lessee-lessor relationship was not merely an arms-length transaction.  The Secretary of the Interior had the power to adjust the value of hydrocarbons that existed under those leases to ensure that those resources could be produced under the terms of the lease.  Section 201.90 of the C.F.R. had vested the power to grant royalty and rental relief with the Secretary, "in order to increase the ultimate recovery of minerals and in the interest of conservation," but the DWRRA specified in statute how this could be applied in the deepwater Gulf of Mexico.[137]

75. Although the administration of the DWRRA later became embroiled in lawsuits, the policy nevertheless helped to stimulate a boom in deepwater leasing, attract billions of dollars in new offshore investment, and fuel the growth in deepwater oil and gas production in the Gulf of Mexico.[138]  Deepwater oil output soared from negligible amounts in 1995 to nearly a million barrels/day in 2004,

---

[136] Ibid.

[137] 19 *Fed. Reg.* 90 (May 8, 1954), C.F.R §250.90, 2665.

[138] Andrew B. Derman and Daniel Johnston, "Royalty Relief Extension Vital for Continued Deepwater Development," *Oil & Gas Journal* (May 8, 2000).

fast replacing sharp declines in shallow water.[139]  In the early 2000s, oil and gas

from the Gulf of Mexico rose to supply close to one-third of U.S. domestic

production, surpassing both onshore Texas and Alaska in crude oil.  The growth of

deepwater oil and gas output in the Gulf of Mexico came at an auspicious moment,

as declining production elsewhere in the United States and the tightening of global

crude supplies fostered rising concerns about American energy security and

independence.  Those concerns intensified as international oil prices climbed

steadily to over $140/barrel by June 2008.

76.  During this period, the federal OCS program looked to offshore Alaska

– the only other place on the OCS not under moratoria – to shore up domestic

energy production.  In 2007 and 2008, the MMS auctioned leases in the Beaufort

Sea off Alaska, and then in 2008 collected a surprising $2.66 billion in bonuses for

leases in the Chukchi Sea.  After these sales, political support to expand offshore

leasing and drilling outside the Gulf of Mexico gathered momentum, making the

OCS a headline issue in the presidential election campaign of 2008.  In July,

President George W. Bush lifted the presidential moratorium on offshore drilling

along vast sections of the U.S. Outer Continental Shelf introduced by his father,

---

[139] Mike Celata, Regional Director, Gulf of Mexico Region, "Deepwater Gulf of Mexico," November 9, 2017, https://www.boem.gov/sites/default/files/boem-newsroom/BOEM-Deepwater-Operation-Presentation.pdf.

President George H.W. Bush, and extended by President Bill Clinton.  That same

month, the U.S. Geological Survey issued a "Circum-Arctic Resource Appraisal,"

in which it placed undiscovered Arctic oil resources at 90 billion barrels (13

percent of the world's undiscovered oil) and natural gas reserves at 1,669 trillion

cubic feet of gas (30 percent of the world's undiscovered gas), and 44 billion

barrels of natural gas liquids.  The amount estimated for the U.S. portion of the

Circum-Arctic was 22 billion barrels of oil and 93 trillion cubic feet of gas.[140]

Then, in September 2008, House Democrats allowed the long-standing

congressional moratorium, in the form of annual riders to Department of the

Interior appropriations, to lapse in the hopes of achieving a compromise with

offshore drilling proponents that would lead to broader energy policy reform.[141]

77. This strategy carried over into the next presidential administration.  On

his last day in office, President Bush released for public comment a Draft Proposed

Program for the 2010-2015 five-year plan, unusual in that it sped up the next five-

---

[140] U.S. Geological Survey, U.S. Department of the Interior, "Circum-Arctic Resource Appraisal: Estimates of Undiscovered Oil and Gas North of the Arctic Circle," USGS Fact Sheet 2008-3049 (2008), http://pubs.usgs.gov/fs/2008/3049/fs2008-3049.pdf.

[141] The exception to the removal of the moratorium was the Eastern Gulf of Mexico.  In 2006, Congress banned leasing within 125 miles or more of Florida's gulf shores until 2022, opening more than eight million acres of the Gulf acreage to new leasing in exchange for bigger shore-buffer protection.

year plan to overlap with the existing 2007-2012 plan.  The new plan included lease sales in four areas off Alaska, two areas off the Pacific coast, three areas in the Gulf of Mexico, and three areas in the Atlantic.  Shortly after Barack Obama took the oath as President, Secretary of the Interior Kenneth Salazar announced his offshore energy policy, which included an extension of the comment period on Bush's Draft Proposed Program.  Meanwhile, in December 2009, Salazar approved a plan for three exploration wells in the Chukchi Sea in the summer of 2010.

78.  On March 31, 2010, President Obama, as part of an "expanded energy development" program, scaled back the Bush administration program, including a revised 2007-2012 plan that cancelled five Alaska lease sales, postponed a lease sale offshore Virginia (moved from the 2007-2012 plan to the 2012-2017 plan), and removed leasing in the Pacific from consideration.  But Obama's revised five-year OCS plan for 2012-2017 also left open the possibility for leasing in the Eastern Gulf of Mexico, the Chukchi and Beaufort Seas, and the Mid- and South-Atlantic.  In his announcement, Obama emphasized a point that had preoccupied every presidential administration since the Second World War – that "our dependence on foreign oil threatens our economy."  Highlighting the need to shift away from fossil fuels entirely, Obama also cautioned that "we are going to need to harness traditional sources of fuel even as we ramp up production of new sources of renewable, homegrown energy."  This is why, he stated, "we're announcing the

expansion of offshore oil and gas exploration, but in ways that balance the need to

harness domestic energy resources and the need to protect America's natural

resources."[142]  As it had for at least six decades, the federal OCS still filled a vital

need for the U.S. government in securing oil and gas resources to make the nation

more energy independent.


## Conclusion


79. The U.S. federal OCS program is the longest-running policy regime for

offshore leasing, drilling, and production in the world.  For more than six decades,

it has been a major engine of wealth creation for the U.S. economy and source of

revenue for the federal government.  By creating abundant and reliable domestic

sources of oil and gas, it has bolstered U.S. energy security and independence and

continues to do so today.  Federal OCS officials achieved this by actively directing

the terms of access, locations, methods and pacing of development, and rates of

production from the publicly owned resources on the Outer Continental Shelf.

Starting in the 1980s, the federal government also closed off the majority of the

federal OCS to leasing and drilling, in a quest to strike a balance between

---

[142] "Text of Obama's Remarks on Offshore Drilling," *New York Times* (March 31, 2010), https://www.nytimes.com/2010/04/01/science/earth/01energy-text.html.

environmental protection and the "expeditious" development of oil and gas in those parts of the OCS that remained open.  The challenging purpose of the OCS program, ultimately, has been to direct private activities to ensure public welfare and manage public lands and resources on the OCS for current and future generations of Americans.

I declare under penalty of perjury that the forgoing is true and correct.  Executed on May 25, 2021.

_Richard Tyler Priest_

_____

Richard Tyler Priest